**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
                                     :

In re:                                :        **Chapter 11**
                                       :

**Amsterdam House Continuing Care Retirement** :        **Case No. 14-73348**
**Community, Inc.,**[1]                       :
                                       :

                  **Debtor.**         :
-------------------------------------------------------------------x

**DECLARATION OF JAMES DAVIS IN SUPPORT OF**
**THE CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, James Davis, hereby declare under penalty of perjury:

        1.        I am the President and Chief Executive Officer ("CEO") of Amsterdam Continuing Care Health System, Inc. ("ACCHS") and Amsterdam House Continuing Care Retirement Community, Inc. ("AHCCRC" or the "Debtor").  ACCHS is the sole member of the Debtor.  The Debtor, d/b/a The Amsterdam at Harborside ("Harborside"), operates Nassau County's first and only continuing care retirement community ("CCRC") licensed under Article 46 of the New York Public Health Law, which provides residents ("Residents") with independent living units, enriched housing and memory support services, comprehensive licensed skilled nursing care, and related health, social, and quality of life programs and services.

        2.        The Debtor's Board of Directors (the "Board") oversees the organization's management and I report directly to the Board.

        3.        I have forty-one (41) years of experience in long term care having served in several administrative capacities at Goldwater Memorial Hospital, as the Executive Director of the Ruth Taylor Geriatric and Rehabilitation Institute at the Westchester Medical Center, and

---

[1] The last four digits of the Debtor's federal tax identification number are 1764.  The Debtor's mailing address is 300 East Overlook, Port Washington, New York 11050.

for almost twenty-six (26) years as the President and Chief Executive Officer ("CEO") of ACCHS, the Debtor, and other affiliates of ACCHS, including the Amsterdam Nursing Home Corporation (1992) in Manhattan.  Over the years, I have contributed frequently to the body of work on elder care and my work has been published in The New York Medical Quarterly and Long-Term Care Forum, among other publications.  I have also spent considerable time and effort advancing the interests of not-for-profit providers statewide, most particularly through LeadingAge New York (previously the New York Association of Homes and Services for the Aging).  I have served on many LeadingAge New York committees and task forces as both a member and chair.  I served as Chair of LeadingAge New York Services for nine years, was a member of the LeadingAge House of Delegates for over five years, and in 2012 was awarded LeadingAge New York's Lawrence E. Larson Award of Honor for contributions to the field of aging services.  I currently serve as a member of the Board of Directors of the Continuing Care Leadership Coalition (a/k/a CCLC), a trade association representing long-term care facilities in the New York metropolitan area.  I have a bachelor's degree in economics and finance from the City College of New York, a master's degree in hospital administration from George Washington University, and am a licensed New York State Nursing Home Administrator.

4.     On the date hereof (the "Petition Date"), AHCCRC filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Eastern District of New York, Central Islip Division (the "Court").

5.     The Debtor remains in possession of its assets and manages its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

6.      In my capacity as President and CEO of AHCCRC, I am familiar with the Debtor's day-to-day operations, financial condition, business affairs, and books and records.  I submit this declaration (the "Declaration") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of this chapter 11 case, and in support of (a) the Debtor's petition for relief under chapter 11 the Bankruptcy Code, and (b) the following motions filed by the Debtor contemporaneously herewith or shortly thereafter (collectively, the "First Day Motions"):

a.  Debtor's Motion for Entry of an Order Establishing Certain Notice, Case Management, and Administrative Procedures and Omnibus Hearing Dates (the "Case Management Motion");

b.  Debtor's Motion for Entry of an Order (I) Extending Deadline for Debtor to File Its Schedules and Statements and (II) Authorizing Debtor to File Certain Documents Under Seal (the "Schedules and Statements Motion");

c.  Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Continued Use of Existing Cash Management System and Bank Accounts and (II) Granting Waiver of Certain U.S. Trustee Requirements (the "Cash Management Motion");

d.  Debtor's Motion for Entry of Interim and Final Orders (I) Prohibiting Utilities From Altering, Refusing, or Discontinuing Service; (II) Approving Debtor's Proposed Form of Adequate Assurance of Payment to Utilities; and (III) Establishing Procedures for Resolving Objections to Debtor's Proposed Form of Adequate Assurance (the "Utilities Motion");

e.  Debtor's Motion for Entry of Interim and Final Orders Authorizing, But Not Directing, the Debtor to (I) Pay Certain Employee Compensation and Benefits and (II) Maintain and Continue Such Benefits and Other Employee-Related Programs (the "Employee Wages Motion");

f.  Debtor's Motion for Entry of an Order Authorizing, But Not Directing, the Debtor to Pay Certain Prepetition Taxes and Granting Related Relief (the "Taxes Motion");

g.  Debtor's Motion for Entry of Interim and Final Orders Authorizing, But Not Directing, the Debtor to Continue Its Insurance Programs and Related Practices (the "Insurance Motion");

h.  Application of the Debtor for Entry of an Order Authorizing the Retention and Employment of Kurtzman Carson Consultants, LLC as Noticing and Claims

Agent for the Debtor, *Nunc Pro Tunc* to the Petition Date (the "KCC Noticing Agent Retention Application");

i.    Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Use Cash Collateral; (II) Granting Adequate Protection; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief (the "Cash Collateral Motion");

j.    Debtor's Motion for Entry of an Order Authorizing the Debtor to Assume the Plan Support Agreement (the "Plan Support Agreement Motion");

k.    Debtor's Motion for Entry of an Order Authorizing Debtor to Continue Escrowing and Refunding Entrance Fees in the Ordinary Course of Business (the "Entrance Fee Motion");

l.    Debtor's Motion for Entry of an Order (I) Approving the Disclosure Statement; (II) Establishing Plan Solicitation, Voting, and Tabulation Procedures; (III) Scheduling a Hearing and Establishing Notice and Objection Procedures for Confirmation of the Debtor's Chapter 11 Plan; and (IV) Granting Related Relief (the "Disclosure Statement Motion");

m.    Debtor's Motion for Entry of an Order (I) Determining That Appointment of Patient Care Ombudsman Is Not Necessary and (II) Allowing Debtor to Self-Report (the "Ombudsman Motion");

n.    Application of the Debtor for Entry of an Order Authorizing the Retention and Employment of Kurtzman Carson Consultants, LLC as Administrative Agent for the Debtor, *Nunc Pro Tunc* to the Petition Date (the "KCC Administrative Agent Retention Application"); and

o.    Debtor's Motion for Entry of an Order Establishing Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof (the "Claims Bar Date Motion").

7.    On the Petition Date, the Debtor has also filed its proposed "Plan of Reorganization Under Chapter 11 of the Bankruptcy Code" (the "Plan") and a proposed disclosure statement in connection therewith (the "Disclosure Statement").

8.    Capitalized terms used but not defined in this Declaration shall have the meanings set forth in the relevant First Day Motion. Except as otherwise indicated, the facts and information set forth in this Declaration are based upon my personal knowledge, my review of the documents, information provided to me by employees working under my supervision and direction, or my opinion based upon my experience, knowledge, and information concerning the

operations and financial condition of the Debtor and the elder care industry as a whole.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized by the Debtor to submit this Declaration in support of the Debtor's chapter 11 petition and First Day Motions.

9.    This Declaration is divided into two sections.  <u>Section I</u> provides a general overview of the Debtor, its operations, its capital structure, and the events preceding the bankruptcy filing.  <u>Section II</u> affirms and incorporates facts that support the First Day Motions.

## I.    <u>BACKGROUND</u>

10.    The purpose of this chapter 11 case is to implement a largely consensual balance sheet restructuring through a prenegotiated chapter 11 plan that has been negotiated at arm's length between the Debtor, the trustee to the Debtor's outstanding revenue bonds (including any successors, the "<u>2007 Bond Trustee</u>") issued by the Nassau County Industrial Development Agency (the "<u>Issuer</u>"), and the holders of approximately 75% in amount of the Debtor's outstanding revenue bonds (the "<u>Consenting Holders</u>"), with the support of the New York State regulators having authority to regulate AHCCRC's operations, based upon regular reports from AHCCRC's management and restructuring professionals.  Critically, the Debtor's restructuring and Plan is designed to have no meaningful impact on the Residents residing at Harborside or the Debtor's general unsecured creditors.  Indeed, except to the extent that a holder of an Allowed General Unsecured Claim (as such term is defined in the Plan) agrees to a less favorable treatment under the Plan, each holder of an Allowed General Unsecured Claim is anticipated to receive payment in full, in cash, of the unpaid portion of such Allowed General Unsecured Claim.  Further, all Residency Agreements (as defined below) will be assumed under the Plan and, as explained in further detail below, if all of the relief sought in the First Day

Motions is granted, the Debtor intends to fully protect the interests of its Residents and prospective Residents by honoring refunds of Entrance Fees (as defined below) in the ordinary course of business as provided for pursuant to the Residency Agreements, and by escrowing Entrance Fees provided by Harborside Residents entering Residency Agreements on or after June 1, 2014, pending entry of an order confirming the Plan, for the benefit of the Resident paying such Entrance Fees.

11.    Accordingly, the Debtor intends for this chapter 11 case to be consensual and that the Debtor will make a smooth transition into and out of chapter 11 as expeditiously as possible, while minimizing any business disruption and impact on the Debtor's daily operation of Harborside or on its Residents, general unsecured creditors, and vendors, among others.

12.    I respectfully request this Court's assistance in providing a swift exit from chapter 11 protection.

### A.    Overview of the Debtor's Business

#### 1) General Business Description

13.    The Debtor was originally incorporated in 2004 under the State of New York's Not-For-Profit Corporation Law, and thereafter received a determination letter from the Internal Revenue Service regarding its tax exempt status, setting forth the Debtor's exemption from federal income taxation under Section 501(a) of the Internal Revenue Code as an organization described in Section 501(c)(3) of the Internal Revenue Code.  Furthermore, the Debtor also operates consistent with its status as a public charity as described in Section 509(a)(2) of the Internal Revenue Code, and is not a private foundation.

14.    The Debtor owns and operates Harborside, which is situated on approximately 8.9 acres in Port Washington, New York.  Harborside is Nassau County's first

and only CCRC licensed under Article 46 of the New York Public Health Law. CCRCs provide senior citizens with a full range of living accommodations and healthcare services during their retirement years, including for instance: independent living, enriched housing and memory support services, and skilled nursing care, all on the same campus. CCRCs thus allow individuals to live and remain in the same community as their healthcare needs change. Harborside, as a life care community, also provides enriched housing and skilled nursing services to independent living Residents without an increase in the monthly service charges (the "Monthly Service Fees"). In addition, CCRCs, including Harborside, provide residents with various social and entertainment outlets for all stages of retirement life.

15.     Harborside currently offers approximately three hundred and twenty nine (329) units of varying sizes for independent, enriched, and skilled nursing care. Notably, Harborside has forty four (44) enriched housing units and fifty six (56) skilled nursing beds in its Isaac H. Tuttle Health Center (the "Health Center") to provide short-term rehabilitation and long term care to its Residents and to individuals living in the community who enter into an Admissions Agreement (as defined below) for the provision of services in the Health Center. The Health Center is certified for Medicare and Medicaid by the Department of Health and Human Services' Center for Medicare & Medicaid Services ("CMS"), and is also licensed by the New York State Department of Health (the "DOH"). Approximately twenty two (22) percent and forty one (41) percent of Residents in the skilled nursing center portion of the Health Center are covered by Medicaid and Medicare, respectively.

16.     The Debtor is affiliated with certain New York entities, including:

- ACCHS, the Debtor's sole member, established in 1997, is a New York not-for-profit corporation that supports the overall mission of programs and services the Debtor and its affiliated corporations provide to senior citizens by obtaining contributions, grants, or holding fund raising events.

- Amsterdam Nursing Home Corporation (1992), established in 1995, is a New York not-for-profit corporation that succeeded an organization established in 1872.  It owns and operates a 409-bed skilled nursing facility and a 40-registrant adult day health care center in upper Manhattan, and maintains clinical and academic relationships with New York-Presbyterian Hospital.

- Amsterdam Services Corp., established in 1996, is a New York not-for-profit corporation that provides managerial and administrative support services to not-for-profit and county-sponsored organizations.

- Amsterdam Services Corporation (2001), established in 2001, is a New York business corporation that provides administrative services.

- Amsterdam Consulting, LLC, established in 2008, is a New York limited liability company that provides managerial and administrative support services to not-for-profit and county-sponsored organizations.  As noted in paragraph 18 below, Amsterdam Consulting, LLC, provides such services for the Debtor.

2) Management of Harborside

17.    The Debtor manages Harborside with the assistance of Greystone Management Services Company, LLC ("GMSC") pursuant to a Management Advisory Services Agreement, dated March 31, 2004 (the "Advisory Agreement"), entered by and between the Debtor and GMSC.  GMSC provides the Debtor with advisory services for Harborside (other than with respect to the Health Center) including, for instance, certain pre-opening services, consultation services, accounting and financial management services, marketing services after achieving ninety percent (90%) occupancy, and general oversight.  The Debtor pays GMSC monthly fees pursuant to the terms of the Advisory Agreement.  After the first twenty four (24) months of occupancy, if Harborside's average monthly occupancy rate dips below ninety percent (90%), the Debtor is entitled to a monthly credit of $5,000.  GMSC's fees are approximately $300,000 annually after giving effect to the $5,000 credit, which is consistent with the fees provided to advisors rendering administrative services to similar communities in the CCRC

industry.  Indeed, GMSC has provided similar services to over fifty (50) communities similar to Harborside nationwide.

18.    One of the Debtor's affiliates, Amsterdam Consulting, LLC ("Amsterdam Consulting"), provides the Debtor with certain administrative and financial services. Specifically, pursuant to an Administrative Services Agreement (the "Administrative Services Agreement"), dated March 31, 2004, by and between the Debtor and Amsterdam Consulting.[2] Amsterdam Consulting provides advisory and consulting services with respect to the administration of the Health Center, and financial services as requested by the Debtor to administer its accounting and finance department.  The Debtor pays Amsterdam Consulting an annual fee in monthly installments under the Administrative Services Agreement, which fee is increased annually in an amount equal to the "Labor Component" of the DOH's Long Term Care Medicaid Trend Factor.[3]  As of the Petition Date, the Debtor pays Amsterdam Consulting an average of $395,000 annually for its services.

19.    The Debtor also receives assistance with Harborside's marketing and development.  Pursuant to that certain Marketing and Development Advisory Services Agreement (the "Marketing and Development Advisory Services Agreement"), dated March 31, 2004, by and between the Debtor and Greystone Development Company II, LP ("GDC"), GDC provides, among other things, unit marketing and sales for the initial Resident fill-up of Harborside until 90% occupancy, to the Debtor.  Under the Marketing and Development

---

[2] Amsterdam Services Corp., an affiliate of the Debtor, was originally party to the Administrative Services Agreement.  Amsterdam Consulting assumed all of the obligations under the Administrative Services Agreement pursuant to the Assignment and Assumption Agreement, dated July 14, 2008, between Amsterdam Consulting and Amsterdam Services Corp.

[3] The Long Term Care Medicaid Trend Factor uses multivariable trending factors to adjust Medicaid payment rates based on New York's inflation rate.  One of the many factors is the "labor component," which measures the change in labor costs.

Advisory Services Agreement, upon the achievement of certain project milestones, the Debtor pays GDC a services fee including, but not limited to, a services fee upon Harborside achieving 90% occupancy of its independent living units, and reimbursement for costs and expenses.

3) Residency and Admission Agreements

20.    Before occupying Harborside, each Resident is required to execute with the Debtor a residency agreement (each a "Residency Agreement").  The Residency Agreement provides the terms and conditions that each independent living unit Resident must abide by while residing at Harborside, and also outlines the Resident's obligations regarding the payment of entrance fees (the "Entrance Fees"), the Resident's rights to a refund of such Entrance Fees, and other monthly charges that may be due to the Debtor during the duration of the Resident's stay at Harborside (referred to herein as the Monthly Service Fees).  For a limited period of time, the New York Public Health Law permits the Debtor to admit certain individuals not residing in an independent living unit to the Health Center by entering into an admission agreement (each an "Admission Agreement") with the Debtor.[4]  See N.Y. Pub. Health Law § 4605; 10 N.Y.C.R.R. § 900.8.  The Admission Agreement is a month-to-month contract that provides the terms and conditions such an individual must abide by while admitted to the Health Center, and outlines such an individual's obligation to pay fees or charges for healthcare services[5] rendered by the Debtor.[6]

---

[4] Under the terms of the Residency Agreement, independent living unit Residents are also eligible to receive treatment in the Health Center.  Under this arrangement, such Residents continue paying Monthly Service Fees while receiving treatment in the Health Center.

[5] For the avoidance of doubt, individuals entering the Health Center under an Admission Agreement do not pay Entrance Fees.  Furthermore, the Admissions Agreement does not contemplate continuum of care.

[6] As of the Petition Date, the Debtor believes that approximately seventy six (76) Residents are contracted under Admission Agreements.

21.     The Debtor currently offers prospective independent living Residents the choice of three residency plans, each evidenced by a different Residency Agreement.  The residency plans primarily differ with regard to the required Entrance Fee, the Monthly Service Fees, and the amount that potentially can be refunded thereunder.  Generally, the purpose of the Entrance Fee is to pay for certain project costs, retire debt, cover operating expenses, and generate investment income for the benefit of Harborside and its Residents.  Prospective Residents typically pay ten percent (10%) of the Entrance Fee upon execution of a Residency Agreement, and the remaining balance prior to occupancy.  The Entrance Fees range from $424,580 to $1,742,826, depending upon the Residency Agreement and unit selected.  Under the Residency Agreements, prospective Residents are entitled to a full refund of any monies paid to the Debtor if they seek a refund prior to occupying a living unit at Harborside.  After occupancy, a Resident is entitled to a refund of a portion, or in some instances – all,[7] of the Entrance Fees on the earlier of (a) thirty (30) days after a new Resident executes a Residency Agreement and occupies the vacated independent living unit at Harborside, or (b) one (1) year after termination of the Residency Agreement.  The terms of any refund rights are outlined in the Residency Agreements.  Under the Plan, the Debtor seeks to assume all Residency Agreements and to continue fulfilling all of its obligations thereunder.

22.     Moreover, in addition to the Entrance Fee, the Debtor also charges Residents a Monthly Service Fee.  For Residents under a Residency Agreement, the Monthly Service Fees range from $2,013 to $6,270 per month, depending upon the Residency Agreement and unit selected.  The Debtor reviews Monthly Service Fees periodically and adjusts them as

---

[7] Under the Residency Agreement, a Resident is entitled to a full refund of the Entrance Fees, less any actual cost of services or charges incurred to customize the residence, if the Residency Agreement is terminated within ninety (90) days of initial occupancy.

-11-

necessary to meet Harborside's financial requirements.  Changes in the Monthly Service Fees must be approved by the New York State Department of Financial Services (the "DFS").

        23.     The terms of each form of Residency Agreement that the Debtor currently offers are summarized as follows:

- 80% Refundable Plan:  This plan offers Residents an 80% refundable contract (without interest).  The Entrance Fees under this plan amortize[8] at 1% per month over a period of twenty months, until the allowable refund amount is reached.

- 50% Refundable Plan:  This plan offers Residents a 50% refundable contract (without interest).  The Entrance Fees under this plan amortize at 2% per month over a period of twenty-five months, until the allowable refund amount is reached.  The Monthly Service Fees under this plan are 20% lower than the Monthly Service Fees for the 80% Refundable Plan.

- 0% Refundable Plan:  This plan offers Residents a traditionally amortizing 0% refundable contract.  The Entrance Fees under this plan amortize at 2% per month over a period of fifty months, until no refund is due.  The Entrance Fees under this plan are 30% lower than the Entrance Fees for the 80% Refundable Plan.

The Debtor has historically offered other Residency Agreements, different from the above, with different amortization rates and refund amounts (the "Prior Residency Agreements"), but any such agreements are no longer offered to new Residents.  As of the Petition Date, approximately one hundred and eighty seven (187) Residents have Prior Residency Agreements.[9]

---

[8] Under the Residency Agreements, and consistent with Article 46 of New York's Public Health Law, a certain percentage of the Entrance Fee, typically between 1%–2%, amortizes and becomes non-refundable each month on account of the Resident's occupancy at Harborside, for the number of months specified under the Residency Agreement.

[9] One (1) Resident has a 100% refundable contract that does not amortize.  One hundred and sixty five (165) Residents have 85% refundable contracts that amortize at 0.18% per month over a period of eighty four (84) months.  Nine (9) Residents have 80% refundable contracts that amortize at 2.0% per month over a period of ten (10) months.  Five (5) Residents have 50% refundable contracts that amortize at 0.60% per month over eighty four (84) months.  Finally, seven (7) Residents have non-refundable contracts that amortize at 1.20% per month over a period of eighty four (84) months.

24.     In certain circumstances, and in the ordinary course of business, the Debtor provides prospective Residents the option of deferring payment of up to eighty percent (80%) of their Entrance Fees for up to twelve (12) months to allow that Resident to obtain the funds necessary to pay the Entrance Fees.  This optional deferral is offered in circumstances when Residents are unable to sell their existing home or have not yet sold, and require funds from the sale of such home to pay the Entrance Fees to the Debtor.  Residents under the deferral program execute a promissory note requiring them to pay the Entrance Fees fourteen (14) days after the closing of the sale of their home, or within one (1) year after occupying Harborside, whichever is earlier.  The Debtor intends to continue offering the deferral program on a case-by-case basis, and in the ordinary course of business, during the pendency of this chapter 11 case.  All of the incentive programs offered to Residents, such as the deferral program discussed above, have been approved by the DOH and the DFS.

25.     Prior to the Petition Date, and in anticipation of this chapter 11 case, the Debtor executed an escrow agreement (the "New Escrow Agreement") with its prepetition escrow agent, Amalgamated Bank, to supplement its existing ordinary course escrow practices and provide Residents with the enhanced protections described in the Entrance Fee Motion.  On July 14, 2014, the Debtor gave DOH written notice of its intent to offer an addendum to the Residency Agreements (the "Residency Addendum"), which gave Residents who executed a Residency Agreement on or after June 1, 2014 (the "New Residency Agreements") and paid the related Entrance Fees (the "New Entrance Fees") the ability to receive a full refund of such New Entrance Fees after receiving notice that a Trigger Date (as defined below) has occurred.  Upon such notice, the Resident would have ten (10) days (the "Rescission Period") to either terminate the New Residency Agreement and receive a full refund, less actual charges incurred, or

continue staying at Harborside.  Thereafter, and to the extent permitted by state law, all New Entrance Fees of Residents who choose not to rescind the New Residency Agreement after the Rescission Period has elapsed will be deposited with the 2014 Bond Trustee (as defined in the Plan) in the Entrance Fee Fund (as defined in the Plan).

4) <u>Regulatory Agencies</u>

26.     CCRCs are regulated by various state agencies.  Each state has a different regulatory regime regarding disclosure of financial statements, solvency of the facility, maintenance of reserves, and the refunds of Entrance Fees or deposits.  New York is renown for being one of the most heavily regulated states with respect to CCRCs.  As a CCRC operating in the State of New York, the Debtor is regulated by the DOH, the DFS, and the New York State Attorney General.  Furthermore, CMS has authority over providers participating in the federal Medicare program, and therefore the Debtor is subject to regulation by CMS.

**B.     Capital Structure**

1) <u>Bond Debt</u>

27.     UMB Bank, n.a., as the 2007 Bond Trustee, is successor indenture trustee under the Indenture of Trust, dated as of December 1, 2007 (as amended, the "<u>2007 Indenture</u>"), between the Issuer and The Bank of New York, as indenture trustee, pursuant to which the Issuer issued the following bonds (collectively, the "<u>Bonds</u>") to facilitate and finance the construction of Harborside:

- Continuing Care Retirement Community Fixed Rate Revenue Bonds Series 2007A (the "<u>Series 2007A Bonds</u>"), in an aggregate principal amount of $164,895,000.

- Continuing Care Retirement Community Adjustable Rate Revenue Bonds Series 2007B (the "<u>Series 2007B Bonds</u>"), in an aggregate principal amount of $8,500,000.

- Continuing Care Retirement Community Excess Cash Flow Revenue Bonds Series 2007C (the "Series 2007C Bonds"), in an aggregate principal amount of $95,100,000.  The Series 2007C Bonds were backed by a letter of credit discussed in further detail below.

- Continuing Care Retirement Community Taxable Variable Rate Demand Revenue Bonds Series 2007D (the "Series 2007D Bonds") in an aggregate principal amount of $24,900,000.  The Series 2007D Bonds were backed by a letter of credit discussed in further detail below.

28.    As of the Petition Date, approximately $164,385,000 of the Series 2007A Bonds, $8,500,000 of the Series 2007B Bonds, $47,685,000 of the Series 2007C Bonds, and none of the Series 2007D Bonds remain outstanding.

29.    Contemporaneously with the execution of the 2007 Indenture, the following agreements were executed to evidence the Issuer's sale of Harborside to the Debtor and the Debtor's obligation to pay the principal and interest on the Bonds:

- A certain Installment Sale Agreement between the Issuer and the Debtor (as amended, the "2007 Installment Sale Agreement");

- A certain Letter of Credit and Reimbursement Agreement (as amended, the "Reimbursement Agreement") between the Debtor and Bank of America, N.A. (as successor by merger to LaSalle Bank National Association), as administrative agent, the "Administrative Agent"); and

- A certain (a) Acquisition Loan Mortgage, Assignment of Leases and Rents and Security Agreement, (b) Building Loan Mortgage, Assignment of Leases and Rents and Security Agreement, and (c) Project Loan Mortgage, Assignment of Leases and Rents and Security Agreement (collectively, the "Mortgage") between the Issuer, the Debtor, the Trustee, and the Administrative Agent.

30.    Under the 2007 Indenture, the Issuer assigned all of its rights, titles, and interests in and to remedies under the 2007 Installment Sale Agreement to the 2007 Bond Trustee, except for certain rights, including the rights to reimbursement of expenses and indemnification.  Further, the Issuer granted the 2007 Bond Trustee, for the benefit of bondholders, certain collateral, which included, among other things, various funds created and

held under the provisions of the 2007 Indenture, such as the operating reserve fund, the entrance fee fund (the "Entrance Fee Fund"), and the debt service reserve fund.

31.     Pursuant to the 2007 Installment Sale Agreement, the Issuer purchased the Harborside site from the Debtor, financed the improvements and construction to be done to the site, and sold the completed Harborside community to the Debtor.  The Debtor then assumed the Issuer's payment obligations under the Bonds.  To evidence the Debtor's obligation under the 2007 Installment Sale Agreement, the Debtor executed and delivered three promissory notes with the principal amounts of $89,112,118, $186,877,707, and $22,151,472 to the 2007 Bond Trustee, as assignee of the Issuer.

32.     Pursuant to the Reimbursement Agreement, the Administrative Agent issued two direct-pay irrevocable letters of credit (each a "Letter of Credit" and together, the "Letters of Credit").  The Letters of Credit were pledged to the 2007 Bond Trustee for the benefit of holders of Series 2007C and Series 2007D Bonds, respectively, but not to the benefit of holders of Series 2007A or Series 2007B Bonds.

33.     Pursuant to the Mortgage, (a) the Debtor and the Issuer granted the 2007 Bond Trustee and the Administrative Agent a second mortgage lien on Harborside's real property and buildings, subject only to a first lien securing the Debtor's obligation to make payments in lieu of taxes ("PILOT"); (b) the Debtor granted the 2007 Bond Trustee and the Administrative Agent a security interest in the Harborside's personal property, equipment, and fixtures; (c) the Debtor granted the 2007 Bond Trustee and the Administrative Agent a security interest in the Debtor's gross revenues; and (d) the Debtor granted its rights under Harborside's Residency Agreements to the 2007 Bond Trustee and the Administrative Agent.

2)  Unsecured Debt

34.    In addition to the bond debt, the Debtor's primary creditor group consists of general unsecured creditors, who are owed approximately $5.2 million as of the Petition Date. This group includes trade creditors and Residents who have requested refund of their Entrance Fees.  As of the Petition Date, the Debtor estimates that it owes approximately $3.7 million to Residents on account of Entrance Fee refund requests,[10] and approximately $1.5 million to trade creditors, which is largely due to the timing of the filing of this chapter 11 case.  The Debtor generally remains current on trade debt in the ordinary course of business.

### 3)  Subvention Certificate

35.    On March 31, 2004, the Debtor issued to ACCHS, the Debtor's sponsor, the Subvention Certificate of Amsterdam House Continuing Care Retirement Community, Inc. in consideration of $3,000,000 paid by ACCHS to the Debtor in furtherance of its development of Harborside (the "Subvention Certificate").  Pursuant to New York Not-for-Profit Corporation Law, the Subvention Certificate is subordinate to the rights and claims of the Debtor's creditors.

### C.    Events Leading to Bankruptcy

36.    Harborside was scheduled to open in March 2010, but construction delays caused a six-month delay in the opening.  As a result, the Debtor was forced to fund millions of dollars of interest expense from operations that originally was to be funded with proceeds of the Bonds, which in turn decreased the level of the Debtor's cash reserves.  Since opening in August 2010, Harborside's financial performance has been negatively impacted by the recession and the economic downturn experienced by the country as a whole.  Specifically, following the 2008 real estate crisis that plagued the nation, large numbers of homeowners were unable to sell their

---

[10] The $3.7 million reflects amounts that are pending and payable on account of requested refunds as of the Petition Date.  The Debtor also has contingent liabilities to Residents in the amount of approximately $130 million, on account of Resident's refund rights that have not yet been exercised.

homes without a substantial loss in value. Because individuals interested in residing in a CCRC typically sell their existing homes and use the positive equity value received from the sale to fund the required entrance fees, the extended decline in the real estate market, combined with a decline in the financial markets, left many individuals without the financial resources to pay the entrance fees for CCRCs, including Harborside. As a result, the fill-up of Harborside has taken longer than originally projected, the redemption of the Bonds has been delayed, the Debtor required additional cash for its operations, and the Debtor's financial performance has not met the original projections. In response to the delayed fill-up, the Debtor implemented Entrance Fee installment plans, and reduced the unit pricings to correspond with decreased home values. However, because Resident occupancy is foundational to the Debtor's business, the Debtor's inability to achieve stabilized occupancy rates in the originally forecasted timeframe eventually resulted in certain defaults under the 2007 Indenture and Reimbursement Agreement.

37.    Due to the Debtor's fiscal instability and defaults under the 2007 Indenture, 2007 Installment Sale Agreement, and the Reimbursement Agreement, on July 27, 2012, May 14, 2013, and December 13, 2013, the Administrative Agent executed certain amendments waiving the Debtor's failure to comply with certain Reimbursement Agreement covenants.

38.    Prior to filing this case, the Debtor began negotiations with the 2007 Bond Trustee, the Consenting Holders, and the Administrative Agent, on behalf of the Letter of Credit providers, to explore a consensual resolution to its financial situation. As a result of the ongoing negotiations, on December 13, 2013, the Debtor entered into a certain forbearance agreement (as amended the "Forbearance Agreement"), that certain Third Amendment to the Reimbursement Agreement, and that certain Third Supplemental Indenture of Trust with the 2007 Bond Trustee,

the Consenting Holders, and the Administrative Agent.   Pursuant to these agreements, the Debtor's lenders have forborne from exercising their respective rights and remedies against the Debtor relating to the existing events of default through March 31, 2014, which provided the Debtor and its lenders with time to negotiate a longer-term solution to the Debtor's financial issues.  In addition, the agreements allowed the Debtor to build its liquidity to a level required by New York State law, while servicing its debt obligations from other pledged bond funds.  Throughout the process, the Debtor kept the DOH and DFS apprised of the Debtor's restructuring efforts, negotiations, and agreements with its lenders.

39.    On March 19, 2014, all of the outstanding Series 2007C Bonds were purchased by a group of investors.   To complete the purchase, the Debtor consented to a termination of the Letter of Credit supporting the Series 2007C Bonds through a notice of technical default under the Reimbursement Agreement.  Despite the technical default, the Debtor continued to be in full compliance with its obligations under the Forbearance Agreement (including the later amendments) and the bond documents as modified by the Forbearance Agreement.  Concurrently with this transaction, the 2007 Bond Trustee and the Debtor extended the forbearance period to facilitate continued debt restructuring discussions by executing an Amended and Restated Forbearance Agreement until March 31, 2014, which has been amended and extended from time to time through July 14, 2014.[11]

---

[11] On March 31, 2014, the Debtor and the 2007 Bond Trustee mutually agreed to further extend the forbearance period until April 30, 2014, by entering into a First Amendment to the Amended and Restated Forbearance Agreement with the 2007 Bond Trustee.  On April 30, 2014, the Debtor and the 2007 Bond Trustee mutually extended the forbearance period until May 31, 2014 by entering into a Second Amendment to the Amended and Restated Forbearance Agreement.  Thereafter, the forbearance period was extended until July 25, 2014 by a Third Amendment to the Amended and Restated Forbearance Agreement.

40.    Thereafter, the Debtor, the Consenting Holders, and the 2007 Bond Trustee negotiated a restructuring of the Debtor's bond debt obligations (the "Restructuring Transaction"), which is embodied in the Plan.  Under the Restructuring Transaction, the Debtor will exchange the Bonds for new bonds to be issued by the Issuer.  Pursuant to the that certain plan support agreement (the "Plan Support Agreement"), the Consenting Holders agreed to support the Debtor's Plan.

41.    Accordingly, as a result of the significant time and effort allocated to negotiating a resolution in advance of commencing this chapter 11 case, the Debtor has filed the Plan, which embodies a consensual restructuring that maintains all Residents' rights, and provides for the payment of all allowed trade debt, to ensure the Debtor is positioned to continue serving the needs of Residents into the future.

## II.    SUMMARY OF FIRST DAY MOTIONS

42.    The Debtor has filed the First Day Motions concurrently with the filing of its chapter 11 petition and this Declaration.  The Debtor requests that each of the First Day Motions be granted to ensure the success of this chapter 11 case.

43.    For more detailed information regarding each First Day Motion, the Debtor respectfully refers the Court to the respective First Day Motion.  In the event that this Declaration and any provision of any First Day Motion are inconsistent, the terms of the First Day Motion shall control.

### A.    Case Management Motion

44.    By the Case Management Motion, the Debtor seeks entry of an order establishing certain notice, case management, and administrative procedures, all subject to further order of the Court, including: (a) establishing notice procedures; (b) authorizing

procedures for the service of pleadings, motions, or filings on the Residents; and (c) directing that matters be heard at monthly omnibus hearings (the "Omnibus Hearings") to be scheduled in advance and approving certain filing procedures related thereto, and establishing objection procedures.

45.     Additionally and as discussed above, because Harborside operates a nursing home that qualifies as a licensed healthcare provider, the Debtor is subject to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and other privacy requirements, which prevents disclosure of individually identifiable health care information (the "Protected Resident Information").  Accordingly, the Case Management Motion proposes certain procedures with respect to service of pleadings and other filings during the course of the chapter 11 case, to prevent disclosure of the Protected Resident Information.  I believe that the proposed procedures would adequately protect the rights of Residents while preserving the spirit of notice and disclosure under the Bankruptcy Code.

46.     I believe the relief requested in the Case Management Motion would minimize the costs and burdens associated with running a chapter 11 process in the absence of procedures set forth in the Case Management Motion.  For instance, the possibility of numerous, fragmented hearings, as well as the costs associated with mass copying and mailing or otherwise serving all filings to parties without such procedures, would impose an administrative and economic burden on the Debtor's estate, this Court, and the parties in interest, and require the Debtor to otherwise re-allocate its limited resources to comply with administrative requirements. Therefore, I respectfully ask this Court to grant the relief sought in the Case Management Motion.

### B.    Schedules and Statements Motion

47.      By the Schedules and Statements Motion, the Debtor seeks entry of an order (a) extending the time by which Debtor must file its schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements") until forty five (45) days after the Petition Date, and (b) authorizing the Debtor to file certain documents under seal.

48.      Because of the complexity of this chapter 11 case, the prepetition negotiations, the preparation of the Plan, and the short expected timeframe of this case, the Debtor's management requires additional time to prepare its Schedules and Statements. Collecting the Debtor's information from voluminous records accumulated over the course of years will require substantial time and effort.

49.      Furthermore, I understand that the Schedules and Statements filed by the Debtor are public documents pursuant to section 107 of the Bankruptcy Code.   Because Harborside operates a nursing home that qualifies as a licensed healthcare provider, subject to HIPAA and other privacy requirements, publicly filing the Schedules and Statements may disclose Protected Resident Information, such as names and addresses of Residents, that would cause the Debtor to violate the law.[12]   Therefore, to preserve the privacy of the Debtor's Residents as required by law, the Debtor respectfully requests to file certain schedules that would otherwise identify and disclose Protected Resident Information under seal and to thereafter file an unredacted copy with this Court.  I believe that such a procedure would adequately protect the

---

[12] For example, under Sesction 18 of the New York Public Health Law, the Debtor is required to keep patient information confidential and disclose it in accordance with the statute.  See N.Y. Pub. Health Law § 18.

rights of Residents and respect the Debtor's obligations under HIPAA and applicable New York State laws, while preserving the spirit of notice and disclosure under the Bankruptcy Code.

50.     I believe that the Schedules and Statements Motion is in the best interests of the Debtor, its estate, and other parties in interest.  Therefore, I respectfully ask this Court to grant the relief sought in the Schedules and Statements Motion.

### C.    Cash Management Motion

51.     By the Cash Management Motion, the Debtor seeks entry of interim and final orders (a) authorizing the Debtor to continue operating its centralized cash management system (the "Cash Management System") and bank accounts (the "Bank Accounts") located at various banks (the "Banks") or modify the Cash Management System and/or Bank Accounts if and when directed by the Banks, (b) granting the Debtor a waiver of certain bank account and related requirements of the Office of the United States Trustee (the "U.S. Trustee"), and (c) authorizing the Debtor to continue its existing deposit practices under the Cash Management System (subject to any reasonable changes to the Cash Management System that the Debtor may implement).

52.     As part of the relief requested in the Cash Management Motion, and to ensure that its transition into and out of chapter 11 is as smooth as possible, the Debtor seeks entry of orders authorizing the Debtor to, among other things, (a) maintain and continue using the Bank Accounts in the same manner and with the same account numbers, styles, and document forms as are currently employed, (b) deposit funds in, and withdraw funds from, the Bank Accounts by all usual means, including checks, wire transfers, automatic clearing house transfers, drafts, electronic fund transfers, or other items presented, issued, or drawn on the Bank Accounts, (c) pay ordinary course bank fees in connection with the Bank Accounts, (d) perform

its obligations under the documents and agreements governing the Bank Accounts, and (e) treat the Bank Accounts for all purposes as accounts of the Debtor in its capacity as debtor in possession, and deeming the Bank Accounts to be "debtor in possession" accounts.

53.     Furthermore, I am advised by counsel that the Debtor's Bank Accounts are in compliance with the requirements of section 345(b) of the Bankruptcy Code.  To the extent that the Bank Accounts are not in compliance thereof, I believe that "cause" exists to waive the requirements of the section.  The Debtor is a sophisticated company with a cash management system that has the capacity to move funds as necessary to ensure the Debtor's fiscal safety.  I believe that strict compliance with section 345(b) of the Code will unduly burden the Debtor with administrative expenses and difficulties.

54.     The continued use of the Cash Management System and the Bank Accounts during the pendency of this chapter 11 case is essential to the Debtor's business operations.  The Debtor employs the Cash Management System and Bank Accounts to maximize efficiencies and the value of its business, and to collect, transfer, and disburse the funds generated by its operation.  Using the Cash Management System and Bank Accounts, the Debtor is able to collect and transfer cash efficiently to satisfy its financial obligations.  The Cash Management System and Bank Accounts facilitate the Debtor's cash forecasting and reporting and enable the Debtor to monitor the collection and disbursement of funds and maintain control over the administration of its accounts at the Banks.  As a practical matter, it would be extremely burdensome and expensive to establish and maintain a different cash management system and different Bank Accounts.  Accordingly, the Debtor requests to continue the Cash Management System and the Bank Accounts without disruption.

55.     Without the relief requested, I believe the Debtor would be unable to effectively and efficiently maintain its financial operations.  This would cause significant harm to the Debtor's business and the value of its estate.  Accordingly, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtor, its estate and creditors, and all parties in interest, and I respectfully ask this Court to grant the relief sought in the Cash Management Motion.

### D.     Utilities Motion

56.     By the Utilities Motion, the Debtor seeks entry of interim and final orders (a) prohibiting utilities from altering, refusing, or discontinuing service to the Debtor, (b) approving the Debtor's proposed form of adequate assurance of payment, and (c) establishing procedures for resolving objections to the Debtor's proposed form of adequate assurance of payment.

57.     In the ordinary course of business, the Debtor obtains electricity, natural gas, water, telephone services, internet, garbage collection, sewerage, and other similar services (collectively, the "Utility Services") from a number of utility providers (the "Utility Providers").

58.     A list of the names and addresses of the Utility Providers, and the recent amounts owed per month over the previous calendar year is attached to the Utilities Motion as **Schedule 1** (the "Utilities Service List").  On average, the Debtor pays approximately $131,000 each month on Utility Services.  The Debtor has historically made full and timely payments for the Utility Services to Utility Providers.

59.     During the pendency of this case, the Debtor intends to pay all Utility Providers, subject to the granting of the Cash Collateral Motion, in a timely manner consistent with the Debtor's ordinary course of business and customary payment terms.

60.     Uninterrupted Utility Services are essential to the Debtor's continued business operations and successful reorganization, and are especially important in light of the healthcare services the Debtor provides to its elderly Residents.  If the Utility Providers are permitted to suspend or discontinue service to the Debtor, the Debtor would be unable to furnish the healthcare services necessary to ensure the safety and well-being of its elderly Residents. Furthermore, discontinuation of the Utility Services would hamper the Debtor's ability to generate revenues, which would hinder the Debtor's ability to reorganize and also degrade the value of the Debtor's estate.  Therefore, I believe that it is critical that this Court grant the relief sought in the Utilities Motion.

61.     As adequate protection, the Debtor proposes depositing two (2) weeks' worth of Utility Service payments (an "Adequate Assurance Deposit") to each Utility Provider that requests such a deposit in writing.  I believe that the Adequate Assurance Deposit, in conjunction with the Debtor's ability to pay for future Utility Services and contingent on the granting of the Cash Collateral Motion, constitutes adequate protection under the Bankruptcy Code.

62.     Furthermore, the Debtor proposes certain procedures, discussed in detail in the Utilities Motion, that would allow a Utility Provider to request additional adequate protection if it believes that there are circumstances warranting greater protection.

63.     I believe that the Utilities Motion is in the best interest of the Debtor, its estate, its Residents, and all parties in interest.  Therefore, I respectfully ask this Court grant the relief sought in the Utilities Motion.

**E.     Employee Wages Motion**

64.    By the Employee Wages Motion, the Debtor seeks entry of an order (a) authorizing, but not requiring, the Debtor to pay prepetition claims for, among other things, ordinary and customary wages and salaries, federal and state withholding taxes, and payroll taxes, (collectively, the "Wage Obligations"), which are paid by the Debtor in the ordinary course of business; (b) authorizing, but not requiring, the Debtor to continue its employee benefits programs (the "Employee Benefits" and together with the Wage Obligations the "Employee Obligations"); and (c) requiring banks and financial institutions to process, honor, and pay any checks presented by the Debtor's employees, and directing the banks and financial institutions to honor all related fund transfer requests made by the Debtor.

65.    The Debtor provides the following wages, Employee Benefits, and related obligations:

   a.  Wages, salaries, and other compensation;

   b.  Employee Benefits, including, but not limited to:

      i.   Medical, dental, and vision insurance;

      ii.  COBRA benefits;

      iii. Life and long-term disability insurance;

      iv.  Short-term disability insurance;

      v.   A 403(b) voluntary retirement savings plan, and a 401(a) defined contribution retirement benefit plan;

      vi.  Flexible spending programs;

   c.  Workers' compensation insurance;

   d.  Paid time off, severance, jury duty, and bereavement;

   e.  Payroll taxes and other deductions; and

f.   Expense reimbursement.

66.    For the reasons described below and as further detailed in the Employee Wages Motion, I believe that the Employee Obligations are entitled to priority treatment in accordance with section 507 of the Bankruptcy Code.

67.    Currently, the Debtor directly employs approximately one hundred and fifty-nine (159) employees (the "Employees"), who perform a variety of functions ranging from providing nursing services, to providing maintenance, dining services, and housekeeping, to office administration.   The Debtor's Executive Director and marketing staff are currently employed by GMSC and GDC as direct reimbursable expenses.

68.    The Debtor cannot operate without the Employees.    Each of the Employees is critical to the uninterrupted operation of the Debtor's service oriented business. The Employees have familiarity with not only the Debtor's business operations, but also with each unique Resident's health and safety needs.   Failure to maintain the Employee Obligations will result in the loss of key Employees, which will negatively impact the quality and scope of services provided to current Residents and, in turn, could jeopardize their health and well-being. Furthermore, loss of Employees and their vital services could result in a loss of confidence from current and prospective Residents, leading to increased Resident turnover.   Minimizing Resident turnover by maintaining Employees and the services they provide is essential to preserving the Debtor's estate.   I also believe that the Debtor's ability to maintain Employees in the ordinary course of business is vital to the ongoing reorganization efforts.

69.    Furthermore, pursuant to state laws, the Debtor must maintain its workers' compensation obligations to ensure prompt and efficient payment and/or reimbursement of its employees.   If the Debtor fails to maintain such obligations, it will be prohibited by state law

from operating in the state.  As a result, I believe that payment of all amounts related to the Debtor's workers' compensation obligations is crucial to the continued operation of its business.

70.     Therefore, I respectfully ask this Court grant the relief sought in the Employee Wages Motion.

**F.     Taxes Motion**

71.     By the Taxes Motion, the Debtor seeks entry of an order authorizing, but not requiring, the Debtor to pay all PILOTs, ad valorem, income, sales, and all other similar obligations (collectively, the "Prepetition Taxes") levied by federal, state, and local authorities (the "Taxing Authorities") as such Prepetition Taxes come due in the ordinary course of business.  Furthermore, the Debtor requests that all banks or financial institutions be directed to receive, process, or pay all requests for payment related to the Prepetition Taxes, whether submitted prior to or after the Petition Date.  The Debtor also requests that all banks or financial institutions be authorized to rely upon the Debtor's representations or designation regarding whether a particular check or payment request is appropriate pursuant to the Taxes Motion.

72.     In the ordinary course of business, the Debtor is subject to certain Prepetition Taxes payable to the Issuer, the State of New York, the Town of North Hempstead, and the Internal Revenue Service.  The Prepetition Taxes have historically been approximately $409,866 per year.  As of the Petition Date, I believe that the Debtor is current on all Prepetition Taxes, and no amount is owed to the Taxing Authorities.  During the pendency of this chapter 11 case, I believe that approximately $138,000 in Prepetition Taxes will become due and payable.

73.     I believe that failure to pay the Prepetition Taxes as they become due will expose the Debtor and its officers or management to substantial civil and/or criminal liability.  A lawsuit or criminal prosecution, and any potential liability, would distract the Debtor and its

officers or managers from not only the Debtor's business operations, but also the ongoing administration of this chapter 11 case. I believe that any such lawsuit, and its potential liabilities, would be a detriment to the Debtor's estate, its Residents, and all parties in interest. Therefore, I respectfully ask this Court to grant the relief sought in the Taxes Motion.

### G.    Insurance Motion

74.    By the Insurance Motion, the Debtor seeks interim and final orders authorizing, but not requiring, the Debtor to (a) continue its prepetition existing insurance policies (the "Insurance Policies") maintained and administered by third-party insurance carriers (the "Insurance Carriers"); and (b) revise, extend, supplement or change its insurance coverage, by, among other things, entering into new insurance policies, renewing the current Insurance Policies, or purchasing new postpetition policies. Furthermore, the Debtor requests that all banks or financial institutions be directed to receive, process, or pay all requests for payment related to the Insurance Policies, whether submitted prior to or after the Petition Date. The Debtor also requests that all banks or financial institutions be authorized to rely upon the Debtor's representations or designation regarding whether a particular check or payment request is appropriate pursuant to the Insurance Motion.

75.    A list of the Insurance Policies, their respective providers, and the recent amounts owed per year over the previous calendar year is attached to the Insurance Motion as **Exhibit B**. On average, the Debtor pays approximately $211,000 each year in insurance premiums.[13] The Debtor has historically made full and timely payments for the insurance premiums.

---

[13] Excluding the Workers' Compensation Program premium payment, for which the Debtor has historically paid approximately $254,778, as set forth in **Exhibit B** of the Insurance Motion.

76.    It is critical that the Debtor be authorized to maintain the prepetition Insurance Policies on an ongoing basis.  Failure to maintain the Insurance Policies could result in Insurance Carriers canceling the Insurance Policies, which would leave the Debtor exposed to substantial liability.  I believe that being exposed to substantial liability is not in the best interest of the Debtor's estate, its Residents, or any party-in-interest.  In addition, I understand that operating guidelines established by the U.S. Trustee for debtors in possession in order to supervise the administration of chapter 11 cases require the Debtor to maintain insurance coverage throughout this chapter 11 case.  Therefore, I respectfully ask this Court to grant the relief sought in the Insurance Motion.

### H.    KCC Noticing Agent Retention Application

77.    Pursuant to the KCC Noticing Agent Retention Application, the Debtor seeks authorization to retain Kurtzman Carson Consultants, LLC ("KCC") as its noticing and claims agent.  Upon information and belief, KCC is an experienced noticing and claims agent and is frequently used by debtors in chapter 11 cases of comparable size and complexity.  I believe that KCC is qualified to provide services, expertise, consultation, and assistance to the Debtor and serve as the noticing and claims agent in this chapter 11 case.  Furthermore, I believe that using KCC will relieve this Court, its clerk, and the Debtor of administrative burdens and expenses.  I believe that employment of KCC will provide an efficient manner to manage claims and the notice process, and thereby allow the Debtor and its management to focus on the Debtor's restructuring efforts.  Therefore, I believe that using KCC will benefit the Debtor, its estate, its creditors, and all parties in interest, and this Court should grant the KCC Noticing Agent Retention Application.

## I.    Cash Collateral Motion

78.    By the Cash Collateral Motion, the Debtor requests the entry of interim and final orders (together, the "Proposed Cash Collateral Orders") (a) authorizing the Debtor to use cash collateral; (b) granting adequate protection; (c) scheduling a final hearing; and (d) granting related relief.

79.    A description of the Debtor's capital structure is provided above in paragraphs 26 through 34.

80.    I believe that the "cash" or "cash equivalents" securing the obligations under the Mortgage constitute "cash collateral" of the 2007 Bond Trustee within the meaning of section 363 of the Bankruptcy Code (the "Cash Collateral").  Subject to this Court's approval and an approved budget, the Cash Collateral will be used to fund operating expenses and professional fees, as well as insurance, certain Entrance Fee refunds, taxes, and the costs related to this chapter 11 case.

81.    Use of the Cash Collateral is critical to the Debtor's ability to fund its postpetition operations in a manner that will permit Harborside to continue providing, amongst its other services, the excellent nursing care, enriched housing services, and skilled nursing services that our Residents deserve and our regulators demand.  Without immediate access to the Cash Collateral, the Debtor will be unable to provide for the safety or care of its Residents, repay Entrance Fee refund obligations to Residents, or obtain goods and services needed to carry on its operations during the chapter 11 case.

82.    After an arm's length negotiation with the Debtor, the 2007 Bond Trustee has consented to the Debtor's use of the Cash Collateral, subject to the terms and conditions described in the Cash Collateral Motion and Proposed Cash Collateral Order attached thereto.

Specifically, as a condition to consenting to the Debtor's use of its Cash Collateral, the 2007 Bond Trustee has agreed to the terms embodied in the Proposed Cash Collateral Orders governing, among other things, the use of deposits held in the Entrance Fee Fund created by the 2007 Indenture.  I believe that the Proposed Cash Collateral Orders are fair, reasonable, and consistent with the Bankruptcy Code.  Granting the Cash Collateral Motion will allow the Debtor to continue the operations necessary to maintain Residents' health and well-being, while also efficiently restructuring the Debtor's debt in this chapter 11 case.

83.     To provide for the Debtor's use of Cash Collateral, the Debtor has agreed with the 2007 Bond Trustee that (a) Entrance Fees received from Residents entering Residency Agreements on or after June 1, 2014, will be held in escrow solely for the benefit of the corresponding Resident pending entry of an order confirming the Plan, and (b) other Entrance Fee refunds (the "Refunds") will be paid in accordance with the terms of the Residency Agreements, all as more fully set forth in the Entrance Fee Motion.  In turn, the 2007 Bond Trustee has agreed that the Debtor may requisition funds from the Entrance Fee Fund in an aggregate amount not to exceed $2,220,000 during the chapter 11 case to pay Refunds owed to Residents then due and owing, provided that the Debtor will only be permitted to requisition such funds after the Debtor itself has expended $2,350,000 on Refunds during the chapter 11 case from the Debtor's current operating accounts.  The Debtor and the 2007 Bond Trustee have further agreed that all New Entrance Fees received will be held in escrow, subject to the granting of the Entrance Fee Motion (as described below).  The Debtor's interest in the escrowed funds will be subject to a first priority lien in favor of the 2007 Bond Trustee for the benefit of the bondholders; provided, however, that during the chapter 11 case, the 2007 Bond Trustee's lien on the escrowed funds will be subject to the rights of any payor of an Entrance Fee under a

Residency Agreement.  Any Refunds that become due and payable during the chapter 11 case in excess of the amounts specified above may be paid from amounts in the Entrance Fee Fund at the sole discretion of the Consenting Holders.

84.     The Debtor will suffer immediate and irreparable injury if it is not granted access to the Cash Collateral.  Without Cash Collateral, the Debtor would be required to cease operations, which would jeopardize the health and safety of Residents, or seek alternate forms of funding, which would likely be more expensive due to interest and fees, and therefore not in the best interest of the Debtor's estate and all parties in interest.  Instead, the Debtor should have access to the Cash Collateral, as mutually agreed to by the Debtor and the 2007 Bond Trustee, subject to the Debtor's provision of the adequate protection set forth in the Proposed Cash Collateral Orders.

85.     Therefore, I respectfully ask this Court grant the relief sought in the Cash Collateral Motion.

**J.      Plan Support Agreement Motion**

86.     By the Plan Support Agreement Motion, the Debtor seeks entry of an order authorizing the Debtor to assume the Plan Support Agreement.  As set forth below, I believe that the Plan Support Agreement is in the best interest of the Debtor and its estate so as to ensure that it continues having the affirmative vote of the Consenting Holders on the Plan.  The Debtor also seeks this relief because, to the extent this Court has not entered an order approving the Plan Support Agreement Motion within 45 days of the Petition Date, the Consenting Holders can terminate the Plan Support Agreement and withdraw their votes on the Plan.

87.     The Debtor and the Consenting Holders entered into the Plan Support Agreement to effectuate the Debtor's Plan.  Pursuant to the Plan Support Agreement and as more

particularly set forth therein, the Debtor agreed that it would (a) proceed forward with the consummation of the Proposed Restructuring in good faith in accordance with the timeline set forth in the Plan Support Agreement, and (b) provide the Plan, the disclosure statement, an agreement regarding the use of Cash Collateral, and other principal documents associated with the chapter 11 proceeding to the 2007 Bond Trustee for its review and consent. Additionally, the Debtor has agreed not to solicit a plan of restructuring that differs from the restructuring contemplated under the Plan without the consent of the Consenting Holders.

88.    Moreover, pursuant to the Plan Support Agreement, as more particularly set forth therein, the Consenting Holders, which entities hold approximately 75% of the principal aggregate amount of the Debtor's outstanding  amount of the Bonds, have agreed to among other things: (a) take all steps necessary to support confirmation of the Plan, pursuant to the terms of the Plan Support Agreement; (b) take no action inconsistent with the terms of the Plan Support Agreement or the Plan; and (c) consent to the Debtor's use of the cash collateral of the 2007 Bond Trustee for the Bonds.  Furthermore, the Consenting Bondholders have agreed not to sell, transfer, assign, or otherwise dispose of, directly or indirectly, any of the Bonds, or any right, claim, or interest relating to or arising from the Bonds, held by its respective members, subject to the terms and conditions of the Plan Support Agreement.

89.    The Plan Support Agreement further provides that upon the occurrence of any of the following events, as more fully set forth in the Plan Support Agreement, it will be deemed terminated upon written notice from the non-breaching party to the breaching party: (a) failure by the parties to agree to the form and substance of any Plan Support Documents (as defined in the Plan Support Agreement), (b) any Bankruptcy Documents (as defined in the Plan Support Agreement) are withdrawn, materially modified or amended, (c) failure to file the

Bankruptcy Documents on the Petition Date, (d) failure to file the petition by the Outside Petition Date (as defined in the Plan Support Agreement), (e) any action by the Debtor that would prevent or affect the ability of the Debtor to consummate the Plan and the Restructuring Transaction, (f) entry of an order by the Court that would prevent or affect the ability of the parties to consummate the Plan and the Restructuring Transaction in this chapter 11 case, or would affect the rights and interests of any of the Consenting Holders or the 2007 Bond Trustee, as set forth in the Plan Support Agreement, (g) the Effective Date of the Plan has not occurred by the time set forth in the Plan Support Agreement, (h) an action by a court prevents consummation of the Plan, (i) a mutual written agreement to terminate the Plan Support Agreement by the Debtor and the Consenting Holders, and (j) failure by either party to comply with any of obligations set forth in the Plan Support Agreement.

90.     The Plan Support Agreement is integral to the Debtor's efforts to consummate the restructuring contemplated by the Plan.  The Plan Support Agreement ensures that, in the absence of any unforeseen Termination Events thereunder, the Debtor will have the votes needed to confirm the Plan.  Additionally, the relief requested herein will facilitate a smooth transition into and out of chapter 11 as expeditiously and consensually as possible, while minimizing any business disruption and impact on the Debtor's daily operation of Harborside or on its Residents and will otherwise minimize the costs and expenses associated with these proceedings.  Absent the benefit of the Plan Support Agreement, the Consenting Holders could withdraw support for the Plan and the related Plan process.  Such a course of action could jeopardize the Debtor's restructuring efforts and the continued operation of Harborside and otherwise cause significant delays, costs, and expenses relating to the resolution of the Debtor's obligations owed to the holders of the Bonds and other third parties

91.    Notably, the restructuring contemplated by the Plan Support Agreement is substantially a restructuring of the Debtor's balance sheet which, while leaving large parts of the Debtor's business relatively unchanged, will nonetheless significantly strengthen the Debtor's financial status and better position the Debtor for future profitability and therefore benefit the holders of the Bonds.  In addition, among other things, the Plan Support Agreement importantly provides that all Residency Agreements will be assumed under the Plan.

92.    Accordingly, the Debtor submits that the Plan Support Agreement Motion is in the best interest of the Debtor, its estate, its Residents, and all parties in interest.  Therefore, I respectfully ask this Court to grant the relief sought in the Plan Support Agreement Motion.

**K.    Entrance Fee Motion**

93.    By the Entrance Fee Motion, the Debtor seeks entry of an order authorizing the Debtor to continue authorizing the Debtor to continue (a) depositing all New Entrance Fees collected under New Residency Agreements into the New Escrow Account pending entry of an order confirming the Plan, and (b) refunding New Entrance Fees in accordance with the respective New Residency Agreements and refunding entrance fees collected from Residents entering into Residency Agreements prior to June 1, 2014 (the "Old Residency Agreements" and any entrance fee thereof the "Old Entrance Fees") in accordance with the Old Residency Agreements.  The Debtor proposes escrowing the New Entrance Fees until the following dates: (a) ten (10) days after a court of competent jurisdiction (i) enters an order confirming Plan or (ii) otherwise enters an order directing the release of the New Entrance Fees ((i) and (ii) collectively the "Trigger Dates"), or (b) a Resident requests a refund under his or her Residency Agreement.

94.     As further set forth in the Entrance Fee Motion, Residents shall be entitled to receive a full refund of any New Entrance Fees paid, less any fees or sums due and payable to the Debtor under the respective New Residency Agreement, the New Escrow Agreement, or applicable law.  With respect to Old Entrance Fees, the Debtor will continue paying such refunds in accordance with the respective Old Residency Agreements.

95.     I believe that a Resident's willingness to pay the Entrance Fee to the Debtor during the pendency of this chapter 11 case is dependent on the Resident's belief that the Entrance Fee is refundable as outlined in its Residency Agreement, without any risk arising as a result of the Debtor being in chapter 11.  Escrowing the New Entrance Fees and permitting all Entrance Fees to be refunded in the ordinary course of business gives both current and prospective Residents confidence that this chapter 11 case will not negatively impact the deposits, and encourages prospective Residents to enter into new Residency Agreements during the pendency of this case.  I believe that any doubt from Residents or prospective Residents regarding the Debtor's ability to honor its refund obligations with respect to Entrance Fees could seriously undermine the Debtor's ability to attract new Residents during the pendency of this prenegotiated chapter 11 case.  For example, I believe that prospective Residents would be reluctant to make the Entrance Fee deposits necessary to reside at Harborside if they were not certain that their New Entrance Fees would be protected while the Debtor is in chapter 11.  Furthermore, I believe that absent the relief sought in the Entrance Fee Motion, current Residents may elect to prematurely terminate their Residency Agreements and demand refunds under the mistaken impression that Entrance Fees are at risk.  Likewise, my own experience and discussions with existing Residents convinces me that their powerful promotion of Harborside

sales among their friend and family networks would be chilled if there were any question about the refund of Old Entrance Fees.

96.    I believe the Entrance Fee Motion should be granted because Entrance Fees are critical to the Debtor's operations.  The Entrance Fees, and the ability to generate New Entrance Fees, represent a significant amount of the Debtor's annual budget, and is critical to the Debtor's ability to reorganize.  Furthermore, I believe that because the Entrance Fees are significant amounts of money, the departing Residents would likely need the refunds of the Old Entrance Fees to secure alternative housing.

97.    I believe that the Entrance Fee Motion is reasonable, necessary, and in the best interest of the Debtor, its estate, its Residents, and all parties in interest.  Therefore, I respectfully ask this Court grant the relief sought in the Entrance Fee Motion.

## L.    Disclosure Statement Motion

98.    By the Disclosure Statement Motion, the Debtor seeks entry of an order (a) approving the Disclosure Statement as containing "adequate information"; (b) establishing and approving solicitation procedures (the "Solicitation Procedures"), including, without limitation, fixing a voting record date, setting a deadline for filing motions to estimate claims for voting purposes, and approving the form of ballots; (c) scheduling a hearing and establishing notice and objection procedures for confirmation of the Plan (the "Confirmation Hearing," and the notice thereof, the "Confirmation Hearing Notice"); and (d) granting related relief.  The Debtor proposes the following dates:

- Objections to the Disclosure Statement Deadline: August 20, 2014 at 4:00 p.m. (prevailing Eastern Time);

- Responses to the Objections to the Disclosure Statement Deadline: August 27, 2014 at 4:00 p.m. (prevailing Eastern Time);

- Disclosure Statement Hearing: September 3, 2014;

- Voting Record Date: September 3, 2014;

- Solicitation Packages Mailing Deadline: September 9, 2014, or as soon as reasonably practicable thereafter;

- Rule 3018 Motion Deadline: September 9, 2014 at 4:00 p.m. (prevailing Eastern Time);

- Voting Deadline: October 7, 2014 at 5:00 p.m. (prevailing Eastern Time);

- Objections to Confirmation of the Plan Deadline: October 7, 2014 at 5:00 p.m.; and

- Confirmation Hearing: October 21, 2014.

99.    The Debtor has filed a prenegotiated Plan in this chapter 11 proceeding. I believe that the relief requested in the Disclosure Statement Motion is integral to the efficient and fair confirmation of the Plan, is cost-effective, provides adequate notice and an opportunity to be heard, and is in the best interests of the Debtor's estate, its creditors, and other parties in interests. Therefore, I respectfully ask this Court to grant the relief sought in the Disclosure Statement Motion.

### M.    Ombudsman Motion

100.    By the Ombudsman Motion, the Debtor seeks entry of an order (a) finding that no patient care ombudsman be appointed in this case, and (b) allowing the Debtor to self-report. I believe that an ombudsman is unnecessary in this case because, among other reasons, (a) the Debtor has a history of providing excellent Resident healthcare services and, subject to the Cash Collateral Motion being granted, will have the resources necessary to continue providing a high level of patient care during this chapter 11 case; (b) the Debtor has existing and stringent internal safeguards that adequately protect Residents; and (c) the Debtor is already subject to regulatory oversight by numerous governmental authorities, such as CMS, the DFS, the DOH, and the New York State Attorney General. The Debtor has informed the

governmental regulatory authorities of this pending chapter 11 case and intends to continue notifying them of material updates of this case.  None of the governmental regulatory authorities have expressed concerns regarding the Debtor's ability to continue rendering healthcare services to Residents.  And in fact, the DOH and DFS have expressed approval of the material terms of the Plan.[14]

101.    I believe that the Debtor has an exemplary history of patient care.  Since opening in 2010, the Debtor has received only a single complaint in its Health Center relating to patient care.[15]  If and when a complaint is filed, the Debtor's staff investigate each complaint and implement procedures to any reoccurrence.  During the pendency of this chapter 11 case, and subject to the Cash Collateral Motion being granted, the Debtor will offer the same high level of Resident care that it offered prepetition.  As exemplified by the Debtor's exemplary record of Resident satisfaction and patient care, I can confirm that Harborside and its staff are fully committed to the Residents and their well-being.

102.    The Debtor has numerous existing safeguards to protect Residents.  For example, the Debtor has a community-wide internal quality management program which entails monitoring by a committee (a "Care Committee") chaired by the Resident Services Director, with the assistance of the Executive Director, and includes representatives from each of

---

[14] On July 17, 2014, the DOH issued a letter to the Debtor indicating that the CCRC Council (as defined in the Ombudsman Motion), which includes the DOH and DFS, reviewed and approved the material terms of the Plan.

[15] As further discussed in the Ombudsman Motion, the Debtor has not received any official complaints regarding care from Residents in the independent living unit, and only one patient care complaint in its Health Center, which was made following the Resident's discharge from Harborside.  The Debtor investigated the complaint and subsequently amended its policies to produce more stringent internal procedures.  Separately, and unrelated to patient care, it was discovered that a Harborside employee converted funds from a Resident's account for its personal benefit.  Upon becoming aware of the incident, the Debtor investigated and terminated the employee.

Harborside's departments.  The Care Committee meets on an as-needed basis to discuss Resident needs as they arise.  Prior to admission into Harborside, each Resident is required to complete a confidential health profile and questionnaire and/or undergo an assessment.  Residents in the enriched housing portion of the Health Center are evaluated by a physician to determine the appropriate level of care, and Harborside's staff develop a service plan based on the physician's evaluation and functional assessment.  The functional assessment and staff's development of the service plan are routinely done at least twice a year, or when the Resident's condition changes, to ensure that each Resident in the enriched housing portion of the Health Center receives adequate care.  Similarly, each Resident admitted into the skilled nursing portion of the Health Center is assigned a team (a "Care Team") of registered nurses, physical therapists, social workers, medical doctors, and others responsible for initially assessing the medical condition of the Resident and then providing ongoing monitoring.  The Care Team is responsible for evaluating the health and condition of each admitted Resident and determining an appropriate level of patient care.  Specifically, the Care Team conducts ongoing weekly advanced planning that evaluates the medical needs of each Resident and makes adjustments as necessary.  Any Resident who is dissatisfied with the care provided has access to a social worker on the Care Team to express any concerns or grievances.  If such concern is expressed, the social worker convenes a comprehensive care planning meeting with all Care Team members involved in the care, the Resident, and his or her family members.  Any expressed concerns or issues are documented and the Debtor, in response, takes appropriate steps to address and resolve them immediately.

103.    Furthermore, the Debtor is subject to regulatory oversight by numerous governmental authorities.  For example, the Debtor provides annual reports discussing the

financial state of Harborside to the DFS and the DOH.  The DOH also conducts required annual and unannounced onsite surveys of Harborside's Health Center.  Furthermore, the Debtor is certified under CMS' conditions for participation in the federal Medicare and Medicaid program, which consists of meeting certain standards regarding ethics, provision of care and treatment, medication management, environment of care, among other categories.

104.    As a result of the Debtor's high standards, the CMS has classified the Health Center as a "four star" provider having an above average overall rating, and the Health Center has also been named one of the "Best Nursing Homes" by the publication U.S. News and World Report.

105.    I believe that an ombudsman would not serve the best interests of the Debtor's Residents, the Debtor's estate, or any parties in interest in this case.  An ombudsman would provide services or supervision that would be duplicative of existing safeguards, and would therefore result in additional costs to the Debtor's estate with little additional value. Given the anticipated short duration of this chapter 11 case, I believe that an ombudsman would only spend estate resources and valuable time familiarizing itself with the Debtor's business before being able to render services already provided by governmental regulatory authorities and internal quality management procedures.  Therefore, I respectfully ask this Court to decline appointing an ombudsman at this time.

106.    Finally, the Debtor is willing to self-report the information relating to the state of Resident care to this Court, the U.S. Trustee, the DOH, and any Residents or family members thereof who specifically request a copy of such information.  I believe that self-reporting will allow this Court and all parties in interest to assess the state of patient care at

Harborside, and goes beyond what is required of a patient care ombudsman, without incurring the added expense of a patient care ombudsman.

107. Therefore, I respectfully ask this Court grant the relief sought in the Ombudsman Motion.

### N. KCC Administrative Agent Retention Application

108. Pursuant to the KCC Administrative Agent Retention Application, the Debtor seeks authorization to retain KCC as its administrative agent. I believe that KCC has extensive experience in as an administrative agent and is frequently used by debtors in chapter 11 cases of comparable size and complexity. As set forth in paragraph 77 above, I believe that using KCC will ease the administrative burdens that would otherwise fall upon the this Court, its clerk, and the Debtor. Therefore, I believe that using KCC will benefit the Debtor, its estate, its creditors, and all parties in interest, and this Court should grant the KCC Administrative Agent Retention Application.

### O. Claims Bar Date Motion

109. By the Claims Bar Date Motion, the Debtor seeks entry of an order (a) establishing (i) the date by which all entities, other than governmental units as defined in section 101(27) of the Bankruptcy Code, must file proofs of claim ("Proofs of Claim") (including any claims entitled to priority under section 503(b)(9) of the Bankruptcy Code) in this chapter 11 case; (ii) the date (the "Governmental Bar Date") by which all governmental units must file Proofs of Claim in the chapter 11 case; (iii) the date (the "Rejection Bar Date") by which all Proofs of Claim (including for administrative claims arising under section 503(b) of the Bankruptcy Code) relating to the Debtor's rejection of executory contracts or unexpired leases must be filed in the chapter 11 case; and (iv) the date (the "Amended Schedules Bar Date", and

collectively with the General Bar Date, the Governmental Bar Date, and the Rejection Bar Date, the "Bar Dates") by which all entities must file Proofs of Claim in the chapter 11 case as a result of any amendment of the Debtor's Schedules and Statements (as defined below); (b) authorizing procedures for the Residents to file Proofs of Claim; and (c) approving the form and manner of notice of the Bar Dates (the "Bar Date Notice").

110.    As further discussed in the Claims Bar Date Motion, the Debtor proposes the following Bar Dates:

- General Bar Date: September 30, 2014 at 5:00 p.m. (prevailing Eastern Time);

- Governmental Bar Date: January 20, 2015 at 5:00 p.m. (prevailing Eastern Time);

- Rejection Bar Date: The later of the General Bar Date or the date that is thirty (30) days after entry of an order rejecting the contract;

- Amended Schedules Bar Date: Thirty (30) days after the Debtor serves notice of an amended Schedules and Statements.

111.    Additionally and as discussed above, because Harborside operates a nursing home that qualifies as a licensed healthcare provider, the Debtor is subject to HIPAA and other privacy requirements, which protects the privacy of Protected Resident Information. Accordingly, the Claims Bar Date Motion proposes certain procedures with respect to Residents that file Proofs of Claim to prevent disclosure of the Protected Resident Information. I believe that the proposed procedures would adequately protect the rights of Residents while preserving the spirit of notice and disclosure under the Bankruptcy Code.

112.    The Debtor is filing this Claims Bar Date Motion on the Petition Date because the Debtor seeks to effectuate a balance sheet restructuring pursuant to the Plan that contemplates confirmation of the Plan within ninety (90) days of the Petition Date. The Debtor

has filed the Claims Bar Date Motion to maintain its proposed timeline for the confirmation of the Plan.

113.    To proceed with the restructuring process pursuant to the proposed timeline, and to make distributions to creditors under the Plan, the Debtor requires, among other things, complete and accurate information regarding the nature, validity, and amount of claims that will be asserted in the chapter 11 case.  Consequently, to avoid any delay in the restructuring process, I respectfully request that the Court establish the Bar Dates and related claims procedures proposed herein and approve the form and manner of notice thereof.

### **INFORMATION REQUIRED BY LOCAL RULE 1007-4**

114.    It is my understanding that the Local Bankruptcy Rules for the Eastern District of New York (the "Local Rules")  require the disclosure of certain information related to the Debtor.  The information required by Local Rule 1007-4 is set forth below and in attached exhibits.

> (i).    I do not believe that the Debtor is a small business debtor within the meaning of the section 101(51D) of the Bankruptcy Code.

> (ii).    The nature of the debtor's business and the circumstances leading to the debtor's filing under chapter 11 have been described above.

> (iii).    **Exhibit A** provides a list, to the extent available, with respect to the committees that have been appointed or formed prior to the Petition Date and any committee professionals thereof.

> (iv).    **Exhibit B** provides a list, to the extent available, with respect to the Debtor's twenty largest unsecured claims: (1) the creditor's name, address, and telephone number; (2) the person(s) familiar with the

Debtor's account; and (3) the amount of the claim and whether the claim is contingent, unliquidated, disputed, or partially secured.

(v).   **Exhibit C** provides a list, to the extent available, with respect to the Debtor's five (5) largest secured claims: (1) the creditor's name, address, and telephone number; and (2) the amount of the claim, estimated value of the collateral securing the claim, and whether the claim or lien is disputed.

(vi).   **Exhibit D** provides an unaudited balance sheet, dated March 31, 2014, showing the Debtor's assets and liabilities as of that date.

(vii).   The Debtor is a not-for-profit corporation. Therefore, there are no shares of stock in the Debtor that are publicly held. There are no debentures or securities that are publicly held.

(viii).   None of the Debtor's property is in the possession of any custodian, public officer, mortgagee, assignee, or secured creditor.

(ix).   **Exhibit E** lists the premises owned or leased by the Debtor in which the Debtor operates its business.

(x).   **Exhibit F** lists the location of the Debtor's significant assets, and the location of the Debtor's books and records. The Debtor has no significant assets held outside the territorial limits of the United States.

(xi).   **Exhibit G** lists the nature and status of each action pending or threatened against the Debtor or its property.

(xii). **<u>Exhibit H</u>** lists (1) the name of individuals who comprise the Debtor's senior management; (2) their tenure with the Debtor; and (3) a summary of their relevant responsibilities and experience.

(xiii). **<u>Exhibit I</u>** lists the estimated amount of weekly payroll to be paid to employees for the thirty (30) day period following the Petition Date.

(xiv). **<u>Exhibit J</u>** lists the amount proposed to be paid to officers and directors in the thirty (30) day period following the Petition Date.

(xv). **<u>Exhibit K</u>** provides a schedule of the estimated cash receipts, net gain or loss, and obligations and receivables expected to accrued that remain unpaid, other than professional fees, for the thirty (30) day period following the Petition Date.

## **CONCLUSION**

The Debtor respectfully requests that the orders granting relief requested in the First Day Motions be entered.  I reserve the right to supplement and/or amend this Declaration with testimony and/or exhibits.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: July 22, 2014

Amsterdam House Continuing
Care Retirement Community, Inc.

*Debtor and Debtor in Possession*

_____
James Davis
President & Chief Executive Officer

## **Exhibit A**

### Committees and Committee Professionals

Before the Petition Date, the following entities formed an *ad hoc* committee of bondholders consenting to the Debtor's proposed Plan.

| Consenting Holders Member | Advisors |
|---|---|
| Holders of approximately 75% of bonds issued by the Issuer under the 2007 Indenture. | **Legal Counsel**[1]<br>Daniel S. Bleck, Esq.<br>Mintz Levin Cohn Ferris Glovsky & Popeo, PC<br>One Financial Center<br>Boston, Massachusetts 02111<br>dsbleck@mintz.com |

---

[1] Mintz Levin Cohn Ferris Glovsky & Popeo, PC is counsel to the 2007 Bond Trustee, and does not represent individual Consenting Holders. The 2007 Bond Trustee works under the direction of bondholders, including the Consenting Holders.

**Exhibit B**

**Debtor's Twenty Largest Unsecured Claims**

| Creditor Number | Name of creditor and complete mailing address, including zip code | Name, telephone number, and fax number of employees, agent or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Amount of claim as of date | Indicate if claim is contingent, unliquidated, disputed, or subject to setoff |
|---|---|---|---|---|---|
| 1 | Resident # 00087 | [REDACTED] | Entrance Fee Liability | $1,477,310 | Contingent, Unliquidated |
| 2 | Resident # 00158 | [REDACTED] | Entrance Fee Liability | $1,393,557 | Contingent, Unliquidated |
| 3 | Resident # 00027 | [REDACTED] | Entrance Fee Liability | $1,210,868 | Contingent, Unliquidated |
| 4 | Resident # 00047 | [REDACTED] | Entrance Fee Liability | $1,174,252 | Contingent, Unliquidated |
| 5 | Resident # 00194 | [REDACTED] | Entrance Fee Liability | $1,156,336 | Contingent, Unliquidated |
| 6 | Resident # 00171 | [REDACTED] | Entrance Fee Liability | $1,132,656 | Contingent, Unliquidated |
| 7 | Resident # 00114 | [REDACTED] | Entrance Fee Liability | $1,049,486 | Contingent, Unliquidated |
| 8 | Resident # 00125 | [REDACTED] | Entrance Fee Liability | $1,041,139 | Contingent, Unliquidated |
| 9 | Resident # 00162 | [REDACTED] | Entrance Fee Liability | $1,040,681 | Contingent, Unliquidated |
| 10 | Resident # 00163 | [REDACTED] | Entrance Fee Liability | $1,039,887 | Contingent, Unliquidated |
| 11 | Resident # 00181 | [REDACTED] | Entrance Fee Liability | $1,013,978 | Contingent, Unliquidated |
| 12 | Resident # 00185 | [REDACTED] | Entrance Fee Liability | $988,380 | Contingent, Unliquidated |
| 13 | Resident # 00208 | [REDACTED] | Entrance Fee Liability | $988,133 | Contingent, Unliquidated |
| 14 | Resident # 00049 | [REDACTED] | Entrance Fee Liability | $940,374 | Contingent, Unliquidated |
| 15 | Resident # 00116 | [REDACTED] | Entrance Fee Liability | $932,995 | Contingent, Unliquidated |

| | | | | | |
|---|---|---|---|---|---|
| 16 | Former Resident # 00002 | [REDACTED] | Pending Refund to Former Resident | $932,830 | Contingent |
| 17 | Resident # 00187 | [REDACTED] | Entrance Fee Liability | $932,200 | Contingent, Unliquidated |
| 18 | Former Resident # 00003 | [REDACTED] | Pending Refund to Former Resident | $930,922 | Contingent |
| 19 | Resident # 00200 | [REDACTED] | Entrance Fee Liability | $904,338 | Contingent, Unliquidated |
| 20 | Resident # 00199 | [REDACTED] | Entrance Fee Liability | $901,147 | Contingent, Unliquidated |

**Exhibit C**

**Top Five Largest Secured Claims**

| Creditor | Mailing Address & Phone Number | Counsel | Approximate Amount of Claim as of July 22, 2014 | Description and Estimated Value of Collateral | Contingent, Unliquidated, Disputed |
|---|---|---|---|---|---|
| UMB Bank, n.a., as 2007 Bond Trustee | 1010 Grand Avenue P.O. Box 419 226 Kansas City, MO 64106-6226 800.860.3020 (bondholder relations) | Mintz Levin Cohn Ferris Glovsky and Popeo PC 666 3rd Ave, New York, NY 10017 | $220,570,000 | Substantially all of the Debtor's assets–value unknown. | |

## Exhibit D

**Unaudited Balance Sheet, Dated May 31, 2014**

| ASSETS | 5/31/2014 | 4/31/2014 |
|---|---|---|
| Cash and Cash Equivalents | 1,563,836 | 1,190,112 |
| Conversion Deposits | 851,573 | 2,376,062 |
| Net A/R Residents | 1,297,116 | 1,911,705 |
| Other Receivables | 7,152,231 | 7,327,065 |
| Inventory | 20,599 | 30,679 |
| Deposits | - | - |
| Prepaid Expenses | 330,387 | 393,108 |
| | | |
| **Total Current Assets** | **11,215,742** | **13,228,731** |
| | | |
| CIP | 151,961 | 138,183 |
| Fixed Assets | 255,430,029 | 255,458,215 |
| Accumulated Depreciation | (23,959,395) | (23,416,358) |
| Intangible Assets | 27,306,663 | 27,306,663 |
| Accumulated Amortization | (7,767,150) | (7,593,772) |
| Restricted Assets | 23,937,933 | 21,534,953 |
| | | |
| **TOTAL ASSETS** | **286,315,782** | **286,656,615** |
| | | |
| **LIABILITIES** | | |
| Accounts Payable | 812,022 | 1,073,731 |
| Resident Current Liabilities | 618,115 | 1,154,503 |
| Payroll Related Current Liabilities | 638,240 | 529,903 |
| Accrued Operating Expenses | 2,014,514 | 1,736,096 |
| Accrued Bond Interest Expense | 5,573,090 | 4,384,560 |
| | | |
| **Total Current Liabilities** | **9,655,981** | **8,878,793** |
| | | |
| Entrance Fee Liability | 144,610,881 | 143,427,643 |
| Future Services Obligation Liability | 57,181,000 | 57,181,000 |
| Subordinated Loan | 3,000,000 | 3,000,000 |
| Accrued Interest on Subordinated Loan | 2,319,592 | 2,319,592 |
| Long Term Debt | 220,380,945 | 220,379,254 |
| | | |
| **TOTAL LIABILITIES** | **437,148,398** | **435,186,281** |
| | | |
| **EQUITY** | | |
| Fund Balance (Deficit) | (141,067,696) | (141,067,696) |
| Net Income (Loss) | (9,764,920) | (7,461,970) |
| **TOTAL EQUITY** | **(150,832,616)** | **(148,529,666)** |
| | | |
| **TOTAL LIABILITIES & EQUITY** | **286,315,782** | **286,656,615** |

**Exhibit E**

**Premises Owned or Leased by Debtor**

| Debtor/Lessee | Property Address | Lease Expiration Date | Type of Interest |
|---|---|---|---|
| AHCCRC, Inc. | 300 E. Overlook Port Washington, NY 11050 | N/A | Owned |

## **Exhibit F**

### **Location of Debtor's Significant Assets and Records**

Pursuant to Local Rule 1007-4(a)(xi), the following lists the location of the Debtor's substantial assets, books and records, and nature, location, and value of any assets held by the Debtor outside the United States:

#### **Location of Debtor's Substantial Assets**

300 E. Overlook
Port Washington, New York 11050

The Debtor's real property, leaseholds and inventory, and the location of these assets are provided in <u>Exhibit E</u>.

#### **Location of the Debtor's Books and Records:**

300 E. Overlook
Port Washington, New York 11050


570 Seventh Avenue, Room 605
New York, New York 10018

#### **Debtor's Assets Outside of the United States**
The Debtor holds no assets outside of the United States.

**Exhibit G**

**Litigation Pending Against Debtor or its Property**

| Plaintiff and Case Number | Court or Agency and Location | State | Status or Disposition | Nature of Proceeding |
|---|---|---|---|---|
| Furtak, Patricia Case No. 0600771/2014 | Nassau County Supreme Court | New York | Waiting for bill of particulars; once provided, insurer will request Debtor be dismissed from this action | Personal Injury Claim |
| Pinnock, Nola Case No. Unknown | Unknown | New York | Liability tendered to snow plowing company | Personal Injury Claim |
| June, Daniel Case No. 0061751/2013 | Suffolk County Supreme Court | New York | Initial claim filed; waiting on response | Personal Injury Claim |
| Guerrero, Rafael Case No. 0800346/2011 | Supreme Court, Civil Branch, New York County | New York | Open/pending | Medical Malpractice |
| Albert, Allison Case No. SC-001654-14/OB | Nassau County District Court - 4th District | New York | Open/pending | Small Claim |
| Amroise, Farah Case No. N/A | N/A | N/A | Currently not in litigation | Workers Compensation Claim |
| Guillen, Brenda Case No. N/A | N/A | N/A | Currently not in litigation | Workers Compensation Claim |

**Exhibit H**

**Summary of Debtor's Senior Management**

| Name | Tenure in Position | Position | Responsibilities |
|------|-------------------|----------|------------------|
| James Davis | 25 years[1] | President and CEO | As President and CEO, James Davis is responsible for overseeing the operations of the corporation and its assets.  He directs and supervises operations of the Debtor, its administration, and each of its departments.  Mr. Davis's responsibilities also consist of supervising the Debtor's overall restructuring efforts and reporting to the Board of Directors regarding the Debtor's operations and strategy. |
| Mark Pancirer | 24 years[1] | Senior Vice President and CFO | As Senior Vice President and CFO, Mark's primary responsibilities include the following: (a) report fiscal operations to the President and Chief Executive Officer, Executive Director, the Board of Directors, and governmental regulatory agencies; (b) develop long-term fiscal policies; (c) coordinate and secure financing of building expansion projects and long term borrowing options; (d) prepare executive summary and interim monthly financial reports; and (e) negotiate contracts with various service agencies. |
| Sam Guedouar | 2 Years | Executive Director | The Executive Director assists in the development of the initial draft of the operating and capital expenditure budget for the corporation. He prepares initial variance analysis of monthly financial statements utilizing the Greystone format. Further, he initiates, promotes and provides ongoing commitment to excellence in services through the Greystone "Living in Style" program. |
| Tony Veksler | 1 Year | Health Care Administrator | The Health Care Administrator's duties include planning, developing, organizing, implementing, and evaluating the Health Center's programs and activities. He also assists with the development of the Health Center's organizational structure and articulates the roles of department heads within that structure. Further, he works on the development and administration of the Health Center's overall budget process.  Tony is a licensed nursing home administrator in the state of New York. |

---

[1] This figure includes the tenure spent with affiliated entities.

## Exhibit I

### Estimated Payroll 30-Days Following Petition Date

| | |
|---|---|
| **Payments to Employees (Not Including Officers and Directors)** | $490,000 |
| **Payments to Financial and Business Consultants** | $481,000[18] |

---

[18] Payments include $198,000 to be paid in to ordinary course professionals and $238,000 to be paid to restructuring professionals.

## Exhibit J

**Estimated Payments to Officers and Directors 30-Days Following Petition Date**

| Payments to Officers and Directors | $69,800[19] |
|---|---|

---

[19] Inclusive of the estimated amount to be paid to Amsterdam Consulting which provides management services to the Debtor, and the payroll & employee reimbursement portion of the GMSC management fee, which is attributable to the Debtor's executive director who is an employee of GDC.

**Exhibit K**

**Schedule of Estimated Cash Receipts, Net Gains or Loss, Obligations, and Receivables**

**Unpaid for 30-Days Following Petition Date**

| | |
|---|---|
| **Cash Receipts** | $1,082,000 |
| **Cash Disbursements** | $2,824,000 |
| **Net Cash Gain/Loss** | ($1,742,000) |

| | |
|---|---|
| **Unpaid Obligations** | $1,030,948 |
| **Unpaid Receivables** | $1,655,812 |