CADWALADER, WICKERSHAM & TAFT LLP
Ingrid Bagby, Esq.
Christopher J. Updike, Esq.
One World Financial Center
New York, New York  10281
Telephone:    (212) 504-6000
Facsimile:    (212) 504-6666

- and -

John Thompson, Esq.
700 Sixth Street, N.W.
Washington, D.C.  20001
Telephone:    (202) 862-2200
Facsimile:    (202) 862-2400

*Proposed Attorneys for the*
*Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
|   |   |
|---|---|
| In re: | Chapter 11 |
| **AMSTERDAM HOUSE CONTINUING CARE RETIREMENT COMMUNITY, INC.,**[1] | **Case No. 14-73348 (AST)** |
| **DEBTOR.** | |

-----------------------------------------------------------------x

### DEBTOR'S MOTION FOR ENTRY OF AN ORDER
### AUTHORIZING THE DEBTOR TO ASSUME PLAN SUPPORT AGREEMENT

Amsterdam House Continuing Care Retirement Community, Inc., the debtor and debtor in possession in the above-captioned case (the "Debtor"), respectfully represents as follows:

---

[1] The last four digits of the Debtor's federal tax identification number are 1764.  The Debtor's mailing address is 300 East Overlook, Port Washington, New York 11050.

**BACKGROUND**

1.      On July 22, 2014 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor is continuing in possession of its property and management of its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2.      The Debtor, d/b/a The Amsterdam at Harborside ("Harborside"), operates Nassau County's first and only continuing care retirement community licensed under Article 46 of the New York Public Health Law, which provides residents (the "Residents") with independent living units, assisted living and memory support services, comprehensive licensed skilled nursing care, and related health, social, and quality of life programs and services.

3.      A more detailed description of the Debtor's business and capital structure, and the circumstances leading to the chapter 11 filing is contained in the Declaration of James Davis In Support of the Chapter 11 Petition and First Day Motions (the "Davis Declaration")[2] filed concurrently herewith and incorporated by reference hereto.

**JURISDICTION AND VENUE**

4.      This Court has jurisdiction to consider this motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core matter pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**RELIEF REQUESTED**

5.      By this motion (the "Motion"), pursuant to section 365(a) of the Bankruptcy Code and rule 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

---

[2] Capitalized terms used herein but not otherwise defined will have the meanings given to them in the Plan Support Agreement.

Rules"), the Debtor respectfully requests entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), authorizing the Debtor to assume the Plan Support Agreement, dated July 21, 2014 (the "Plan Support Agreement"), attached hereto as **Exhibit B**, in support of a proposed plan of reorganization under chapter 11 of the Bankruptcy Code (the "Plan"), by and between the Debtor and the holders of approximately 75% principal aggregate amount of the Debtor's outstanding 2007 Bonds (as defined below) (the "Consenting Holders").

## FACTS SPECIFIC TO RELIEF REQUESTED

6.      Pursuant to the Plan Support Agreement, the Consenting Bondholders and the Debtor have agreed to support a restructuring of the 2007 Bonds on the terms and conditions set forth in the restructuring term sheet (the "Restructuring Term Sheet")[3] attached to the Plan Support Agreement.  The Restructuring Term Sheet sets forth certain of the principal terms and conditions of the Debtor's proposed financial restructuring, including, among other things, a transaction whereby the 2007 Bonds would be exchanged for new bonds to be issued by Nassau County Industrial Development Authority (the "Issuer") pursuant to the Plan (the "Restructuring Transaction").[4]

7.      The Consenting Holders are comprised of bondholders currently holding at least 75% of the outstanding aggregate principal amount of: (a) the Nassau County Industrial Development Agency Continuing Care Retirement Community Fixed Rate Revenue Bonds (Amsterdam at Harborside Project) Series 2007A, in the original aggregate principal amount of $167,895,000 (the "Series 2007A Bonds"), (b) the Nassau County Industrial Development

---

[3] The Restructuring Term Sheet is not and shall not be deemed to be a solicitation of votes for the acceptance of the Plan or any plan of reorganization.

[4] For a more comprehensive explanation of the Plan and its terms, please see the "Disclosure Statement for Debtor's Plan of Reorganization under Chapter 11 of the Bankruptcy Code" filed contemporaneously herewith.

Agency Continuing Care Retirement Community Adjustable Rate Revenue Bonds (Amsterdam at Harborside Project) Series 2007B, in the original aggregate principal amount of $8,500,000 (the "Series 2007B Bonds"), and (c) the Nassau County Industrial Development Agency Continuing Care Retirement Community Variable Rate Demand Revenue Bonds (Amsterdam at Harborside Project) Series 2007C, in the original aggregate principal amount of $95,100,000 (the "Series 2007C Bonds" and collectively, with the Series 2007A Bonds and Series 2007B Bonds, the "2007 Bonds"). The 2007 Bonds were issued by the Issuer for the benefit of the Debtor, pursuant to an Indenture of Trust, dated as of December 1, 2007 (the "2007 Indenture"), between the Issuer and The Bank of New York, as trustee. UMB Bank, n.a. currently serves as successor trustee under the 2007 Bond Indenture (the "2007 Bond Trustee").

8.      The Plan, among other things, contemplates that the Issuer will issue (a) the Nassau County Industrial Development Agency Continuing Care Retirement Community Fixed Rate Revenue Bonds (Amsterdam at Harborside Project) Series 2014A (the "Series 2014A Bonds"), (b) the Nassau County Industrial Development Agency Continuing Care Retirement Community Fixed Rate Revenue Bonds (Amsterdam at Harborside Project) Series 2014B (the "Series 2014B Bonds"), and (c) the Nassau County Industrial Development Agency Continuing Care Retirement Community Excess Cash Flow Revenue Bonds (Amsterdam at Harborside Project) Series 2014C (the "Series 2014C Bonds") pursuant to a new Indenture of Trust (the "2014 Indenture"), between the Issuer and the 2007 Bond Trustee.

9.      If confirmed, on the effective date of the Plan, each holder of an outstanding Series 2007A Bond or outstanding Series 2007B Bond shall exchange the then outstanding Series 2007A Bond or Series 2007B Bond for (a) its *pro rata* share of the principal amount of the Series 2014A Bonds allocated to that respective maturity as further set out in the

Plan; and (b) its *pro rata* share of the Series 2014C Bonds in approximate aggregate principal amount of $47,225,656 (which amount shall include interest from the Petition Date through the Effective Date as set forth in the Plan).  In addition, the holders of the Series 2007A Bonds and the Series 2007B Bonds shall receive payment in full in cash on account of its allocable share of accrued and unpaid interest on the Series 2007A Bonds or Series 2007B Bonds, as applicable, through the date immediately preceding the Petition Date.

10.    Further, on the effective date of the Plan, if confirmed, each holder of an outstanding Series 2007C Bond shall exchange the then outstanding Series 2007C Bond for a *pro rata* share of: (a) Series 2014A Bonds in the aggregate principal amount of $11,921,250, (b) Series 2014B Bonds in the aggregate principal amount of $23,842,500, and (c)  Series 2014C Bonds in the aggregate principal amount of $12,905,945 (which amount shall include interest from the Petition Date through the Effective Date, at 5.9% per annum).  Each holder of an outstanding Series 2007C Bond shall also receive payment in full in cash on account of its allocable share of accrued and unpaid interest (based upon the contractual rate of interest of 10% per annum) on the Series 2007C Bonds through the date immediately preceding the Petition Date.

11.    The Debtor and the Consenting Holders entered into the Plan Support Agreement, which incorporates the Restructuring Term Sheet, to effectuate the Restructuring Transaction.  The restructuring contemplated therein by the Debtor is a restructuring of its balance sheet which, while leaving large parts of the Debtor's business relatively unchanged, will nonetheless significantly strengthen the Debtor's financial status and ability to service debt and meet covenants, and better position the Debtor for long term financial stability and therefore benefit the holders of the 2007 Bonds.  In addition, among other things, the Restructuring Term

Sheet requires that all Residency Agreements (as defined in the Davis Declaration) will be assumed under the Plan.

12.     Pursuant to the Plan Support Agreement, the Debtor, consistent with its business judgment and the exercise of its fiduciary duties, has agreed to the following material covenants and conditions:

(a)     the Debtor will take all commercially reasonable steps that are necessary to obtain any necessary approval for the Restructuring Transaction as expeditiously as is reasonably practicable under applicable law, including the solicitation of requisite acceptances by means of the Disclosure Statement;

(b)     the Debtor will take all commercially reasonable steps to obtain any and all requisite regulatory or third party approvals necessary to consummate the Plan as is reasonably practicable;

(c)     the Debtor will take all reasonably necessary steps in seeking to obtain from the Bankruptcy Court an order confirming the Plan reasonably acceptable in form and substance to the Consenting Holders by October 24, 2014;

(d)     the Plan is substantially consummated including, but not limited to, the exchange of the 2007 Bonds on or before November 28, 2014;

(e)     the Debtor will take no action inconsistent with the Restructuring Transaction, the transactions contemplated thereby, or the expeditious confirmation and consummation of such transactions, except as otherwise permitted under the Plan Support Agreement; and

(f)     the Debtor, subject to the exercise of its fiduciary duties, will not file a petition under the Bankruptcy Code or seek any similar relief without providing the Bond Trustee and the Consenting Holders at least five (5) Business Days written notice thereof;

(g)     in the event that the Debtor proposes a plan of reorganization that does not comply with the Plan Support Agreement or that constitutes a Support Agreement Termination Event (as defined in the Plan Support Agreement), it will not assert that the Consenting Holders have expressly or impliedly supported, endorsed or otherwise agreed to any financial information, including any projections or liquidation analysis, included in the bankruptcy documents; and

(h)     the Debtor will not:

      i.     incur any further indebtedness with priority over the 2007 Bonds,

      ii.     transfer any assets other than in the ordinary course of its business other than miscellaneous assets not necessary for the operations of Harborside, or

      iii.     take action that would result in entry of an order terminating, whether in whole or in part, the Debtor's exclusive right to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code.

13.     Pursuant to the Plan Support Agreement, each Consenting Holder:

(a)     agrees that, until the Plan Support Agreement has been terminated in accordance with the Termination Events, it shall not sell, transfer or assign any of its 2007 Bonds or all related claims, rights, powers and causes of action arising out of or in connection with or otherwise relating to such 2007 Bonds or the Bond Documents (collectively, the "Claims") or any option thereon or any right or interest (voting or otherwise) therein unless the transferee thereof (i) has already executed the Plan Support Agreement or (ii) agrees in writing by executing the form of Joinder attached as Exhibit 2 to the Plan Support Agreement to be bound, for the benefit of the parties, by all of the terms of the Plan Support Agreement. Subject to applicable securities and bankruptcy law, the Plan Support Agreement shall in no way be construed to preclude any Consenting Holder or any of its respective subsidiaries or affiliates from acquiring additional 2007 Bonds; provided, however, that any such additional 2007 Bonds acquired by such Consenting Holder or any subsidiary or affiliate thereof shall automatically be deemed to be subject to the terms of the Plan Support Agreement;

(b)     agrees that, subject to the terms and conditions of the Plan Support Agreement, and so long as the Plan Support Agreement has not been terminated, and further provided that the Disclosure Statement approved by the Court contains information substantially similar to that set forth in the Disclosure Statement filed as part of the bankruptcy documents, it will vote all claims that it holds or as to which it has voting authority with respect to the 2007 Bonds outstanding, the Claims, and all other claims, rights, or interests that exist against the Debtor to accept a plan of reorganization proposed as part of the Chapter 11 Case that reflects the Restructuring Transaction outlined in the Term Sheet and that

is filed by the Outside Petition Date (as defined in the Plan Support Agreement);

(c)     agrees, so long as the Plan Support Agreement has not been terminated, not to:

    i.    support or encourage, directly or indirectly, any financial restructuring or sale of assets concerning the Borrower or its assets, other than the Restructuring Transaction,

    ii.    take any action inconsistent with the Term Sheet, the transactions contemplated hereby or thereby, or the expeditious confirmation and consummation of such transactions,

    iii.    vote against the Plan or otherwise agree, consent, or provide any support, to any other chapter 11 plan or other restructuring or sale or liquidation of assets concerning the Borrower or its assets, other than the Restructuring Transaction,

    iv.    object to or otherwise commence any proceeding to oppose or alter the Plan or any of the terms of the Restructuring Transaction (or any other document filed in furtherance of, and that is consistent with the Restructuring Transaction),

    v.    make (and will not direct the Bond Trustee to make) any election under Section 1111(b) of the Bankruptcy Code, and will vote against and/or direct the Bond Trustee to object to any action or motion to make such an election, or

    vi.    direct the Bond Trustee to take any action or otherwise act in a manner contrary to the terms of the Plan Support Agreement;

(d)     agree that, to the extent necessary, it will direct the 2007 Bond Trustee to take actions consistent with the Plan Support Agreement.

14.     The Plan Support Agreement further provides that upon the occurrence of any of the following events, the Plan Support Agreement will be deemed terminated upon written notice from the non-breaching party to the breaching party (the "Support Agreement Termination Events"):

(a)     failure by the Debtor and Consenting Holders to agree to the form and substance of any of the Plan Support Documents (as defined in the Plan Support Agreement), the 2014 Bond Documents, or the Bankruptcy Documents by the earlier of the Petition Date or the Outside Petition Date;

(b)     any of the Bankruptcy Documents are withdrawn, materially modified, or amended (except in the case of a document which is an interim order, by replacement with a final order that would otherwise meet the requirements of a Bankruptcy Document, or with the consent of the Consenting Holders and/or the 2007 Bond Trustee);

(c)     the Debtor:

    i.     files or supports confirmation of, or fails to actively oppose confirmation of, a plan of reorganization that requests or would result in a withdrawal, modification, or amendment of the Plan, or that, as to any provision of the Plan, materially adversely affects the Consenting Holders;

    ii.    files a motion, pleading, objection, lawsuit, or administrative or adversary proceeding (or takes any action in support of such a motion or pleading filed by another party) in the Bankruptcy Court or other court, or otherwise assists in any of the foregoing, that requests or would result in a withdrawal, modification or amendment (including in the case of document which is an interim order, by replacement with a final order) of the Restructuring Transaction; or

    iii.   files a motion, complaint, application, or other request seeking to disallow, subordinate, or limit in any way the 2007 Bonds held by the Consenting Holders, the Claims, or the liens of the Consenting Holders and/or the 2007 Bond Trustee, or seeking entry of an order by the Bankruptcy Court disallowing, subordinating, or limiting in any way the 2007 Bonds, Claims, or liens of the Consenting Holders and/or the 2007 Bond Trustee, or asserting a claim against any Consenting Holder and/or the 2007 Bond Trustee to avoid any transfer or obligation, or seeking any other monetary or equitable relief from or against any Consenting Holder and/or the 2007 Bond Trustee, in its capacity as such.

(d)     following the Petition Date, the Court has:

i.    not approved the Disclosure Statement by September 8, 2014, or by such later date as is agreed to in writing by the Consenting Holders;

ii.    not entered an order authorizing the assumption of the Plan Support Agreement under Section 365 of the Bankruptcy Code within 45 days of the Petition Date or such later date as is agreed to in writing by the Requisite Consenting Holders (as defined in the Plan Support Agreement);

iii.    not entered the Confirmation Order by October 24, 2014, or by such later date as is agreed to in writing by the Requisite Consenting Holders;

iv.    entered an order denying confirmation of the Plan;

v.    entered an order pursuant to section 1104 of the Bankruptcy Code appointing a trustee or appointing an examiner with powers beyond the duty to investigate and report (as set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code), including, without limitation, to operate and manage the Debtor's business (unless the motion resulting in such order was filed or supported by the 2007 Bond Trustee), or the Debtor files a motion, application, or other pleading consenting to or acquiescing in any such appointment;

vi.    entered an order dismissing the Chapter 11 Case or an order pursuant to Section 1112 of the Bankruptcy Code converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code;

vii.    enters an order suspending the Chapter 11 Case under Section 305 of the Bankruptcy Code;

viii.    enters an order materially staying, reversing, vacating, materially amending, or modifying the Cash Collateral Order (which for purposes hereof shall include any interim or final cash collateral order) without the prior written approval of the 2007 Bond Trustee, or fails to enter an order approving the use of Cash Collateral on a final basis by August 22, 2014;

ix.    enters an order in the Chapter 11 Case, over the objection of the 2007 Bond Trustee, approving financing pursuant to Section 364 of the Bankruptcy Code that (i) would grant an additional security interest or a lien that is equal or

senior to that of the 2007 Bond Trustee on any collateral, or (ii) would grant to any party other than the 2007 Bond Trustee a superpriority administrative claim that is senior or equal to that granted to the 2007 Bond Trustee under the Cash Collateral Order; or

x.      granted relief that is inconsistent with the Plan Support Agreement or the Plan or that would result in a withdrawal, modification, or amendment of the Restructuring that is contrary to the Term Sheet and that has a material adverse effect on the Consenting Holders, provided that such relief has not resulted from any action or inaction by any of the Consenting Holders or the 2007 Bond Trustee.

(e)      the Effective Date of the Plan shall not have occurred by November 28, 2014 or by such later date as is agreed to by the Requisite Consenting Holders;

(f)      an injunction, judgment, order, decree, ruling, or charge shall have been entered that prevents consummation of the Restructuring and that remains in effect for longer than 30 days;

(g)      there is a mutual written agreement to terminate the Plan Support Agreement by the Parties;

(h)      failure by the Debtor to comply with any obligations under the Plan Support Agreement other than those set forth in Section 8 of the Plan Support Agreement, and such failure is not cured within 5 business days after written notice thereof has been given to the Debtor;

(i)      failure by the Debtor to comply with any obligations under Section 8 of the Plan Support Agreement; and

(j)      failure by any of the Consenting Holders to comply with any of their obligations under the Plan Support Agreement, and such failure is not cured within 5 business days after written notice thereof has been given by the Debtor to such Consenting Holder and the 2007 Bond Trustee.

15.      Additionally, a Support Agreement Termination Event may be waived after written notice thereof has been given by the non-defaulting party.

## BASIS FOR RELIEF REQUESTED

I.    **Assumption of the Plan Support Agreement is in the Best Interests of the Debtor's Estate**

16.    Section 365 of the Bankruptcy Code allows a debtor in possession to assume or reject executory contracts or unexpired leases to maximize the value of the estate.  See Orion Pictures Corp. v. Showtime Networks, Inc., 4 F.3d 1095, 1098 (2d Cir. 1993).  "The purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor in possession to use valuable property of the estate and to 'renounce title and abandon burdensome property.'"  Id.

17.    Courts allow debtors significant discretion when requesting whether to assume or reject an executory contract and will typically defer to a debtor's business judgment.  See NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984) (recognizing that the business judgment standard is used to authorize assumption or rejection of executory contracts);  Nostas Assocs. V. Costich (In re Klein Sleep Prods., Inc.), 78 F.3d 18, 25 (2d Cir. 1996) (same); In re Minges, 6022 F.2d 38, 42-43 (2d  Cir. 1979) (holding that business judgment test is appropriate for determining when executory contracts can be assumed or rejected); In re Riodizio, Inc., 204 B.R. 417, 424 (Bankr. S.D.N.Y. 1997) ("[A] court will ordinarily defer to the business judgment of the debtor's management").  The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company."  See In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).  The business judgment standard is satisfied if a debtor establishes that the requested assumption will benefit the estate.  See Westbury Real Estate Ventures, Inc. v. Bradlees, Inc. (In re Bradlees Stores, Inc.), 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996)

("[T]he court must examine the contract and circumstances and apply its best 'business judgment' to determine if the assumption or rejection would be beneficial or burdensome to the estate.").

18.     Additionally, courts have approved the assumption of agreements similar to the Plan Support Agreement in connection with the confirmation of a plan of reorganization. See, e.g., In re Hingham Campus, LLC., No. 11-33912 (SGJ) (Bankr. N.D. Tex. July 28, 2011) (ECF No. 154); In re Haights Cross Commc'ns, Inc., No. 10-10062 (BLS), 2010 WL 2723979 (Bankr. D. Del. Feb. 24, 2010); In re Morris Publ'g Grp., LLC, No. 10-10134, 2010 WL 6618887 (Bankr. S.D. Ga. Feb. 17, 2010); In re Lear Corp., No. 09-14326 (ALG), 2009 WL 6677955 (Bankr. S.D.N.Y. Nov. 5, 2009); In re Residential Capital LLC, No. 12-12020 (MG), 2013 WL 3286198 (Bankr. S.D.N.Y. June 27, 2009).

19.     The Plan Support Agreement is integral to the Debtor's efforts to consummate the restructuring contemplated under the Plan.  The Plan Support Agreement ensures that, in the absence of any unforeseen termination events thereunder, the Debtor will have the votes needed to confirm the Plan.  Additionally, the relief requested herein will facilitate a smooth transition into and out of chapter 11 as expeditiously and consensually as possible, while minimizing any business disruption and impact on the Debtor's daily operation of Harborside or on its Residents and will otherwise minimize the costs and expenses associated with these proceedings.  Absent the benefit of the Plan Support Agreement, the Consenting Holders could withdraw support for the Plan and the related Plan process.  Such a course of action could jeopardize the Debtor's restructuring efforts and the continued operation of Harborside and otherwise cause significant delays, costs, and expenses relating to the resolution of the Debtor's obligations owed to the holders of the 2007 Bonds and other third parties.

Accordingly, the Debtor, in its business judgment, believes that the assumption of the Plan Support Agreement is in the best interests of the Debtor, its estate and all parties in interest, and that this Court should enter the Proposed Order, authorizing the Debtor to assume the Plan Support Agreement.

## RESERVATION OF RIGHTS

23.    Nothing contained herein is intended or shall be construed as (a) an admission as to the validity of any claim against the Debtor, (b) an admission with respect to the validity, extent, or perfection of any lien, (c) a waiver of the rights of the Debtor or any party in interest to dispute, contest, setoff, or recoup any claim, or assert any rights, claims, or defenses related thereto, or (d) a waiver of the rights of the Debtor or any party in interest regarding the validity, extent, perfection, or possible avoidance of any lien.

## MOTION PRACTICE

24.    This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated, and a discussion of their application to this Motion.  Moreover, in addition to all entities otherwise entitled to receive notice, the Debtor has given notice of this Motion to all entities believed to have, or be claiming, an interest in the subject matter of the Motion or who, it is believed, otherwise would be affected by the Motion.  Accordingly, the Debtor submits that this Motion satisfies Local Rule 9013-1.

## NOTICE

25.    Notice of this Motion has been provided by facsimile, electronic transmission, overnight delivery, or hand delivery to:  (a) the U.S. Trustee, (b) counsel to 2007 Bond Trustee, (c) the holders of the twenty largest unsecured claims against the Debtor, (d) Consenting Holders, (e) the Nassau County Industrial Development Agency, (f) the Treasurer

of the County of Nassau, (g) the New York State Department of Health, (h) the New York State Department of Financial Services, (i) the New York State Attorney General, (j) the Centers for Medicare and Medicaid Services, (k) the United States Attorney for the Eastern District of New York, (l) the Internal Revenue Service, (m) the Securities and Exchange Commission, and (n) the Tax Division of the United States Department of Justice. Following the hearing, a copy of this Motion and any order entered with respect hereto will be served on the foregoing parties and all parties having filed requests for notices in this chapter 11 case. Due to the nature of the relief requested herein, the Debtor submits that no other or further notice need be given.

**<u>NO PRIOR REQUEST</u>**

26.     No previous motion for the relief sought herein has been made by the Debtor to this or any other court.

WHEREFORE, the Debtor respectfully requests entry of the Proposed Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other and further relief as may be just and proper.

Dated: July 23, 2014

CADWALADER, WICKERSHAM & TAFT LLP

By:*/s/ Ingrid Bagby*
    Ingrid Bagby, Esq.
    Christopher J. Updike, Esq.
    One World Financial Center
    New York, New York  10281
    Telephone:    (212) 504-6000
    Facsimile:    (212) 504-6666
    Ingrid.Bagby@cwt.com
    Christopher.Updike@cwt.com

    - and -

    John Thompson, Esq.
    700 Sixth Street, N.W.
    Washington, D.C.  20001
    Telephone:    (202) 862-2200
    Facsimile:    (202) 862-2400
    JohnH.Thompson@cwt.com

    *Proposed Attorneys for the*
    *Debtor and Debtor in Possession*

**Exhibit A**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
                                                        :
In re:                                                  :                    **Chapter 11**
                                                        :
**AMSTERDAM HOUSE CONTINUING CARE**                     :              **Case No. 14-73348 (AST)**
**RETIREMENT COMMUNITY, INC.,** [1]                     :
                                                        :
                                                        :
            **Debtor.**                                 :
-----------------------------------------------------------------x

**ORDER AUTHORIZING THE DEBTOR**
**TO ASSUME PLAN SUPPORT AGREEMENT**

Upon the motion (the "Motion")[2] of Amsterdam House Continuing Care

Retirement Community, Inc., the debtor and debtor in possession in the above-captioned case

(the "Debtor"), for entry of an order, pursuant to section 365(a) of the Bankruptcy Code,

approving the Debtor's assumption of the Plan Support Agreement, all as more fully set forth in

the Motion; and due and sufficient notice of the Motion having been provided under the

particular circumstances, and it appearing that no other or further notice need be provided; and

the Court having jurisdiction to consider the Motion and the relief requested therein in

accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and a hearing having been held

to consider the relief requested in the Motion (the "Hearing"); and upon the "Declaration of

James Davis in Support of the Chapter 11 Petition and First Day Motions", the record of the

Hearing, and all of the proceedings before the Court; and the Court having found and determined

---

[1] The last four digits of the Debtor's federal tax identification number are 1764.  The Debtor's mailing
address is 300 East Overlook Port Washington, New York 11050.

[2] Capitalized terms used but not defined herein shall have the meanings given to them in the Motion.

that the relief requested in the Motion is in the best interests of the Debtor, its estate and creditors, and all other parties in interest; and that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and after due deliberation thereon and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motion is GRANTED to the extent set forth herein.

2.      Pursuant to section 365(a) of the Bankruptcy Code, the Debtor is authorized and directed to assume the Plan Support Agreement, and that the Plan Support Agreement shall be and is hereby deemed assumed within the meaning of section 365 of the Bankruptcy Code.

3.      Any applicable stay under Bankruptcy Rule 6006(d) is waived.

4.      The Debtor is authorized and empowered to take all actions necessary or appropriate to implement the relief granted in this Order.

5.      This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

Dated: Central Islip, New York
          _____, 2014

                                        _____

                                        THE HONORABLE ALAN S. TRUST
                                        UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT B

**Plan Support Agreement**

**EXECUTION VERSION**

## PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT (this "Plan Support Agreement") is made and entered into as of July 21, 2014 (the "Effective Date") by and between the following parties:

(a)    Amsterdam House Continuing Care Retirement Community, Inc. (the "Borrower"); and

(b)    each of the undersigned holders of Bonds (as defined herein) (the "Consenting Holders", and together with the Borrower, each a "Party" and collectively the "Parties").

## RECITALS

A.    Nassau County Industrial Development Agency (the "Issuer") issued its (i) $167,895,000 Continuing Care Retirement Community Fixed Rate Revenue Bonds (Amsterdam at Harborside Project) Series 2007A (the "Series A Bonds"), (ii) $8,500,000 Continuing Care Retirement Community Adjustable Rate Revenue Bonds (Amsterdam at Harborside Project) Series 2007B (the "Series B Bonds"), (iii) $95,100,000 Continuing Care Retirement Community Variable Rate Demand Revenue Bonds (Amsterdam at Harborside Project) Series 2007C (the "Series C Bonds") and (iv) $24,900,000 Continuing Care Retirement Community Variable Rate Demand Revenue Bonds (Amsterdam at Harborside Project) Series 2007D (the "Series D Bonds" and collectively with the Series A Bonds, the Series B Bonds, and the Series C Bonds, the "Bonds").

B.    UMB Bank, n.a., is the successor trustee (the "Bond Trustee") under that certain Indenture of Trust, dated as of December 1, 2007 by and between the Bond Trustee and the Issuer (the "2007 Indenture"), pursuant to which the Bonds were issued.

C.    The Borrower used the proceeds of the Bonds to acquire a continuing care retirement community known as "The Amsterdam at Harborside" (the "Harborside") located in North Hempstead, Nassau County, New York.  Pursuant to that certain Installment Sale Agreement, dated as of December 1, 2007 (the "Installment Sale Agreement"), between the Borrower and the Issuer, the Borrower agreed to pay installment payments to purchase Harborside in amounts sufficient to pay, when due, the principal, purchase price, redemption price of, and interest on the Bonds.  The rights of the Issuer under the Installment Sale Agreement were assigned to the Bond Trustee pursuant to the 2007 Indenture.

D.    As security for the obligations owing on the Bonds, the Borrower and the Issuer granted the Bond Trustee, inter alia: (i) an Acquisition Loan Mortgage, Assignment of Leases and Rents and Security Agreement, dated as of December 1, 2007, (ii) a Building Loan Mortgage, Assignment of Leases and Rents and Security Agreement dated as of December 1, 2007 and (iii) a Project Loan Mortgage, Assignment of Leases and Rents and Security Agreement, dated as of December 1, 2007 (collectively, the "Mortgages"), pursuant to which the Borrower and the Issuer granted a first priority mortgage against the property described therein (the "Mortgaged Property").  The Issuer

also granted the Bond Trustee certain collateral under the 2007 Indenture (the "2007 Indenture Collateral," and, collectively with the Mortgaged Property, the "Pre-Petition Collateral"). The 2007 Indenture, the Installment Sale Agreement, the Mortgages, and any other document or agreement delivered as security for, or in respect to, the Bonds or the Borrower's obligations under any of such documents are collectively referred to herein as the "Bond Documents."

E.      Each Consenting Holder holds debt arising out of, or related to, the Bonds and the Consenting Holders hold debt, in aggregate, arising out of or related to the Bonds equal to at least seventy-five percent (75%) of the principal amount of the Bonds outstanding.

F.      Defaults, potential defaults or events of default have occurred (or will occur) under the Bond Documents.

G.      The Borrower desires to implement a restructuring (the "Restructuring") of its financial obligations with respect to the Bonds on the terms and conditions set forth in the term sheet (including all exhibits therein, the "Term Sheet") attached hereto as **Exhibit 1**.

H.      The Consenting Holders have agreed to the Restructuring, solely on the terms and conditions outlined in the Term Sheet, which provides that the obligations of the Borrower with respect to the Restructuring and under the Term Sheet are subject to and contingent upon the execution of this Plan Support Agreement, and have agreed to direct the Bond Trustee in accordance with such Term Sheet.

I.      The Borrower intends to implement the Restructuring by filing a voluntary petition for relief commencing a case (the "Chapter 11 Case") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court") on or before July 25, 2014 (the "Outside Petition Date").

J.      Each Party has reviewed, or has had the opportunity to review, this Plan Support Agreement and the Term Sheet with the assistance of professional legal advisors of its own choosing.

## STATEMENT OF AGREEMENT

In consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    <u>Preliminary Statements</u>.  The preliminary statements set forth in the recitals are incorporated herein and form an integrated part of this Plan Support Agreement, subject to such modifications and amendments as may be permitted by Section 11 hereof.

2.    <u>Effectiveness of Plan Support Agreement.</u> Upon the execution of this Plan Support Agreement by the Parties, this Plan Support Agreement will constitute the legally binding and enforceable agreement of the Parties, effective as of the Effective Date.

3.    <u>Agreements of the Borrower</u>.  The Borrower agrees that consistent with its business judgment and the exercise of its fiduciary duties it has agreed that the following are material covenants and conditions to the agreements contained herein:

(a)    The Borrower agrees to take all reasonable efforts to draft the following documents (collectively, the "<u>Bankruptcy Documents</u>") in form and substance satisfactory to the Consenting Holders and the Bond Trustee no later than the Outside Petition Date:

i)    Petition with required documents**,** including: (i) board resolution, (ii) disclosure of related cases, (iii) top 20 unsecured creditors list, (iv) declaration verifying top 20 unsecured creditors list, (v) list of creditors, (vi) declaration verifying list of creditors, (vii) statement regarding equity security holders and corporate disclosure statement, (viii) declaration verifying statement regarding equity security holders and corporate disclosure statement;

ii)    Declaration in Support of First Day Pleadings;

iii)    Motion to Approve Disclosure Statement and Solicitation Procedures;

iv)    Plan of Reorganization;

v)    Disclosure Statement;

vi)    Motions to Retain Claims, Noticing, and Solicitation Agent;

vii)    Motion Authorizing Use of Cash Collateral;

viii)    Motion to Assume Plan Support Agreement;

ix)    Motion to Self-Report in Lieu of an Ombudsman;

      x)      Motion to Maintain Prepetition Escrow Arrangements and Refund Certain Resident Deposits in the Ordinary Course;

      xi)      Motion to Utilize Existing Cash Management System;

      xii)      Motion to Pay Employee Wages and Benefits;

      xiii)      Motion Prohibiting Utilities From Discontinuing Service;

      xiv)      Motion to Pay Prepetition Taxes;

      xv)      Motion to Maintain Existing Insurance Programs;

      xvi)      Motion Extending Time to File Schedules and Statements;

      xvii)      Motion to Establish Proof of Claim Bar Date;

(b)      The Borrower agrees to take all commercially reasonable steps that are necessary to obtain any necessary approval for the Restructuring as expeditiously as is reasonably practicable under applicable law, including the solicitation of requisite acceptances by means of the Disclosure Statement;

(c)      The Borrower agrees to take all commercially reasonable steps to obtain any and all requisite regulatory or third party approvals necessary to consummate the Restructuring as is reasonably practicable;

(d)      The Borrower will take all commercially reasonable efforts to file the Chapter 11 Case, contemporaneously with the Bankruptcy Documents, no later than the Outside Petition Date (the date on which the Chapter 11 Case and Bankruptcy Documents are actually filed shall be referred to herein as the "Petition Date");

(e)      The Borrower agrees to take all reasonably necessary steps in seeking to obtain from the Bankruptcy Court an order confirming the Plan (as defined herein) reasonably acceptable in form and substance to the Consenting Holders (the "Confirmation Order") by October 24, 2014;

(f)      The Plan is substantially consummated including, but not limited to, the exchange of the Bonds, on or before November 28, 2014 (the "Effective Date");

(g)      The Borrower agrees to take no action inconsistent with the Restructuring, the transactions contemplated thereby, or the expeditious confirmation and consummation of such transactions, except as otherwise permitted under this Plan Support Agreement;

(h)    Subject to the exercise of its fiduciary duties, the Borrower agrees that it will not file a petition under the Bankruptcy Code or seek any similar relief without providing the Bond Trustee and the Consenting Holders at least five (5) Business Days' written notice thereof; and

(i)    The Borrower agrees that in the event that it proposes a plan of reorganization that does not comply with this Plan Support Agreement or that constitutes a Support Agreement Termination Event, it will not assert that the Consenting Holders have expressly or impliedly supported, endorsed, or otherwise agreed to any financial information, including any projections or liquidation analysis, included in the Bankruptcy Documents.

(j)    The Borrower agrees that:

i)    It will not incur any further indebtedness with priority over the Bonds;

ii)    It will not transfer any assets other than in the ordinary course of its business other than miscellaneous assets not necessary for the operations of Harborside; and

iii)    It will take no action that would result in entry of an order terminating, whether in whole or in part, the Borrower's exclusive right to file a Chapter 11 plan pursuant to Section 1121 of the Bankruptcy Code.

4.    <u>Agreements of Consenting Holders.</u>

(a)    <u>Ownership.</u> Each Consenting Holder represents and warrants that, as of the date hereof, such Consenting Holder either (i) is the sole legal or beneficial owner of a principal amount of the Bonds outstanding as set forth on **Schedule 1** hereto, and all related claims, rights, powers, and causes of action arising out of or in connection with or otherwise relating to such Bonds or the Bond Documents (collectively, the "<u>Claims</u>"), or (ii) has the power and authority to bind the legal and beneficial owner(s) of such Bonds and Claims to the terms of this Plan Support Agreement and, in either case, such Consenting Holder has full power and authority to vote on and consent to such matters concerning such Bonds outstanding and such Claims and to exchange, assign and transfer such Bonds and Claims.

(b)    <u>Restrictions on Transfers.</u> Each Consenting Holder agrees that, until this Plan Support Agreement has been terminated in accordance with Section 8, it shall not voluntarily sell, transfer, or assign any of its Bonds or Claims or any option thereon or any right or interest (voting or otherwise) therein unless the transferee thereof (i) has already executed this Plan Support Agreement or (ii)

5

agrees in writing by executing the form of Joinder attached hereto as **Exhibit 2** to be bound, for the benefit of the Parties, by all of the terms of this Plan Support Agreement. Subject to applicable securities and bankruptcy law, this Plan Support Agreement shall in no way be construed to preclude any Consenting Holder or any of its respective subsidiaries or affiliates from acquiring additional Bonds; _provided_, _however_, that any such additional Bonds acquired by such Consenting Holder or any subsidiary or affiliate thereof shall automatically be deemed to be subject to the terms of this Plan Support Agreement.

(c)    <u>Voting on the Plan.</u>  Each Consenting Holder agrees that, subject to the terms and conditions of this Plan Support Agreement, and so long as this Plan Support Agreement has not been terminated, and further provided that the Disclosure Statement approved by the Court contains information substantially similar to that set forth in the Disclosure Statement filed as part of the Bankruptcy Documents, it will vote all claims that it holds or as to which it has voting authority with respect to the Bonds outstanding, the Claims, and all other claims, rights, or interests that exist against the Borrower to accept a plan of reorganization proposed as part of the Chapter 11 Case that reflects the Restructuring outlined in the Term Sheet (such plan, the "<u>Plan</u>") and that is filed by the Outside Petition Date.

(d)    <u>Support.</u>  So long as this Plan Support Agreement has not been terminated, each Consenting Holder agrees that it will not:

      i)    support or encourage, directly or indirectly, any financial restructuring or sale of assets concerning the Borrower or its assets, other than the Restructuring;

      ii)    take any action inconsistent with the Term Sheet, the transactions contemplated hereby or thereby, or the expeditious confirmation and consummation of such transactions;

      iii)    vote against the Plan or otherwise agree, consent, or provide any support, to any other chapter 11 plan or other restructuring or sale or liquidation of assets concerning the Borrower or its assets, other than the Restructuring;

      iv)    object to or otherwise commence any proceeding to oppose or alter the Plan or any of the terms of the Restructuring (or any other document filed in furtherance of, and that is consistent with the Restructuring);

      v)    make (and will not direct the Bond Trustee to make) any election under Section 1111(b) of the Bankruptcy Code,

and will vote against and/or direct the Bond Trustee to object to any action or motion to make such an election; or

vi)       direct the Bond Trustee to take any action or otherwise act in a manner contrary to the terms of this Plan Support Agreement.

(e)      <u>Adequate Information; Compliance with Section 1125(g) of the Bankruptcy Code.</u>  Each Consenting Holder agrees that it has obtained adequate information regarding the Restructuring and that the Borrower has provided all material, relevant information that the Consenting Holder has requested in advance of executing this Plan Support Agreement. Additionally, each Consenting Holder agrees that, for purposes of this Plan Support Agreement, the solicitation of its support of the Plan in accordance with the terms and conditions hereof complies with applicable law and that each Consenting Holder was solicited in a manner complying with applicable law.

(f)      <u>Agreement to Forbear</u>. Each Consenting Holder agrees to take all necessary steps to enter into an amendment to that certain Amended and Restated Forbearance Agreement, dated March 21, 2014, between Harborside and the Bond Trustee, to extend the Forbearance Period (as defined therein) through the earlier of (1) the Petition Date, and (ii) July 25, 2014.

(g)      <u>Appearing in the Bankruptcy Court</u>.  Notwithstanding any provision in this Plan Support Agreement to the contrary, nothing in this Plan Support Agreement shall be construed to prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Bankruptcy Court so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Plan Support Agreement and the Restructuring and are not for the purpose of hindering, delaying, or preventing the consummation of the Restructuring.

(h)      <u>Direct the Bond Trustee</u>.    Each Consenting Holder agrees that, to the extent necessary, it will direct the Bond Trustee to take actions consistent with this Plan Support Agreement.

(i)      <u>Documents</u>.   The Consenting Holders agree to direct the Bond Trustee to take all reasonable efforts to draft the following documents in form and substance satisfactory to the Borrower no later than the Outside Petition Date:

i)      Plan Support Agreement;

ii)      Cash Collateral Order (together with the Plan Support Agreement, the "<u>Plan Support Documents</u>");

7

iii)    Indenture of Trust by and between the Issuer and the Bond Trustee;

iv)    Installment Sale Agreement by and between the Issuer and the Borrower; (together with the documents listed in (iii) through (iv), the "2014 Bond Documents")

5.    Representations and Warranties of the Borrower. The Borrower represents and warrants to the Consenting Holders that the following statements are true, correct, and complete as of the date hereof:

(a)    it has all requisite corporate or similar authority to enter into this Plan Support Agreement and, subject to any necessary Bankruptcy Court approval, carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Plan Support Agreement and the performance of the Borrower's obligations hereunder have been duly authorized by all necessary corporate, limited liability, partnership, or other similar action on its part;

(b)    the execution, delivery, and, subject to any necessary Bankruptcy Court approval, performance by the Borrower of this Plan Support Agreement does not and shall not violate any provision of law, rule, or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries;

(c)    the execution, delivery, and performance by the Borrower of this Plan Support Agreement does not and shall not require any registration or filing with, consent or approval of, notice to, or other action to, with or by, any federal, state, or governmental authority or regulatory body;

(d)    to the best of its knowledge, after reasonable diligence, the information provided in connection with the Restructuring and this Plan Support Agreement did not and does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading; and

(e)    subject to the assumption of this Plan Support Agreement pursuant to 11 U.S.C. § 365, this Plan Support Agreement is, and shall be, a legally valid and binding obligation of the Borrower, enforceable in accordance with its terms.

6.    Representations and Warranties of the Consenting Holders. Each Consenting Holder represents and warrants to the Borrower that the following statements are true, correct, and complete as of the date hereof:

(a)    it has all requisite corporate, partnership, limited liability company, or similar authority to enter into this Plan Support Agreement and perform its obligations contemplated hereunder, and the execution and delivery of this Plan Support Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, limited liability, partnership, or other similar action on its part;

(b)    the execution, delivery, and performance by the undersigned of and under this Plan Support Agreement does not and shall not violate any provision of law, rule, or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries;

(c)    the execution, delivery, and performance by the undersigned of and under this Plan Support Agreement does not and shall not require any registration or filing with, consent or approval of, notice to, or other action to, with or by, any federal, state or governmental authority or regulatory body; and

(d)    this Plan Support Agreement is the legally valid and binding obligation of such Consenting Holder, enforceable in accordance with its terms.

7.    <u>Alternative Transactions</u>.  From and after execution of this Plan Support Agreement until it is terminated pursuant to Section 8 hereof, and subject to the Borrower's business judgment and exercise of its fiduciary duties, none of the Borrower, or any of its respective officers, directors, employees, agents, representatives, or affiliates (including any investment banker or financial advisor retained by the Borrower or any of the foregoing) shall, directly or indirectly, encourage, solicit, or initiate any inquiry or proposal from, or encourage, solicit, or initiate any negotiations with, or solicit or initiate any discussions with any person or entity (other than the Consenting Holders and the Bond Trustee or an affiliate, associate, representative or agent of the Consenting Holders) concerning any potential sale of the Borrower or restructuring of the Borrower or a transaction that is similar to, in conflict with or in substitution of the Restructuring pursuant to the terms hereof (each, an "<u>Alternative Transaction</u>"), or agree to endorse or take any other action to facilitate any Alternative Transaction, unless the Borrower has obtained the prior written consent of the Consenting Holders holding all rights related to or otherwise having voting authority with respect to 75% of the principal amount of the Bonds held collectively by the Consenting Holders who are signatory hereto (the "<u>Requisite Consenting Holders</u>").

8.    <u>Termination of Support Agreement.</u> Upon the occurrence of any Support Agreement Termination Event, this Plan Support Agreement shall be deemed terminated upon written notice from the non-breaching Party to the breaching Party. In the event of any such termination, all Parties shall be immediately relieved of any obligations hereunder.  If the Chapter 11 Case has been filed prior to such occurrence, such notice may be provided as part of a motion for relief from the automatic stay; *provided* that

nothing herein shall be deemed to require a motion for relief from the automatic stay to effect such termination. Notwithstanding the above or anything else in this Plan Support Agreement to the contrary, upon termination of this Plan Support Agreement, any Consenting Holder shall be entitled as of right to change or withdraw its vote in favor of the Plan and be relieved from all obligations of a Consenting Holder under this Plan Support Agreement (collectively, a "Withdrawal"), with prior written notice thereof to the Borrower and, if applicable, compliance with Rule 3018 of the Federal Rules of Bankruptcy Procedure. The occurrence of any one or more the following shall constitute a "Support Agreement Termination Event":

    (a)    Failure by the Parties hereto to agree to the form and substance of any of the Plan Support Documents, the 2014 Bond Documents, or the Bankruptcy Documents by the earlier of the Petition Date or the Outside Petition Date;

    (b)    Any of the Bankruptcy Documents is withdrawn, materially modified or amended (except in the case of a document which is an interim order, by replacement with a final order that would otherwise meet the requirements of a Bankruptcy Document, or with the consent of the Consenting Holders and/or the Bond Trustee);

    (c)    The Borrower fails to file the Bankruptcy Documents on the Petition Date;

    (d)    The Petition Date is not on or before the Outside Petition Date;

    (e)    The Borrower:

        i)    files or supports confirmation of, or fails to actively oppose confirmation of, a plan of reorganization that requests or would result in a withdrawal, modification, or amendment of the Plan, or that, as to any provision of the Plan, materially adversely affects the Consenting Holders;

        ii)    files a motion, pleading, objection, lawsuit, or administrative or adversary proceeding (or takes any action in support of such a motion or pleading filed by another party) in the Bankruptcy Court or other court, or otherwise assists in any of the foregoing, that requests or would result in a withdrawal, modification, or amendment (including in the case of document which is an interim order, by replacement with a final order) of the Restructuring; or

        iii)    files a motion, complaint, application, or other request seeking to disallow, subordinate, or limit in any way the

Bonds held by the Consenting Holders, the Claims, or the liens of the Consenting Holders and/or the Bond Trustee, or seeking entry of an order by the Bankruptcy Court disallowing, subordinating, or limiting in any way the Bonds, Claims, or liens of the Consenting Holders and/or the Bond Trustee, or asserting a claim against any Consenting Holder and/or the Bond Trustee to avoid any transfer or obligation, or seeking any other monetary or equitable relief from or against any Consenting Holder and/or the Bond Trustee, in its capacity as such.

(f)     Following the Petition Date, the Bankruptcy Court has:

i)      not approved the Disclosure Statement by September 8, 2014, or by such later date as is agreed to in writing by the Requisite Consenting Holders;

ii)     not entered an order authorizing the assumption of this Plan Support Agreement under Section 365 of the Bankruptcy Code within forty-five (45) days of the Petition Date or such later date as is agreed to in writing by the Requisite Consenting Holders;

iii)    not entered the Confirmation Order by October 24, 2014, or by such later date as is agreed to in writing by the Requisite Consenting Holders;

iv)     entered an order denying confirmation of the Plan;

v)      entered an order pursuant to Section 1104 of the Bankruptcy Code appointing a trustee or appointing an examiner with powers beyond the duty to investigate and report (as set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code), including, without limitation, to operate and manage the Borrower's business (unless the motion resulting in such order was filed or supported by the Bond Trustee), or the Borrower files a motion, application or other pleading consenting to or acquiescing in any such appointment;

vi)     entered an order dismissing the Chapter 11 Case or an order pursuant to Section 1112 of the Bankruptcy Code converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code;

vii)    enters an order suspending the Chapter 11 Case under Section 305 of the Bankruptcy Code;

viii)    enters an order materially staying, reversing, vacating, materially amending or modifying the Cash Collateral Order (which for purposes hereof shall include any interim or final cash collateral order) without the prior written approval of the Bond Trustee, or fails to enter an order approving the use of Cash Collateral on a final basis by August 22, 2014;

ix)    enters an order in the Chapter 11 Case, over the objection of the Bond Trustee, approving financing pursuant to Section 364 of the Bankruptcy Code that (i) would grant an additional security interest or a lien that is equal or senior to that of the Bond Trustee on any collateral, or (ii) would grant to any party other than the Bond Trustee a superpriority administrative claim that is senior or equal to that granted to the Bond Trustee under the Cash Collateral Order; or

x)    granted relief that is inconsistent with this Plan Support Agreement or the Plan or that would result in a withdrawal, modification, or amendment of the Restructuring that is contrary to the Term Sheet and that has a material adverse effect on the Consenting Holders; *provided* that such relief has not resulted from any action or inaction by any of the Consenting Holders or the Bond Trustee.

(g)    The Effective Date of the Plan shall not have occurred by November 28, 2014 or by such later date as is agreed to by the Requisite Consenting Holders;

(h)    An injunction, judgment, order, decree, ruling, or charge shall have been entered that prevents consummation of the Restructuring and that remains in effect for longer than 30 days;

(i)    There is a mutual written agreement to terminate this Plan Support Agreement by the Parties;

(j)    Failure by the Borrower to comply with any obligations under this Plan Support Agreement, other than those set forth in this Section 8, and such failure is not cured within five (5) business days after written notice thereof has been given to the Borrower;

(k)    Failure by the Borrower to comply with any obligations under this Section 8; and

(l)    Failure by any of the Consenting Holders to comply with any of their obligations under this Plan Support Agreement, and such failure is not cured within five (5) business days after written notice thereof has been given by the Borrower to such Consenting Holder and the Bond Trustee.

A Support Agreement Termination Event may be waived in writing by the Requisite Consenting Holders and/or the Borrower, as applicable.

9.    <u>Effect of Termination</u>.  Subject to Section 14 of this Plan Support Agreement, upon termination of this Plan Support Agreement, all obligations hereunder, shall terminate and shall be of no force and effect.

10.    <u>Cooperation; Further Assurances; Acknowledgment; Definitive Documents.</u>  The Parties shall cooperate with each other and shall coordinate their activities (to the extent practicable) in respect of all commercially reasonable actions necessary to consummate the Restructuring.  The Parties further agree to execute and deliver such other instruments and to perform such commercially reasonable acts, in addition to the matters herein specified, as may be appropriate or necessary, from time to time, to effectuate the Restructuring.

11.    <u>Amendments.</u>  This Plan Support Agreement may not be modified, amended or supplemented except in a writing signed by the Parties.

12.    <u>GOVERNING LAW; JURISDICTION.</u>    THIS PLAN SUPPORT AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICT OF LAWS PROVISIONS THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.  BY ITS EXECUTION AND DELIVERY OF THIS PLAN SUPPORT AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT, OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER, OR ARISING OUT OF OR IN CONNECTION WITH, THIS PLAN SUPPORT AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT, OR PROCEEDING, SHALL BE BROUGHT IN ANY FEDERAL OR STATE COURT IN THE STATE OF NEW YORK HAVING JURISDICTION, AND BY EXECUTION AND DELIVERY OF THIS PLAN SUPPORT AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT

TO ANY SUCH ACTION, SUIT OR PROCEEDING; PROVIDED, THAT AFTER THE PETITION DATE THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY ISSUES RELATING TO THIS PLAN SUPPORT AGREEMENT PROVIDED THAT THE BANKRUPTCY COURT SHALL FOLLOW APPLICABLE CHOICE OF LAW RULES.

13.    <u>Specific Performance.</u> It is understood and agreed by the Parties that the exact nature and extent of damages resulting from a breach of this Plan Support Agreement are uncertain at the time of entering into this Plan Support Agreement and that breach of this Plan Support Agreement would result in damages that would be difficult to determine with certainty. It is understood that money damages would not be a sufficient remedy for any breach of this Plan Support Agreement, and the Parties shall each be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach. Such remedies shall be deemed the exclusive remedies for breach of this Plan Support Agreement by any Party or its representatives.

14.    <u>Survival.</u> Notwithstanding any sale of the Bonds outstanding or Claims in accordance with Section 3(b) of this Plan Support Agreement, the agreements and obligations herein shall survive such sale and shall continue in full force and effect for the benefit of the Borrower and the Consenting Holders in accordance with the terms hereof, and any purchaser of such Bonds and/or Claims shall be bound by and subject to the terms of this Plan Support Agreement.

15.    <u>Headings.</u> The headings of the Sections, paragraphs, and subsections of this Plan Support Agreement are inserted for convenience only, and shall not affect the interpretation hereof.

16.    <u>Successors and Assigns; Severability; Several Obligations.</u> This Plan Support Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators, and representatives. The invalidity or unenforceability at any time of any provision hereof shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof. The agreements, representations, and obligations of the Consenting Holders under this Plan Support Agreement are, in all respects, several and not joint.

17.    <u>No Third-Party Beneficiaries.</u> Unless expressly stated herein, this Plan Support Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third party beneficiary hereof.

18.    <u>Consideration.</u> It is hereby acknowledged by the Parties that no consideration shall be due or paid to the Consenting Holders and the Bond Trustee for agreement of the Consenting Holders to support the Restructuring and to vote in favor of the Plan in accordance with the terms and conditions of this Plan Support Agreement, other than the Borrower's agreement to pursue the Restructuring and to file, pursue

confirmation of, and implement the Plan in accordance with the terms and conditions of this Plan Support Agreement, which the Parties acknowledge is fair and sufficient consideration to support the Parties' respective agreements hereunder.

19.    <u>Prior Negotiations; Entire Agreement.</u> This Plan Support Agreement constitutes the entire agreement of the Parties related to the Restructuring, and supersedes all other prior negotiations with respect to the subject matter hereof, except that the Parties acknowledge that all Bond Documents shall continue in full force and effect.

20.    <u>Counterparts.</u> This Plan Support Agreement and any amendments, joinders (including the joinder in the form of **Exhibit 2** hereto), consents, or supplements hereto, may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement.  Facsimile or scanned signatures on this Plan Support Agreement shall be treated as originals for all purposes.

21.    <u>Construction.</u>  This Plan Support Agreement shall be deemed to have been negotiated and prepared at the joint request, direction, and construction of the Parties, and at arm's length and shall be interpreted without favor to any Party.

22.    <u>Time of the Essence</u>.  Time shall be of the essence with respect to each and every of the various undertakings and obligations set forth in this Plan Support Agreement.

23.    <u>Notices.</u>  All notices, demands, requests, consents, approvals, and other communications ("<u>Notice</u>" or "<u>Notices</u>") hereunder shall be in writing and delivered by (i) courier or messenger service, (ii) express or overnight mail, (iii) electronic mail (with a contemporaneous telephone message at the phone number(s) listed below), or (iv) by registered or certified mail, return receipt requested and postage prepaid, addressed to the respective parties as follows:

> If to Borrower:
> > Amsterdam House Continuing Care Retirement
> > Community, Inc.
> > Attn: James Davis
> > 300 East Overlook
> > Port Washington, New York, 11050
> > E-mail: jdavis@amsterdamnh.org

Copy to:

> Cadwalader, Wickersham & Taft LLP
> Attn: Ingrid Bagby, Esq. and Christopher Updike, Esq.
> Cadwalader, Wickersham & Taft, LLP
> One World Financial Center
> New York, New York, 10281
> E-mail: Ingrid.Bagby@cwt.com

If to Trustee:

> UMB Bank, n.a.,
> Attn:  Virginia A. Housum, Senior Vice President
> 120 South 6th Street, Suite 1400
> Minneapolis, MN  55403
> Telephone:  612-308-9775
> e-mail:  Virginia.Housum@umb.com

Copy to:

> Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
> Attn: Daniel S. Bleck, Esq.
> One Financial Center
> Boston, MA 02111
> Telephone.:  617-542-6000
> e-mail:  dsbleck@mintz.com

Copy to:                    Consenting Bondholders
                            [See Schedule 1 Attached Hereto]

or to such other addresses as any Party may hereafter designate.  Notice by courier or messenger service or by express or overnight mail shall be effective upon receipt.  Notice by electronic mail shall be effective upon delivery by the sender of a confirming telephone message.  Notice by mail shall be complete at the time of deposit in the United States mail system, but any right or duty to do any act or make any response within any prescribed period or on a date certain after the service of such Notice given by mail shall be, without further action by any party, automatically extended three (3) days.

24.    <u>Reservation of Rights.</u> Except as expressly provided in this Plan Support Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of any Party to protect and preserve its rights, remedies, and interests, including its Claims.  Nothing herein shall be deemed an admission of any kind.  If the transactions contemplated herein are not consummated, or this Plan Support Agreement is terminated for any reason, the Parties hereto fully reserve any and all of their rights.

Except as required by the Bankruptcy Code to assume, perform, or disclose this Plan Support Agreement, pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence, and any other applicable law, foreign or domestic, this Plan Support Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

25.    _Fiduciary Duty_.  Nothing contained in this Plan Support Agreement shall prevent the Borrower from taking or failing to take any action that it is obligated to take (or not to take, as the case may be) in performance of any fiduciary duty that it may owe to any person or entity under applicable law; _provided_, _however_, that any such action that results in a Support Agreement Termination Event under this Plan Support Agreement shall be subject to the provisions set forth in Section 8 hereof.

26.    _Nature of Consenting Holder Obligations_.  The obligations of each Consenting Holder hereunder shall be several, and not joint with the obligations of any other Consenting Holder herein, and no Consenting Holder shall be responsible in any way for the performance of the obligations of any other Consenting Holder hereunder. Nothing herein or in any other agreement or document, and no action taken by any Consenting Holder pursuant hereto or thereto, shall be deemed to constitute the Consenting Holders as a group, a partnership, an association, a joint venture or any other kind of entity, or to create a presumption that the Consenting Holders are in any way acting in concert or as a group with respect to such obligations or the transaction contemplated by this Plan Support Agreement.  Each Consenting Holder shall be entitled to protect and enforce its rights, including without limitation, the rights arising out of this Plan Support Agreement, and it shall not be necessary for any other Consenting Holder to be joined as an additional party in the proceeding for such purpose.

27.    _Automatic Stay_.  The Borrower acknowledges that after any commencement of the Chapter 11 Case, the giving of notice of termination by any Party pursuant to this Plan Support Agreement or a Withdrawal shall not be a violation of the automatic stay of Section 362 of the Bankruptcy Code.

28.   <u>Support Agreement Not a Plan</u>. This Plan Support Agreement does not constitute a plan of reorganization or confirmation thereof under the Bankruptcy Code. The Plan will not become effective unless and until the Bankruptcy Court enters an order confirming the Plan and the Plan becomes effective in accordance with its terms.  This Plan Support Agreement is not intended to constitute a solicitation or acceptance of the Plan.

IN WITNESS WHEREOF, the parties have caused this Plan Support Agreement to be executed in their respective names by their duly authorized officers, all dated as of the date first above written.

**INVESCO HIGH YIELD MUNICIPAL FUND**
**INVESCO TRUST FOR INVESTMENT GRADE**
**NEW YORK MUNICIPALS**
**INVESCO NEW YORK TAX FREE INCOME FUND**
**INVESCO MUNICIPAL INCOME**
**OPPORTUNITIES TRUST**
**INVESCO MUNICIPAL OPPORTUNITY TRUST**


By:    _____
Its Authorized Representative
and not individually
Principal Amount of the Series A Bonds: $39,750,000
Principal Amount of the Series C Bonds: $17,595,000


**WADDELL & REED ADVISORS MUNI HIGH INCOME & IVY**
**MUNI HIGH INCOME**



By:    _____
Its Authorized Representative
and not individually
Principal Amount of the Series A Bonds: $26,250,000
Principal Amount of the Series C Bonds: $11,620,000


**OPPENHEIMER ROCHESTER AMT-FREE NEW YORK**
**MUNICIPAL FUND**
**OPPENHEIMER ROCHESTER FUND MUNICIPALS**
**OPPENHEIMER ROCHESTER HIGH YIELD MUNICIPAL**
**FUND**



By:    _____
Its Authorized Representative
and not individually
Principal Amount of the Series A Bonds: $16,075,000
Principal Amount of the Series C Bonds:   $7,120,000

28.    <u>Support Agreement Not a Plan</u>. This Plan Support Agreement does not constitute a plan of reorganization or confirmation thereof under the Bankruptcy Code. The Plan will not become effective unless and until the Bankruptcy Court enters an order confirming the Plan and the Plan becomes effective in accordance with its terms.  This Plan Support Agreement is not intended to constitute a solicitation or acceptance of the Plan.

IN WITNESS WHEREOF, the parties have caused this Plan Support Agreement to be executed in their respective names by their duly authorized officers, all dated as of the date first above written.

**INVESCO HIGH YIELD MUNICIPAL FUND**
**INVESCO TRUST FOR INVESTMENT GRADE**
**NEW YORK MUNICIPALS**
**INVESCO NEW YORK TAX FREE INCOME FUND**
**INVESCO MUNICIPAL INCOME**
**OPPORTUNITIES TRUST**
**INVESCO MUNICIPAL OPPORTUNITY TRUST**

By:    _____
       Its Authorized Representative
       and not individually
       Principal Amount of the Series A Bonds: $39,750,000
       Principal Amount of the Series C Bonds: $17,595,000

**WADDELL & REED ADVISORS MUNI HIGH INCOME & IVY MUNI HIGH INCOME**

By:    _____
       Its Authorized Representative
       and not individually
       Principal Amount of the Series A Bonds: $26,250,000
       Principal Amount of the Series C Bonds: $11,620,000

**OPPENHEIMER ROCHESTER AMT-FREE NEW YORK MUNICIPAL FUND**
**OPPENHEIMER ROCHESTER FUND MUNICIPALS**
**OPPENHEIMER ROCHESTER HIGH YIELD MUNICIPAL FUND**

By:    _____
       Its Authorized Representative
       and not individually
       Principal Amount of the Series A Bonds: $16,075,000
       Principal Amount of the Series C Bonds:   $7,120,000

28.    <u>Support Agreement Not a Plan</u>. This Plan Support Agreement does not constitute a plan of reorganization or confirmation thereof under the Bankruptcy Code. The Plan will not become effective unless and until the Bankruptcy Court enters an order confirming the Plan and the Plan becomes effective in accordance with its terms.  This Plan Support Agreement is not intended to constitute a solicitation or acceptance of the Plan.

IN WITNESS WHEREOF, the parties have caused this Plan Support Agreement to be executed in their respective names by their duly authorized officers, all dated as of the date first above written.

**INVESCO HIGH YIELD MUNICIPAL FUND**
**INVESCO TRUST FOR INVESTMENT GRADE**
**NEW YORK MUNICIPALS**
**INVESCO NEW YORK TAX FREE INCOME FUND**
**INVESCO MUNICIPAL INCOME**
**OPPORTUNITIES TRUST**
**INVESCO MUNICIPAL OPPORTUNITY TRUST**

By:    _____
Its Authorized Representative
and not individually
Principal Amount of the Series A Bonds: $39,750,000
Principal Amount of the Series C Bonds: $17,595,000

**WADDELL & REED ADVISORS MUNI HIGH INCOME & IVY**
**MUNI HIGH INCOME**

By:    _____
Its Authorized Representative
and not individually
Principal Amount of the Series A Bonds: $26,250,000
Principal Amount of the Series C Bonds: $11,620,000

**OPPENHEIMER ROCHESTER AMT-FREE NEW YORK**
**MUNICIPAL FUND**
**OPPENHEIMER ROCHESTER FUND MUNICIPALS**
**OPPENHEIMER ROCHESTER HIGH YIELD FUND**

By:    _____
Its Authorized Representative
and not individually
Principal Amount of the Series A Bonds: $16,075,000
Principal Amount of the Series C Bonds:  $7,120,000

[*Signature Page to Plan Support Agreement*]

**T. ROWE PRICE TAX-FREE HIGH YIELD FUND, INC.**
**NEW YORK TAX-FREE BOND FUND** (a series of the T. Rowe
Price State Tax-Free Income Trust)
**T. ROWE PRICE SUMMIT MUNICIPAL INCOME FUND** (a
series of the T. Rowe Price Summit Municipal Funds, Inc.)
**T. ROWE PRICE SUMMIT MUNICIPAL INTERMEDIATE
FUND** (a series of the T. Rowe Price Summit Municipal Funds, Inc.)

By: T. Rowe Price Associates, Inc., as Investment Adviser

By: _____
    Its Authorized Representative
    and not individually
    Principal Amount of the Series A Bonds: $17,870,000
    Principal Amount of the Series C Bonds:  $7,910,000

**ALLIANCEBERNSTEIN MUNICIPAL INCOME FUND,
INC./HIGH INCOME MUNICIPAL PORTFOLIO**

By: _____
    Its Authorized Representative
    and not individually
    Principal Amount of the Series A Bonds:  $7,770,000
    Principal Amount of the Series C Bonds:  $3,440,000

**WESTERN ASSET MANAGEMENT COMPANY**

By: _____
    Its Authorized Representative
    and not individually
    Principal Amount of Series A Bonds: $11,840,000

[*Signature Page to Plan Support Agreement*]

**T. ROWE PRICE TAX-FREE HIGH YIELD FUND, INC.**
**NEW YORK TAX-FREE BOND FUND** (a series of the T. Rowe
Price State Tax-Free Income Trust)
**T. ROWE PRICE SUMMIT MUNICIPAL INCOME FUND** (a
series of the T. Rowe Price Summit Municipal Funds, Inc.)
**T. ROWE PRICE SUMMIT MUNICIPAL INTERMEDIATE
FUND** (a series of the T. Rowe Price Summit Municipal Funds, Inc.)

By: T. Rowe Price Associates, Inc., as Investment Adviser

By: _____
    Its Authorized Representative
    and not individually
    Principal Amount of the Series A Bonds: $17,870,000
    Principal Amount of the Series C Bonds:  $7,910,000

**AllianceBernstein Municipal Income Fund, Inc. –**
**AllianceBernstein High Income Municipal Portfolio**

**AllianceBernstein Corporate Shares –**
**AllianceBernstein Municipal Income Shares**

**AllianceBernstein Municipal Income Fund, Inc. –**
**New York Portfolio**

By: _____
    Its Authorized Representative
    and not individually
    Principal Amount of the Series A Bonds: $7,770,000
    Principal Amount of the Series C Bonds: $3,440,000

**WESTERN ASSET MANAGEMENT COMPANY**

By: _____
    Its Authorized Representative
    and not individually
    Principal Amount of Series A Bonds: $11,840,000

*[Signature Page to Plan Support Agreement]*

**T. ROWE PRICE TAX-FREE HIGH YIELD FUND, INC.**
**NEW YORK TAX-FREE BOND FUND** (a series of the T. Rowe
Price State Tax-Free Income Trust)
**T. ROWE PRICE SUMMIT MUNICIPAL INCOME FUND** (a
series of the T. Rowe Price Summit Municipal Funds, Inc.)
**T. ROWE PRICE SUMMIT MUNICIPAL INTERMEDIATE
FUND** (a series of the T. Rowe Price Summit Municipal Funds, Inc.)

By: T. Rowe Price Associates, Inc., as Investment Adviser

By: _____
     Its Authorized Representative
     and not individually
     Principal Amount of the Series A Bonds: $17,870,000
     Principal Amount of the Series C Bonds:  $7,910,000

**ALLIANCEBERNSTEIN MUNICIPAL INCOME FUND,
INC./HIGH INCOME MUNICIPAL PORTFOLIO**

By: _____
     Its Authorized Representative
     and not individually
     Principal Amount of the Series A Bonds: $7,770,000
     Principal Amount of the Series C Bonds:  $3,440,000

**WESTERN ASSET MUNICIPAL PARTNERS FUND INC.
MUNICIPAL HIGH INCOME PORTFOLIO
WESTERN ASSET NEW YORK MUNICIPALS FUND
WESTERN ASSET INTERMEDIATE-TERM MUNICIPALS
FUND**

By: _____    Michael A. Van Raaphorst
     Its Authorized Representative    Head of New York Operations/Client Service/i
     and not individually
     Principal Amount of Series A Bonds: $11,840,000

*[Signature Page to Plan Support Agreement]*

BORROWER:

**AMSTERDAM HOUSE CONTINUING CARE RETIREMENT COMMUNITY, INC.**

_____

Name: James Davis
Title:   President and Chief Executive Officer

## SCHEDULE 1

"CONSENTING HOLDERS"

| Consenting Bondholder | Principal Amount of Bonds Owned |
|---|---|
| INVESCO HIGH YIELD MUNICIPAL FUND INVESCO TRUST FOR INVESTMENT GRADE NEW YORK MUNICIPALS INVESCO NEW YORK TAX FREE INCOME FUND INVESCO MUNICIPAL INCOME OPPORTUNITIES TRUST INVESCO MUNICIPAL OPPORTUNITY TRUST | Series A Bonds: $39,750,000 Series C Bonds: $17,595,000 |
| WADDELL & REED ADVISORS MUNI HIGH INCOME & IVY MUNI HIGH INCOME | Series A Bonds: $26,250,000 Series C Bonds: $11,620,000 |
| OPPENHEIMER ROCHESTER AMT-FREE NEW YORK MUNICIPAL FUND OPPENHEIMER ROCHESTER FUND MUNICIPALS OPPENHEIMER ROCHESTER HIGH YIELD MUNICIPAL FUND | Series A Bonds: $16,075,000 Series C Bonds:   $7,120,000 |

| | |
|---|---|
| T. ROWE PRICE TAX-FREE HIGH YIELD FUND, INC.<br>NEW YORK TAX-FREE BOND FUND (a series of the T. Rowe Price State Tax-Free Income Trust)<br>T. ROWE PRICE SUMMIT MUNICIPAL INCOME FUND (a series of the T. Rowe Price Summit Municipal Funds, Inc.)<br>T. ROWE PRICE SUMMIT MUNICIPAL INTERMEDIATE FUND (a series of the T. Rowe Price Summit Municipal Funds, Inc.) | Series A Bonds: $17,870,000<br>Series C Bonds:   $7,910,000 |
| ALLIANCEBERNSTEIN MUNICIPAL INCOME FUND, INC./HIGH INCOME MUNICIPAL PORTFOLIO | Series A Bonds:  $7,770,000<br>Series C Bonds:  $3,440,000 |
| WESTERN ASSET MUNICIPAL PARTNERS FUND INC.<br>MUNICIPAL HIGH INCOME PORTFOLIO<br>WESTERN ASSET NEW YORK MUNICIPALS FUND<br>WESTERN ASSET INTERMEDIATE-TERM MUNICIPALS FUND | Series A Bonds: $11,840,000 |

# **EXHIBIT 1**

TERM SHEET

**RESTRUCTURING TERM SHEET**

This Restructuring Term Sheet (this "***Term Sheet***"), dated as of July 21, 2014 (the "***Execution Date***"), sets forth certain of the principal terms and conditions of a financial restructuring (the "***Restructuring Transaction***") of the outstanding indebtedness of Amsterdam House Continuing Care Retirement Community, Inc. ("***Amsterdam***" or the "***Debtor***"), including, without limitation, (i) $167,895,000 Nassau County Industrial Development Agency Continuing Care Retirement Community Fixed Rate Revenue Bonds (Amsterdam at Harborside Project) Series 2007A (the "***Series 2007A Bonds***"), (ii) $8,500,000 Nassau County Industrial Development Agency Continuing Care Retirement Community Adjustable Rate Revenue Bonds (Amsterdam at Harborside Project) Series 2007B (the "***Series 2007B Bonds***"), and (iii) $95,100,000 Nassau County Industrial Development Agency Continuing Care Retirement Community Variable Rate Demand Revenue Bonds (Amsterdam at Harborside Project) Series 2007C (the "***Series 2007C Bonds***" and together with the Series 2007A Bonds and the Series 2007B Bonds, the "***Series 2007 Bonds***") pursuant to that certain Indenture of Trust (the "***2007 Indenture***"), dated as of December 1, 2007, between the Nassau County Industrial Development Agency (the "***Issuer***") and UMB Bank, n.a., as trustee (the "***Trustee***").

The Restructuring Transaction contemplates, among other things, an exchange of the outstanding Series 2007 Bonds in the aggregate principal amount of approximately $222,375,000, plus accrued and unpaid interest thereon, as provided for herein, for new Series 2014A Bonds, Series 2014B Bonds and Series 2014C Bonds (as such terms are hereinafter defined). This Term Sheet contemplates the consummation of the Restructuring Transaction through a plan of reorganization (the "***Plan***") in a chapter 11 proceeding of Amsterdam (the "***Anticipated Bankruptcy Proceeding***") pending before a court of competent jurisdiction (the "***Bankruptcy Court***") as more fully described below.

This Term Sheet and the undertakings contemplated herein are subject in all respects to the negotiation, execution and delivery of mutually acceptable definitive documentation between Amsterdam, the Issuer, the Trustee, and the members of an informal steering committee comprised of bondholders currently holding 75% of the outstanding aggregate principal amount of Series 2007 Bonds (the "***Steering Committee***"). This Term Sheet is not and shall not be deemed to be a solicitation of votes for the acceptance of the Plan or any plan of reorganization.

**THE TERM SHEET IS BEING PROVIDED AS PART OF A COMPREHENSIVE COMPROMISE AND SETTLEMENT, EACH ELEMENT OF WHICH IS CONSIDERATION FOR THE OTHER ELEMENTS AND AN INTEGRAL ASPECT OF THE PROPOSED RESTRUCTURING OF THE SERIES 2007 BONDS. THE TERM SHEET IS SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND COMPARABLE STATE STATUTES. NOTHING IN THE TERM SHEET SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION OR A WAIVER, AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE, SOLELY FOR SETTLEMENT PURPOSES, WITH A FULL RESERVATION AS TO ALL RIGHTS, REMEDIES AND DEFENSES OF AMSTERDAM, THE TRUSTEE, THE STEERING COMMITTEE, AND ALL OTHER PARTIES.**

Capitalized terms not otherwise defined herein shall have the meanings given to them in the 2007 Indenture.

A.    **Implementation of Restructuring Transaction**

| | |
|---|---|
| **Plan Process** | The Restructuring Transaction will be implemented through the Plan.  The Series 2014A Bonds, Series 2014B Bonds and Series 2014C Bonds (each as defined below and collectively, the "***Series 2014 Bonds***") will be issued on the effective date of the Plan (the |

|  | "***Effective Date***") pursuant to an Indenture of Trust ("***2014 Indenture***" and together with all related documents necessary for the issuance of the Series 2014 Bonds, the "***2014 Bond Documents***") between the Issuer and the Trustee.<br><br>The Plan contemplates acceptances from the holders of at least two-thirds in dollar amount and a majority in number of the holders of the Series 2007 Bonds that vote to accept or reject the Plan.<br><br>Amsterdam will file in the Anticipated Bankruptcy Proceeding a Plan and disclosure statement to the Plan (the "***Disclosure Statement***"), that is acceptable to the Trustee, which contains the terms and conditions outlined in the Term Sheet, on the timeline set forth below.  Prior to the filing of the Anticipated Bankruptcy Proceeding, Amsterdam shall provide the Plan, Disclosure Statement, Cash Collateral Agreement (defined herein) and all other principal documents associated with the Anticipated Bankruptcy Proceeding (collectively, the "***Bankruptcy Documents***") to the Trustee for its review and consent.  Any substantive amendments, modifications or supplements to the Bankruptcy Documents shall be reviewed by, and acceptable to, the Trustee; provided, however, that no amendment, modification, or supplement shall be materially different from the Term Sheet. |
| **Plan Support** | Prior to the commencement of the Anticipated Bankruptcy Proceeding, and subject to the timeline set forth herein, the Steering Committee agrees to take all necessary steps to enter into a binding plan support agreement (the "***Plan Support Agreement***") concerning the Steering Committee's commitment to and support of the Plan.<br><br>The Steering Committee agrees to take all steps necessary to support confirmation of the Plan, pursuant to the terms of the Plan Support Agreement, and the Steering Committee agrees to not take any actions inconsistent with this Term Sheet, and to direct the Trustee not to take any actions inconsistent with this Term Sheet.  The Steering Committee agrees to vote or cause to be voted all such claims that the Steering Committee's members control, or have the ability to control, to accept the Plan by delivering a duly executed and completed ballot or ballots, as applicable, accepting the Plan on a timely basis pursuant to the ongoing solicitation of votes for the Plan and shall not change such vote.  The Steering Committee agrees not to vote or cause to be voted (to the extent applicable) any of the claims that the Steering Committee's members hold, control, or have the ability to control to reject the Plan, and agree not to otherwise commence any proceeding to oppose the Plan or object to confirmation thereof.  All such actions by the Steering Committee are subject to the terms of the Plan Support Agreement. |
| **Forbearance Period Extension** | The Trustee and Amsterdam agree to take all necessary steps to enter into a further amendment (the "***Amendment***") to the Amended and Restated Forbearance Agreement, dated March 21, 2014 ("***Amended and Restated Forbearance Agreement***"), extending the Forbearance Period (as defined in the Amended and Restated Forbearance Agreement) through the earlier of the date of commencement of the Anticipated Bankruptcy Proceeding (the "***Petition Date***") or July 25, 2014. |
| **Steering Committee Retention of Bonds and Claims** | The Steering Committee agrees that it shall not sell, transfer, assign, or otherwise dispose of, directly or indirectly, any of the Series 2007 Bonds, or any right, claim, or interest (voting or otherwise) related to or arising from the Series 2007 Bonds, held by its respective members, subject to the terms and conditions of the Plan Support Agreement. |
| **Escrow of Entrance Fees Received Post-** | All Entrance Fees received after the commencement of the Anticipated Bankruptcy Proceeding but before the Effective Date ("***Escrowed Entrance Fees***") shall be held in |

| | |
|---|---|
| **Petition** | escrow solely for the benefit of the corresponding resident, and shall not constitute property of the Debtor's bankruptcy estate.  Amsterdam will file a first-day motion in the Anticipated Bankruptcy Proceeding requesting authority to effectuate such escrow, pursuant to an Initial Entrance Fee escrow agreement acceptable to the Trustee. |
| **Assumption of Residence Agreements and Related Obligations** | The Plan shall provide that Amsterdam will assume all existing Residence Agreements, including but not limited to those agreements with residents of Amsterdam's Assisted Living Units and Nursing Center and their related obligations, including the obligation of Amsterdam to pay any resident refunds required to be satisfied under the terms of the Residence Agreements ("***Refunds***"). |
| **Trade Creditor and Vendor Claims Paid in Full** | The Plan shall provide that the claims of all trade creditors and vendors shall be paid in full. |

## B.     Terms of Restructuring

| | |
|---|---|
| **Exchange** | On the Effective Date, the holders of the Series 2007A Bonds and Series 2007B Bonds shall exchange the then outstanding Series 2007A Bonds and Series 2007B Bonds for a pro rata share of (i) certain Series 2014A Bonds issued in the aggregate principal amount equal to 75% of the then outstanding Series 2007A Bonds and Series 2007B Bonds and (ii) certain Series 2014C Bonds issued in the aggregate principal amount equal to (A) 25% of the then outstanding Series 2007A Bonds and Series 2007B Bonds, plus (B) interest accrued on such Series 2007 Bonds from the Petition Date through the Effective Date at the post-effective restructuring rate of interest. |
| | On the Effective Date, the holders of the Series 2007C Bonds shall exchange their Series 2007C Bonds for a pro rata share of (i) certain Series 2014A Bonds issued in the aggregate principal amount equal to $11,921,250, (ii) certain Series 2014B Bonds issued in the aggregate principal amount equal to $23,842,500, and (iii) certain Series 2014C Bonds issued in the aggregate principal amount equal to (A) 25% of the then outstanding Series 2007C Bonds, plus (B) interest accrued on such Series 2007 Bonds from the Petition Date through the Effective Date at 5.9% per annum. |
| **Series 2014A Bonds** | The Series 2014A Bonds shall be issued as current paying bonds with an aggregate principal amount equal to (i) approximately 75% of the then outstanding principal amount of the Series 2007A Bonds and Series 2007B Bonds, plus (ii) $11,921,250 with respect to the Series 2007C Bonds.  The Series 2014A Bonds shall bear interest at and have maturities in the years and in principal amounts as set forth on Schedule 1 hereto.  The Series 2014A Bonds shall further be subject to mandatory redemption/amortization as set forth in Schedule 2 hereto. Interest on the Series 2014A Bonds shall be payable semiannually following the Effective Date and principal shall be paid annually as set forth in Schedule 2. |
| | The Series 2014A Bonds will be secured by a first priority lien on all assets of Amsterdam (except for Entrance Fees) *pari passu* with the Series 2014B Bonds and a second priority lien on Entrance Fees. The Series 2014A Bond shall mature in 35 years. |
| | The Series 2014A Bonds will be subject to optional redemption prior to maturity commencing on the 10th year after the Effective Date at a price equal to: in year 10, at a |

| | price of 101% and thereafter at par. |
|---|---|
| **Series 2014B Bonds** | The Series 2014B Bonds shall be issued as current paying bonds with an aggregate principal amount equal to $23,842,500 at the Effective Date.  The Series 2014B Bonds shall bear interest at 5.5%, payable semiannually, maturing in 5.5 years.  The Series 2014B Bonds shall be subject to mandatory redemption from Entrance Fees, as set forth below.<br><br>The Series 2014B Bonds will be secured by a first priority lien on Entrance Fees and shall be secured *pari passu* with the Series 2014A Bonds on the other assets of Amsterdam. |
| **Series 2014C Bonds** | The Series 2014C Bonds (the "*Series 2014C Bonds*") shall be issued in an aggregate principal amount equal to (A) approximately 25% of the then outstanding principal amount of the Bonds as of the Effective Date, plus (B) interest accrued on the Series 2007 Bonds from the Petition Date through the Effective Date at the post-effective restructuring rate of interest; provided that for the Series 2007C Bonds, at 5.9% per annum.<br><br>The Series 2014C Bonds shall bear interest at 2%, payable semiannually, but only to the extent of Excess Cash (defined below), in accordance with the Distribution Waterfall (defined below), applied first to accrued interest, then to principal.  The Series 2014C Bonds shall mature in 35 years.<br><br>Any balance outstanding on the Series 2014C Bonds at final maturity shall be due and payable in full.<br><br>The Series 2014C Bonds will be secured by a lien on all assets of Amsterdam subordinate to the lien securing the Series 2014A Bonds and Series 2014B Bonds. |
| **Priority/Security** | The Series 2014A Bonds and the Series 2014B Bonds will be *pari passu*, secured by a first priority lien on all assets of Amsterdam (except Entrance Fees) and will be senior to the Series 2014C Bonds in repayment and security.  The Series 2014B Bonds will have a first priority lien on all Entrance Fees and the Series 2014A Bonds will have a second priority lien on all Entrance Fees. The Series 2014C Bonds will be secured by a lien on all assets of Amsterdam subordinate to the lien securing the Series 2014A Bonds and Series 2014B Bonds. |
| **Subordinate Obligations** | The $3,000,000 Subvention Certificate to Amsterdam from Amsterdam Continuing Care Health System, Inc., dated March 31, 2004 (the "*Subvention*"), shall be assumed by Amsterdam as part of the Restructuring Transaction and the Plan, and shall continue to be enforceable according to its terms, provided that the Subvention is amended to reflect that no amounts thereon shall be paid until the Series 2014 Bonds are paid in full and it is confirmed that the Subvention has no negative impact on the actuarial analysis relating to the restructuring. |
| **Advisory Agreements** | The third party services advisors for Amsterdam (which as of the date hereof includes Amsterdam Consulting, LLC, Greystone Development Company II, LP and Greystone Management Services Company, LLC) and the terms and conditions of their respective agreements as of the Effective Date shall be as agreed to by Amsterdam with the reasonable approval of the Trustee. |
| **Mount Sinai CCRC** | Amsterdam Continuing Care Health System, Inc. (the "*Sponsor*") understands that subject |

| | |
|---|---|
| **Property and Contribution by Sponsor** | to the approval of the NYS Department of Health ("***DOH***"), the owner of the property in Mount Sinai, NY intended for development as a CCRC is in negotiations to sell the property to a third party who will assume the obligations under the HEAL Grant issued previously. If DOH agrees to the assignment of the HEAL Grant, upon completion of the sale, neither the Sponsor nor any other Amsterdam affiliate shall have any obligations under the HEAL Grant. |
| | Moreover, neither Amsterdam nor its Sponsor shall engage in any conduct within the within the primary market area or secondary market area of the Amsterdam at Harborside facility that competes with the sales efforts of the Amsterdam at Harborside facility. For the purposes of foregoing, "primary market area" is as defined in the feasibility study prepared by Dixon Hughes PLLC in connection with the issuance of the Series 2007 Bonds and "secondary market area" means the area within the following zip codes: 11001, 11003, 11004, 11005, 11010, 11042, 11354, 11355, 11356, 11357, 11358, 11359, 11360, 11361, 11362, 11363, 11364, 11365, 11366, 11367, 11375, 11423, 11426, 11427, 11428, 11429, 11439, 11549, 11550, 11552, 11553, 11554, 11797, 11801 and 11803. |

## Indenture Held/Amsterdam Held Funds

| | |
|---|---|
| **Operating Account** | Upon the Effective Date, Amsterdam shall hold and maintain an operating account (the "***Operating Account***"), which shall be subject to the lien of the Trustee under the 2014 Indenture pursuant to a deposit account control agreement with a depository bank that is reasonably acceptable to the Trustee.  The Operating Account shall contain no more than 45 Days Cash on Hand as an unrestricted reserve amount funded as of the Effective Date (the "***Unrestricted Reserve Amount***").  The Unrestricted Reserve Amount may be increased by Amsterdam's share of the Excess Cash received pursuant to the Distribution Waterfall below until the Unrestricted Reserve Amount equals 120 Days Cash on Hand (the "***Unrestricted Reserve Cap***"). |
| **Entrance Fee Fund** | Upon the Effective Date, Amsterdam shall maintain the existing Entrance Fee Fund under the 2014 Indenture.  After the Effective Date, pursuant to the 2014 Indenture, all Entrance Fees of Amsterdam shall be required to be deposited in the Entrance Fee Fund until the Series 2014B Bonds are paid in full. |
| | Entrance Fees will only be transferred from the Entrance Fee Fund after any applicable rescission rights under the Residence Agreements have expired. |
| | Entrance Fees on deposit in the Entrance Fee Fund shall be applied on a monthly basis as follows: |
| | 1. To pay any Refunds; <br> 2. To replenish the balance of the Operating Reserve Fund and the Operating Account to a combined total of 175 Days Cash on Hand; <br> 3. To redeem Series 2014B Bonds in authorized denominations; and <br> 4. After payment in full of the Series 2014B Bonds, any remaining Entrance Fee amounts will be transferred to the Revenue Fund (as defined herein) and shall be available to flow through the Distribution Waterfall (as defined herein). |
| **Revenue Fund** | The 2014 Indenture shall establish a Revenue Fund with the Trustee, subject to the lien of |

| | the 2014 Indenture, pursuant to which all revenues and other income of Amsterdam (the "***Revenues***"), shall, upon the Effective Date, be deposited into a revenue fund (the "***Revenue Fund***").  Funds from the Revenue Fund shall be withdrawn pursuant to the Distribution Waterfall below. |
|---|---|
| **Operating Reserve Fund** | Upon the Effective Date, Amsterdam shall maintain the existing Operating Reserve Fund with the Trustee, subject to the lien of the 2014 Indenture, and fund such Operating Reserve Fund with an amount such that Amsterdam shall have 130 Days Cash on Hand[1] as of the Effective Date.  The amounts in the Operating Reserve Fund shall be available to Amsterdam for Operating Expenses (as defined herein) including those set forth in the First, Second, and Third of the Distribution Waterfall. |
| **Bond Fund** | Upon the Effective Date, Amsterdam shall establish a Bond Fund (the "***Bond Fund***") under the 2014 Indenture, subject to the lien of the 2014 Indenture, with subaccounts for each series of Series 2014 Bonds.  In accordance with the Distribution Waterfall below, the Bond Fund will receive (i) the monthly payments of principal and interest due and payable under the Series 2014A Bonds and Series 2014B Bonds, and (ii) Excess Cash (as defined below and to the extent provided for in the Distribution Waterfall) with such amounts then being distributed to the holders of the Series 2014C Bonds. |
| **Debt Service Reserve Fund** | Upon the Effective Date, Amsterdam shall establish a Debt Service Reserve Fund (the "***Debt Service Reserve Fund***") under the 2014 Indenture, subject to the lien of the 2014 Indenture to secure payment of the Series 2014A Bonds and Series 2014B Bonds.  All amounts held by the Trustee in the Debt Service Reserve Fund with respect to the Series 2007 Bonds shall be transferred to the new Debt Service Reserve Fund.  The Debt Service Reserve Fund shall not become an asset of Amsterdam, but shall remain funds held by the Trustee for the benefit of the holders of the Series 2014A Bonds and Series 2014B Bonds. The Debt Service Reserve Fund Requirement shall equal (i) until the Series 2014B Bonds are paid in full, Annual Debt Service, which shall be satisfied prior to the commencement of the redemption of the Series 2014B Bonds and (ii) thereafter, Maximum Annual Debt Service. After payment in full of the Series 2014A Bonds and Series 2014B Bonds, the Debt Service Reserve Fund shall secure payment of the Series 2014C Bonds. |
| **Distribution Waterfall** | Upon the Effective Date, all Entrance Fees, including Escrowed Entrance Fees, shall be deposited with the Trustee in the Entrance Fee Fund.  Such amounts, together with the balances of the Operating Account and the Operating Reserve Fund, as of such date, and any Revenues available to Amsterdam at such time, shall be applied in the following order of priority:

1. to pay any Refunds;
2. to pay all professional fees and expenses incurred in connection with the Restructuring Transaction (including, without limitation, any costs associated with obtaining opinions from bond counsel) subject to an agreed upon budget; |

---

[1] The term "***Days Cash on Hand***" means the sum of the amount in the Operating Reserve Fund and the Operating Account (collectively, "***Total Available Cash***") divided by average daily cash expenditures.  Average daily cash expenditures is defined as reported expenses per Amsterdam' income statement (including any interest expenses) less depreciation and amortization (the "***Cash Operating Expenses***") for the three (3) months preceding the measurement date multiplied by a multiple of four (4) and divided by 365 days.  The Days Cash on Hand will be calculated and reported on a quarterly basis; however, Amsterdam shall produce monthly reports thirty (30) days following each month with respect to the Operating Reserve Fund until the later of Stabilized Occupancy (as defined in the 2014 Indenture) or the payment in full of the Series 2014B Bonds.

3.   to pay interest on the Series 2007 Bonds accrued and unpaid through the date before the Petition Date (approximately $1,696,996.98 assuming a July 22, 2014 Petition Date);

4.   to fund the Operating Reserve Fund in an amount equal to approximately 130 Days Cash on Hand (approximately $11.1 million);

5.   to fund the Unrestricted Reserve Amount in an amount equal to approximately 45 Days Cash on Hand (approximately $3.9 million); and

6.   to fund the Debt Service Reserve Fund up to the initial Debt Service Reserve Fund Requirement.

Thereafter, all post-Effective Date Entrance Fees and other Revenues of Amsterdam shall be deposited in the Entrance Fee Fund or the Revenue Fund, as applicable; provided, however, that Revenues with respect to any government payor shall be deposited into an account in the name of Amsterdam, and such Revenues shall be swept into the Revenue Fund on a weekly basis.

Subject to the next sentence, amounts on deposit in the Revenue Fund shall be made available to Amsterdam on a monthly basis to satisfy ongoing operations and management costs and expenses of Amsterdam, including, without limitation, any management fees, budgeted capital expenditures relating to Amsterdam, Refunds and replenishment of any Unrestricted Reserve Amount (collectively, the "***Operating Expenses***").  If an Event of Default (as defined in the 2014 Indenture) shall occur, then the monthly amounts on deposit in the Revenue Fund available for withdrawal to satisfy Operating Expenses shall be made available to Amsterdam in an amount not to exceed the amounts set forth in an operating budget established pursuant to the terms of the 2014 Indenture.

On the first day of each calendar month, monies in the Revenue Fund shall be distributed in the following order of priority (the "***Distribution Waterfall***"):

- First, to transfer to Amsterdam's Operating Account the amount certified by Amsterdam (in a certificate setting forth in reasonable detail the projected application of the amount so certified) as necessary to pay anticipated Operating Expenses for the upcoming month (taking into account any unapplied amount withdrawn for such purpose in a prior month);

- Second, to the Series 2014A Bonds subaccount and the Series 2014B Bonds subaccount of the Bond Fund, in an amount equal to 1/6th of the interest due on the next interest payment date;

- Third, to the Series 2014A Bonds subaccount and the Series 2014B Bonds subaccount of the Bond Fund, in an amount equal to 1/12th of the principal due on the next principal payment date;

- Fourth, to replenish the balance of the Operating Reserve Fund and the Operating Account to a combined total of 175 Days Cash on Hand;

- Fifth, to replenish any deficiency as of the Effective Date in the Debt Service Reserve Fund necessary to make the amount therein equal the Debt Service Reserve Fund Requirement;

- Sixth, any remaining amounts after application of paragraphs first to fifth above (such remaining amounts referred to as "***Excess Cash***") shall be transferred as follows until the amount in the Operating Account is funded up to the Unrestricted Reserve Cap:

| | |
|---|---|
| | 50% to the Operating Account and 50% to the Series 2014C Bonds subaccount of the Bond Fund to redeem Series 2014C Bonds; and thereafter, 100% of the Excess Cash shall be deposited in the Series 2014C Bonds subaccount of the Bond Fund to redeem Series 2014C Bonds;<br><br>The foregoing requirement to remit all Revenues into the Revenue Fund shall terminate to the extent (i) Amsterdam's Debt Service Coverage Ratio is greater than 1.30x, (ii) Amsterdam has 250 Days Cash on Hand, (iii) Stabilized Occupancy (as defined in the 2014 Indenture) has been maintained for six consecutive months, and (iv) there is not otherwise a default or Event of Default under the 2014 Bond Documents.  Under such circumstances, all Revenues will instead be transferred to Amsterdam's Operating Account, and Amsterdam shall thereafter be required to make monthly payments of principal and interest, plus replenish any deficiencies in the Debt Service Reserve Fund, as further set forth under the 2014 Indenture. |
| **Operating/Financial Covenants** | |
| **Days Cash on Hand** | Days Cash on Hand requirement of not less than (i) 150 Days Cash on Hand as of each testing date, commencing June 30, 2015, (ii) 175 Days Cash on Hand as of each testing date, commencing on the second testing date following the date the Series 2014B Bonds are paid in full, and (iii) 200 Days Cash on Hand as of each testing date thereafter, commencing on the third testing date following the date the Series 2014B Bonds are paid in full (each such requirement, the "***DCOH Target***").  Amsterdam shall provide reporting of Days Cash on Hand quarterly, the Days Cash on Hand covenant will be tested semi-annually on each June 30 and December 31 (each, a "***Testing Date***"). |
| **Additional Permitted Indebtedness** | Amsterdam shall not be permitted to issue any additional indebtedness except for (i) Capitalized Leases not to exceed $1,000,000 in the aggregate, (ii) refunding indebtedness pursuant to terms and conditions acceptable to a majority of Series 2014 Bondholders, (iii) indebtedness relating to the financing of construction of additional independent living units not to exceed 71 units ("Phase II"), provided that prior to the incurrence of such indebtedness, (A) at least ninety-two percent (92%) of the independent living units in the existing Project are occupied or reserved with ten percent (10%) deposits, (B) at least seventy percent (70%) of the independent living units to be constructed as Phase II have been reserved with executed Residence Agreements and deposits at least equal to ten percent (10%) of the Entrance Fee shall have been received for such units; (C) there is a guaranteed maximum price or stipulated construction contract for Phase II; (D) the Cumulative Cash Loss or Debt Service Coverage Ratio (as applicable) and the Liquidity Covenant were met on the most recent evaluation date, (E) all required deposits have been made into the Operating Reserve Fund, (F) a Consultant's forecast shows that the Debt Service Coverage Ratio for the two (2) Fiscal Years following the completion of Phase II will be at least 1.25 and the Days' Cash on Hand at the end of the first Fiscal Year in which the average occupancy of such Independent Living Units is forecasted to reach eighty-five (85%) will be at least 200 and (G) concurrently with the issuance of such indebtedness, Amsterdam shall redeem at least twenty (20) percent of the original principal amount of the Series 2014C Bonds. |
| **Cumulative Cash Loss Covenant** | Amsterdam shall have a Cumulative Cash Loss no greater than the amount set forth in a Schedule to be agreed upon by the Steering Committee and Amsterdam for the prior fiscal quarter. |
| **Debt Service** | Commencing with the earlier of (i) the first fiscal year following achievement of Stabilized Occupancy (as to be defined in the 2014 Indenture) and (ii) the fiscal quarter ending |

| | |
|---|---|
| **Coverage Ratio** | December 31, 2016 (the "***Initial Testing Date***"), Amsterdam shall achieve a debt service coverage ratio of not less than (a) 1.10x from the Initial Testing Date until December 31, 2017 and (b) 1.20x thereafter, which ratio shall be measured (i) on a rolling four quarter basis, commencing on the Initial Testing Date and each fiscal quarter thereafter through the fiscal quarter ending December 31, 2017, and (ii) on an annual basis, at the end of each fiscal year, thereafter. This ratio will include net Entrance Fees (i.e., Entrance Fees, but not Initial Entrance Fees, received during such period minus Entrance Fees refunded during such period) in the numerator and the denominator will be Maximum Annual Debt Service on the Series 2014A Bonds and the Series 2014B Bonds. |
| **IL Occupancy Covenants** | Commencing with the first fiscal quarter following the Effective Date, Amsterdam will have occupied independent living ("IL") units equal to or above the levels set forth for the prior fiscal quarter in the projections to be agreed upon by the Steering Committee and Amsterdam (the "***IL Occupancy Covenant***"). Amsterdam shall achieve 92% occupancy of IL units no later than 18 months after the Effective Date (the "***IL Target Covenant***"). |
| **Assisted Living and Nursing Center Occupancy Covenants** | Commencing with the first fiscal quarter following the Effective Date, Amsterdam shall achieve and maintain (i) a 90% occupancy level for Assisted Living ("***AL***") units and (ii) an 85% occupancy level for Nursing Center ("***NC***") units, which shall be measured as the average occupancy of the AL and NC units, as applicable, during such fiscal quarter (the "***AL/NC Occupancy Covenant***"). |
| **Failure to meet covenants** | (i) If Amsterdam fails to meet the Cumulative Cash Loss Covenant, the Days Cash on Hand, the AL/NC Occupancy Covenant or the Debt Service Coverage Ratio as of any testing date, then upon the first occurrence of such non-compliance, Amsterdam shall be required to retain a management consultant acceptable (which approval shall not be unreasonably withheld) to the holders of not less than a majority of the outstanding aggregate principal amount of the Series 2014A Bonds and the Series 2014B Bonds (each treated as separate class), to provide a report and improvement plan to the Trustee. <br><br>(ii) If Amsterdam fails to meet the Cumulative Cash Loss Covenant, the Days Cash on Hand or the Debt Service Coverage Ratio by the end of the second quarter after the report and improvement plan are provided, Amsterdam shall, at the direction of the holders of not less than a majority of the outstanding aggregate principal amount of the Series 2014A Bonds and the Series 2014B Bonds (each treated as separate class), replace the management services advisor with an advisor acceptable to such holders. <br><br>(iii) If Amsterdam fails to meet the Cumulative Cash Loss Covenant, the Days Cash on Hand, the AL/NC Occupancy Covenant or the Debt Service Coverage Ratio for two consecutive testing dates, then such non-compliance will constitute an Event of Default under the 2014 Indenture. If on any testing date after the Initial Testing Date, the Debt Service Coverage Ratio is 1.0x or below or the Days Cash on Hand is equal to or less than 130, it shall constitute an Event of Default under the 2014 Indenture. <br><br>(iv) Same remedies in (i) or (ii) above will apply for failure to meet the IL Occupancy Covenant or the IL Target Covenant, provided that Amsterdam shall be required to hire a marketing consultant in lieu of a management consultant and shall, at the direction of the holders of not less than a majority of the outstanding aggregate principal amount of the Series 2014A Bonds and the Series 2014B Bonds (each treated as separate class), replace the marketing agent in lieu of the management |

| | services advisor. Furthermore, if there is no acting marketing agent, Amsterdam shall be required to hire a marketing agent acceptable to the Trustee. |
|---|---|

## Reporting Requirements

| Reporting | Amsterdam shall deliver monthly financial statements (including a balance sheet, an income statement, an escrow statement and a cash flow statement) and a monthly report on marketing, occupancy and sales within 45 days following the prior month end comparing actual results to budget and shall include an explanation of variances of more than 10% from budgeted amounts. Such financial statements shall also include an Entrance Fee analysis. |
|---|---|
| | Amsterdam shall enter into a new Continuing Disclosure Agreement providing for the same reporting as required by the existing Continuing Disclosure Agreement (in addition to the information required above), except for any amendments thereto required to reflect changes to Rules 15c2-12. |
| Update Calls | Until the later of Stabilized Occupancy (as defined in the 2014 Indenture) or the first year from the Effective Date, Amsterdam shall hold monthly calls for holders of the Series 2014 Bonds. After such time, Amsterdam shall hold quarterly calls. |

## General Provisions

| Marketing and Development Fees | Subsequent to the Effective Date of the restructuring, any fees that become due under the marketing and development advisory services agreement will be paid as they become due as follows:<br>• Pro rata at each 5% occupancy increment to 90% – $33,579 per increment, 85% and 90% remaining; and<br>• Milestone payment for achievement of 90% occupancy – $302,214.50 to be paid upon achievement of 90% occupancy and $302,214.50 to be deferred and paid upon the earlier of (i) termination of Greystone and (ii) achievement of 92% occupancy.<br><br>Of the amount earned and deferred as of the date hereof (totaling approximately $772,324) the following payment terms would apply:<br><br>• $522,324 to be paid on Effective Date;<br>• $250,000 to be deferred and paid upon the earlier of (i) termination of Greystone and (ii) payment in full of the Series 2014B Bonds; and<br>• Of the $250,000 deferred, the amount owed will be reduced by approximately 1/6 for each month that achievement of 90% occupancy falls behind the date in the projections for the restructuring. [i.e. if the projections show achievement of 90% in February 2015 and we achieve it in April 2015, the $250,000 would be reduced for 2 months delayed achievement (or 1/3)] |
|---|---|
| PILOTs | The Payment in Lieu of Taxes Agreement, as amended by the First Amendment to the Payment in Lieu of Taxes Agreement dated as of June 1, 2014 (providing for the extension of the current taxation rate) shall be assumed by Amsterdam as part of the Plan. |
| New 2014 Bond Documents | The 2014 Bond Documents shall be prepared or, as applicable, amended and modified in a manner necessary to effectuate the Restructuring Transaction. The 2014 Bond Documents and other agreements governing the Restructuring Transaction shall provide, inter alia, |

| | |
|---|---|
| | that (i) Amsterdam shall incur no new indebtedness without the consent of the holders of at least 66% in the principal amount of Series 2014A Bonds and Series 2014B Bonds (each treated as a separate class), except for new indebtedness set forth in (ii) hereof, (ii) Amsterdam shall be permitted to incur additional indebtedness, subject to certain additional bonds tests to be determined, (a) for the purpose of constructing additional units at The Amsterdam at Harborside facility and (b) of up to $1 million total for capital leases; (iii) except as provide herein, shall contain all of the existing covenants, defaults and provisions and (iv) such additional provisions as acceptable to the Steering Committee and consistent with the Term Sheet. |
| **Release/Exculpation** | The Restructuring Transaction contemplated by the Term Sheet shall contain customary release, injunction and exculpation provisions for all Parties to the Restructuring Transaction to the extent available under applicable law. The Parties hereby agree that they will use respective best efforts to obtain approval of such release, injunction and exculpatory provisions, which by way of example only shall include opposing any effort by any person or entity that is not a Party to this Term Sheet to eliminate or reduce the scope of such release, injunction and exculpation provisions. |
| **Binding Effect** | The obligation of each of the undersigned parties to pursue the Restructuring Transaction in accordance with the terms hereof is subject to (i) the negotiation, execution and delivery of mutually acceptable final documentation, (ii) receipt of all necessary consents, including any consent of any party's credit or other committee or board of directors and any regulatory approvals, (iii) receipt of a satisfactory tax opinion confirming that the interest on the 2014 Bonds will be excluded from gross income for federal income tax purposes under the Internal Revenue Code, and (iv) confirmation of the Plan pursuant to an order of confirmation acceptable to Amsterdam and the Trustee. |
| **Cash Collateral Order** | The Trustee shall enter into a cash collateral agreement ("***Cash Collateral Agreement***") with Amsterdam upon the commencement of Anticipated Bankruptcy Proceeding that shall (i) permit Amsterdam to use cash collateral, subject to agreed upon budgets, (ii) provide that Amsterdam may requisition funds from the Entrance Fee Fund in an aggregate amount not to exceed $2,220,000 during the Anticipated Bankruptcy Proceeding to pay Refunds then due and owing, provided that Amsterdam shall only be permitted to requisition such funds after it has expended $2,350,000 on Refunds during the Anticipated Bankruptcy Proceeding from Amsterdam's current operating accounts; and (iii) provide that all Entrance Fees received during the Anticipated Bankruptcy Proceeding be held in escrow and subordinating any rights or liens of the bondholders of the Bonds to the rights of any resident/payor of such escrowed Entrance Fees, subject to the occurrence of the Effective Date; provided that the Trustee shall retain its first priority lien against the Debtor's interest in such funds. As further adequate protection, Amsterdam shall acknowledge that the Debt Service Reserve Fund and the Entrance Fee Fund are not property of Amsterdam's bankruptcy estate and the Trustee shall be entitled to utilize such funds in accordance with the terms of the 2007 Indenture and other applicable documents related to the Series 2007 Bonds without further order of the Court. Any Refunds that become due and payable during the Anticipated Bankruptcy Proceeding in excess of the amounts in (ii) above may be paid from amounts in the Entrance Fee Fund at the sole discretion of the Steering Committee. |

| | |
|---|---|
| **Miscellaneous** | This Term Sheet shall be governed by the laws of the State of New York.<br><br>This Term Sheet may be executed in one or more counterparts, and when all counterparts have been executed, each executed counterpart will have the force and effect of the original. |
| **Timeline** | The Restructuring Transaction contemplated by the Term Sheet shall proceed as soon as practicable following approval of this Term Sheet and any supporting documentation by Amsterdam and the Trustee (the "***Parties***").  The Parties agree that after such date, they shall use their best efforts to adhere to the following timeline:<br><br>1.  June 16 – Exchange of drafts of the principal Bankruptcy Documents and 2014 Bond Documents;<br><br>2.  July 17 – Finalize terms of the agreed Bankruptcy Documents and 2014 Bond Documents, and execution of Plan Support Agreement<br><br>3.  July 21 – Petition Date (filing of Plan, Disclosure Statement, cash collateral motion, and first days)<br><br>4.  August 22 – Entry of interim cash collateral order;<br><br>5.  September 8 – Entry of final cash collateral order, and approval of Disclosure Statement;<br><br>6.  September 9 – October 23 – Solicitation of Plan (mailing date through voting deadline);<br><br>7.  October 24 – Confirmation of Plan; and<br><br>8.  November 28 – Effective Date. |

26947424v.12

**Schedule 1**
**Series 2014A Bonds**

| Principal Amount | Maturity (January 1) | Interest Rate |
| --- | --- | --- |
| $6,255,000 | 2023 | 5.875% |
| $21,123,750 | 2032 | 6.500% |
| $6,375,000 | 2034 | 6.500% |
| $95,910,000 | 2049 | 6.700% |
| $11,921,250 | 2049 | 6.700% |

**Schedule 2**
**Series 2014A Bonds**

The Series 2014A Bonds shall be subject to mandatory sinking fund redemption by the Agency prior to maturity, as selected by the Trustee, on January 1 of each of the years and in the principal amounts set forth below, at a Redemption Price equal to 100% of the principal amount thereof, together with interest accrued to the date of redemption:

| Mandatory Sinking Fund Redemption (January 1) | $6,255,000 Series 2014A Bonds maturing January 1, 2023 | $21,123,750 Series 2014A Bonds maturing January 1, 2032 | $6,375,000 Series 2014A Bonds maturing January 1, 2034 | $95,910,000 Series 2014A Bonds maturing January 1, 2049 | $11,921,250 Series 2014A Bonds maturing January 1, 2049 |
|---|---|---|---|---|---|
| 2019 | $1,418,934 | | | | $123,524 |
| 2020 | 1,502,297 | | | | 131,800 |
| 2021 | 1,590,556 | | | | 140,631 |
| 2022 | 1,684,002 | | | | 150,053 |
| 2023 | 59,211 | $1,723,726 | | | 160,106 |
| 2024 | | 1,887,685 | | | 170,833 |
| 2025 | | 2,010,384 | | | 182,279 |
| 2026 | | 2,141,059 | | | 194,492 |
| 2027 | | 2,280,228 | | | 207,523 |
| 2028 | | 2,428,443 | | | 221,427 |
| 2029 | | 2,586,291 | | | 236,263 |
| 2030 | | 2,754,400 | | | 252,092 |
| 2031 | | 2,933,437 | | | 268,982 |
| 2032 | | 378,097 | $2,746,013 | | 287,004 |
| 2033 | | | 3,327,177 | | 306,233 |
| 2034 | | | 301,810 | $3,241,633 | 326,751 |
| 2035 | | | | 3,773,767 | 348,643 |
| 2036 | | | | 4,026,610 | 372,002 |
| 2037 | | | | 4,296,393 | 396,926 |
| 2038 | | | | 4,584,250 | 423,521 |
| 2039 | | | | 4,891,396 | 451,896 |
| 2040 | | | | 5,219,120 | 482,173 |
| 2041 | | | | 5,568,800 | 514,479 |
| 2042 | | | | 5,941,910 | 548,949 |
| 2043 | | | | 6,340,017 | 585,729 |
| 2044 | | | | 6,764,798 | 624,973 |
| 2045 | | | | 7,218,040 | 666,846 |
| 2046 | | | | 7,701,649 | 711,524 |
| 2047 | | | | 8,217,660 | 759,196 |
| 2048 | | | | 8,768,242 | 810,063 |
| 2049 | | | | 9,355,715 | 864,337 |

# **EXHIBIT 2**

JOINDER

# FORM OF JOINDER

This Joinder to the Plan Support Agreement, dated as of July 21, 2014, by and among the Borrower and the Consenting Holders (the "**Support Agreement**"), is executed and delivered by _____ (the "**Joining Party**") as of _____. Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Support Agreement.

1. <u>Agreement to be Bound.</u> The Joining Party hereby agrees to be bound by all of the terms of the Plan Support Agreement (and all exhibits and annexes thereto), attached to this Joinder as **Annex I** (as such Plan Support Agreement, exhibits and annexes may be hereafter amended, restated, or otherwise modified from time to time). The Joining Party shall hereafter be deemed to be a "Consenting Holder" and a "Party" for all purposes under the Plan Support Agreement.

2. <u>Representations and Warranties.</u> With respect to the Bonds set forth below its name on the signature page hereof and all related claims, rights, and causes of action arising out of or in connection with or otherwise relating to such Bonds, the Joining Party hereby makes to the Borrower the representations and warranties of the Consenting Holders set forth in the Plan Support Agreement.

3. <u>Notices.</u> For purposes of notices and other communications to be delivered to the Joining Party the relevant addresses and facsimile numbers are set forth below.

4. <u>Governing Law.</u> This Joinder shall be governed by and construed in accordance with the laws of The State of New York, without regard to any conflict of laws provisions that would require the application of the law of any other jurisdiction.

\* \* \* \* \*

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]