**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
                                :

In re:                          :          **Chapter 11**
                                :

**AMSTERDAM HOUSE CONTINUING CARE**  :        **Case No. 14-73348 (AST)**
**RETIREMENT COMMUNITY, INC.,**[1]     :
                                :

                **Debtor.**      :
-----------------------------------------------------------------x

## DEBTOR'S AMENDED PLAN OF REORGANIZATION
## <u>UNDER CHAPTER 11 OF THE BANKRUPTCY CODE</u>

CADWALADER, WICKERSHAM & TAFT LLP
Ingrid Bagby, Esq.
Christopher J. Updike, Esq.
One World Financial Center
New York, New York  10281
Telephone:    (212) 504-6000
Facsimile:    (212) 504-6666

- and -

John H. Thompson, Esq.
700 Sixth Street, N.W.
Washington, D.C.  20001
Telephone:    (202) 862-2200
Facsimile:    (202) 862-2400

September 2, 2014

---

[1] The last four digits of the Debtor's federal tax identification number are 1764.  The Debtor's mailing address is 300 East Overlook, Port Washington, NY 11050.

# TABLE OF CONTENTS

Page

SECTION 1.    DEFINITIONS AND INTERPRETATION .......................................................1

    A.    Definitions...........................................................................................................1

           1.1    2007 Bond Documents.............................................................1
           1.2    2007 Bond Trustee ..................................................................1
           1.3    2007 Bonds .............................................................................1
           1.4    2007 Indenture .......................................................................1
           1.5    2014 Bond Documents.............................................................1
           1.6    2014 Bond Indenture ..............................................................1
           1.7    2014 Bond Trustee ..................................................................1
           1.8    2014 Bonds .............................................................................1
           1.9    2014 Installment Sale Agreement...........................................1
           1.10    2014 Mortgage .......................................................................2
           1.11    ACCHS ....................................................................................2
           1.12    Accrued Professional Compensation .......................................2
           1.13    Administrative Claim...............................................................2
           1.14    Administrative Services Agreement ........................................2
           1.15    Advisory Agreement................................................................2
           1.16    Allowed...................................................................................2
           1.17    Amended and Assumed Administrative Services Agreement.................3
           1.18    Amended Subvention Certificate.............................................3
           1.19    Amsterdam Consulting ...........................................................3
           1.20    Assets......................................................................................3
           1.21    Avoidance and Other Actions..................................................3
           1.22    Bankruptcy Code ....................................................................3
           1.23    Bankruptcy Court....................................................................3
           1.24    Bankruptcy Rules....................................................................3
           1.25    Bar Date Order ........................................................................3
           1.26    Board of Directors ..................................................................4
           1.27    Business Day............................................................................4
           1.28    Cash ........................................................................................4
           1.29    Cash Collateral Order..............................................................4
           1.30    Causes of Action.....................................................................4
           1.31    Chapter 11...............................................................................4
           1.32    Chapter 11 Case ......................................................................4
           1.33    Claim.......................................................................................4
           1.34    Class........................................................................................4
           1.35    Committee or Committees.......................................................4
           1.36    Confirmation Date ..................................................................4
           1.37    Confirmation Hearing .............................................................4
           1.38    Confirmation Order..................................................................5

i

# TABLE OF CONTENTS
(continued)

Page

1.39 Consenting Holders ................................................................5
1.40 Corporate Governance Documents .........................................5
1.41 Creditor ...................................................................................5
1.42 Cure ........................................................................................5
1.43 Days Cash on Hand ................................................................5
1.44 Debt Service Reserve Fund ....................................................5
1.45 Debt Service Reserve Fund Requirement ...............................5
1.46 Debtor .....................................................................................5
1.47 Disbursing Agent ...................................................................5
1.48 Disclosure Statement .............................................................5
1.49 Disputed .................................................................................5
1.50 Distribution Date ...................................................................5
1.51 Distribution Record Date .......................................................6
1.52 Distribution Waterfall ............................................................6
1.53 DTC ........................................................................................6
1.54 Effective Date ........................................................................6
1.55 Entrance Fee Fund .................................................................6
1.56 Entrance Fees .........................................................................6
1.57 Escrow Agreement .................................................................6
1.58 Estate ......................................................................................6
1.59 Excess Cash ...........................................................................6
1.60 Exculpated Party ....................................................................6
1.61 Executory Contract ................................................................6
1.62 Facility ...................................................................................6
1.63 Federal Bankruptcy Rules .....................................................6
1.64 Final Order .............................................................................6
1.65 General Unsecured Claim ......................................................7
1.66 GDC ........................................................................................7
1.67 GMSC .....................................................................................7
1.68 Initial Entrance Fee ...............................................................7
1.69 Insurance Policies ..................................................................7
1.70 Interest ....................................................................................7
1.71 Issuer ......................................................................................7
1.72 Lien .........................................................................................7
1.73 Marketing and Development Advisory Services Agreement ..7
1.74 New Financial Services Advisory Agreement ........................7
1.75 New Marketing Services Advisory Agreement .......................8
1.76 Office of the U.S. Trustee ......................................................8
1.77 Operating Account .................................................................8
1.78 Operating Reserve Fund .........................................................8
1.79 Other Priority Claim ..............................................................8
1.80 Other Secured Claim ..............................................................8

# TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|

| | | |
|---|---|---|
| 1.81 | Person | 8 |
| 1.82 | Petition Date | 8 |
| 1.83 | PILOT Agreement | 8 |
| 1.84 | PILOT Claim | 8 |
| 1.85 | PILOT Mortgage | 8 |
| 1.86 | Plan | 8 |
| 1.87 | Plan Supplement | 8 |
| 1.88 | Plan Support Agreement | 9 |
| 1.89 | Primary Market Area | 9 |
| 1.90 | Priority Tax Claim | 9 |
| 1.91 | Professionals | 9 |
| 1.92 | Proof of Claim | 9 |
| 1.93 | Refunds | 9 |
| 1.94 | Released Parties | 9 |
| 1.95 | Releasing Party | 9 |
| 1.96 | Reorganized Debtor | 9 |
| 1.97 | Residency Agreements | 9 |
| 1.98 | Resident Claim | 9 |
| 1.99 | Schedules | 10 |
| 1.100 | Secondary Market Area | 10 |
| 1.101 | Secured Claim | 10 |
| 1.102 | Series 2007A Bonds | 10 |
| 1.103 | Series 2007A/B Bond Claims | 10 |
| 1.104 | Series 2007B Bonds | 10 |
| 1.105 | Series 2007C Bonds | 10 |
| 1.106 | Series 2007C Bond Claims | 10 |
| 1.107 | Series 2014A Bonds | 10 |
| 1.108 | Series 2014B Bonds | 10 |
| 1.109 | Series 2014C Bonds | 11 |
| 1.110 | Subordination Agreement | 11 |
| 1.111 | Subvention Certificate | 11 |
| 1.112 | Subvention Claim | 11 |
| 1.113 | Turnover Entrance Fee | 11 |
| 1.114 | Unexpired Lease | 11 |
| 1.115 | Unrestricted Reserve Amount | 11 |
| 1.116 | Unrestricted Reserve Cap | 11 |
| 1.117 | U.S. Trustee Fees | 11 |
| 1.118 | Voting Deadline | 11 |

# TABLE OF CONTENTS
(continued)

Page

B.    Interpretation:  Application of Definitions and Rules of Construction...............11

SECTION 2.    TREATMENT OF ADMINISTRATIVE CLAIMS, PRIORITY TAX
CLAIMS, AND U.S. TRUSTEE FEES..............................................................12

2.1    Administrative Claims. ..........................................................................12
2.2    Professional Compensation....................................................................12
2.3    Priority Tax Claims................................................................................12
2.4    U.S. Trustee Fees. ..................................................................................13

SECTION 3.    CLASSIFICATION AND TREATMENT OF CLAIMS AND
INTERESTS ..................................................................................................13

3.1    Classification and Specification of Treatment of Claims. ......................13
3.2    Classes of Claims and Interests. .............................................................13
3.3    Acceptance or Rejection of this Plan......................................................16

SECTION 4.    MEANS FOR IMPLEMENTATION OF THIS PLAN.....................................16

4.1    Sources of Consideration. ......................................................................16
4.2    Cancellation of 2007 Bonds. ..................................................................16
4.3    Issuance of 2014 Bonds. ........................................................................16
4.4    Section 1145 Exemption.........................................................................18
4.5    Advisory Services Agreements...............................................................18
4.6    Assumption of Residency Agreements....................................................18
4.7    Reorganized Debtor's Board of Directors. .............................................18
4.8    Officers of the Reorganized Debtor........................................................18
4.9    Employee Benefits..................................................................................19
4.10   Vesting of Assets in the Reorganized Debtor..........................................19
4.11   Restructuring Transactions. ...................................................................19
4.12   Corporate Action....................................................................................20
4.13   Section 1146 Exemption from Certain Taxes and Fees...........................20
4.14   Preservation of Causes of Action of the Debtor. ...................................20

SECTION 5.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES.........................................................................................................21

5.1    Assumption and Rejection of Executory Contracts and
Unexpired Leases....................................................................................21
5.2    Claims Based on Rejection of Executory Contracts or
Unexpired Leases....................................................................................22
5.3    Cure of Defaults for Assumed Executory Contracts and
Unexpired Leases....................................................................................22
5.4    Insurance Policies. .................................................................................22

# TABLE OF CONTENTS
(continued)

| | | |
|---|---|---|
| 5.5 | Modifications, Amendments, Supplements, Restatements, or Other Agreements. | 22 |
| 5.6 | Reservation of Rights. | 23 |
| 5.7 | Contracts and Leases Entered Into After the Petition Date. | 23 |

SECTION 6.    PROVISIONS GOVERNING DISTRIBUTIONS ............................................23

| | | |
|---|---|---|
| 6.1 | Timing and Calculation of Amounts to Be Distributed. | 23 |
| 6.2 | Disbursing Agent. | 23 |
| 6.3 | Rights and Powers of Disbursing Agent. | 24 |
| 6.4 | Payments and Distributions on Disputed Claims. | 24 |
| 6.5 | Special Rules for Distributions to Holders of Disputed Claims. | 24 |
| 6.6 | Delivery of Distributions in General. | 24 |
| 6.7 | Undeliverable Distributions and Unclaimed Property. | 24 |
| 6.8 | Withholding and Reporting Requirements. | 25 |
| 6.9 | Setoffs. | 25 |
| 6.10 | Insurance Claims. | 25 |
| 6.11 | Applicability of Insurance Policies. | 25 |
| 6.12 | Allocation of Distributions Between Principal and Unpaid Interest. | 25 |
| 6.13 | Interest on Claims. | 26 |

SECTION 7.    PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS ............................................26

| | | |
|---|---|---|
| 7.1 | Prosecution of Objections to Claims. | 26 |
| 7.2 | Allowance of Claims. | 26 |
| 7.3 | Distributions After Allowance. | 26 |
| 7.4 | Estimation of Claims. | 26 |

SECTION 8.    SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS ............................................27

| | | |
|---|---|---|
| 8.1 | Compromise and Settlement of Claims, Interests and Controversies. | 27 |
| 8.2 | Releases by the Debtor. | 27 |
| 8.3 | Releases by Holders of Claims. | 28 |
| 8.4 | Exculpation. | 29 |
| 8.5 | Discharge of Claims. | 29 |
| 8.6 | Injunction. | 29 |
| 8.7 | Term of Injunctions or Stays. | 31 |
| 8.8 | Protection Against Discriminatory Treatment. | 31 |
| 8.9 | Release of Liens. | 31 |

# TABLE OF CONTENTS
(continued)

Page

SECTION 9.        CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ..........................32

   9.1    Conditions Precedent to the Effective Date...........................................32
   9.2    Waiver of Conditions...............................................................................33
   9.3    Effect of Failure of Conditions. ............................................................33

SECTION 10.      MODIFICATION, REVOCATION OR WITHDRAWAL OF THIS
                 PLAN....................................................................................................33

   10.1   Modification and Amendments. .............................................................33
   10.2   Effect of Confirmation on Modifications. .............................................34
   10.3   Revocation or Withdrawal of this Plan..................................................34

SECTION 11.      RETENTION OF JURISDICTION ...................................................................34

SECTION 12.      MISCELLANEOUS PROVISIONS...................................................................37

   12.1   Immediate Binding Effect.......................................................................37
   12.2   Additional Documents. ...........................................................................37
   12.3   Dissolution of Any Committees. ............................................................37
   12.4   Reservation of Rights...............................................................................37
   12.5   Successors and Assigns. ..........................................................................37
   12.6   Votes Solicited in Good Faith.................................................................37
   12.7   Closing of Chapter 11 Case. ...................................................................38
   12.8   Notices......................................................................................................38
   12.9   Headings. ..................................................................................................38
   12.10  Severability. .............................................................................................38
   12.11  Validity and Enforceability.....................................................................39
   12.12  Plan Supplement. .....................................................................................39
   12.13  Governing Law. .......................................................................................39
   12.14  Request for Confirmation Pursuant to Sections 1129(a) and
          1129(b) of the Bankruptcy Code. ...........................................................39

Amsterdam House Continuing Care Retirement Community, Inc. (the "***Debtor***") proposes this Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code.

## SECTION 1.    DEFINITIONS AND INTERPRETATION

### A.    Definitions.

The following terms used herein shall have the respective meanings below:

1.1    2007 Bond Documents means the 2007 Indenture and any bonds, loan agreement, mortgage, security agreement, document, agreement, or instrument executed or delivered in connection with the issuance of the 2007 Bonds including the 2007 Installment Sale Agreement.

1.2    ***2007 Bond Trustee*** means UMB Bank, n.a., in its capacity as successor trustee under the 2007 Indenture, and any successor trustee in such capacity.

1.3    ***2007 Bonds*** means, collectively, the Series 2007A Bonds, the Series 2007B Bonds, and the Series 2007C Bonds.

1.4    ***2007 Indenture*** means that certain Indenture of Trust, dated as of December 1, 2007, as supplemented by that certain First Supplemental Indenture of Trust, dated as of December 1, 2013; that certain Second Supplemental Indenture of Trust, dated as of December 1, 2013; and that certain Third Supplemental Indenture of Trust, dated as of December 1, 2013, by and between the Issuer and the 2007 Bond Trustee, pursuant to which the 2007 Bonds were issued.

1.5    ***2014 Bond Documents*** means the 2014 Bond Indenture, and any bonds, loan agreement, mortgage, security agreement, document, agreement, or instrument executed or delivered in connection with the issuance of the 2014 Bonds, including the 2014 Installment Sale Agreement and the 2014 Mortgage.

1.6    ***2014 Bond Indenture*** means the Indenture of Trust (as such indenture may be further amended, supplemented, or modified from time to time) to be entered into by and between the Issuer and the 2014 Bond Trustee pursuant to this Plan on or after the Effective Date, including all notes and instruments delivered pursuant thereto or in connection therewith in connection with the issuance of the 2014 Bonds, and which shall be in form and substance acceptable to the Debtor, the Issuer, and the 2014 Bond Trustee.

1.7    ***2014 Bond Trustee*** means UMB Bank, n.a., in its capacity as bond trustee under the 2014 Bond Indenture, and any successor trustee in such capacity.

1.8    ***2014 Bonds*** means, collectively, the Series 2014A Bonds, the Series 2014B Bonds, and the Series 2014C Bonds.

1.9    ***2014 Installment Sale Agreement*** means the Installment Sale Agreement (as such Installment Sale Agreement may be further amended, supplemented, or

modified from time to time) to be entered into by and between the Issuer and the Reorganized Debtor pursuant to this Plan on or after the Effective Date in connection with the issuance of the 2014 Bonds, and which shall be in form and substance acceptable to the Debtor and the 2007 Bond Trustee.

1.10    ***2014 Mortgage*** means, collectively, any mortgage agreement or agreements whereby the Debtor, directly or by way of assignment, grants one or more mortgages or other liens to the 2014 Bond Trustee to secure the Debtor's obligations under the 2014 Bond Documents.

1.11    ***ACCHS*** means Amsterdam Continuing Care Health System, Inc.

1.12    ***Accrued Professional Compensation*** means, at any given moment, all accrued, contingent and/or unpaid fees (including success fees) for legal, financial advisory, accounting, and other services, along with all obligations for reimbursement of expenses rendered or incurred before the Effective Date under sections 327, 328, 329, 330, 331, or 1103 of the Bankruptcy Code by any retained Professional in the Chapter 11 Case, or under section 503 of the Bankruptcy Code, that the Bankruptcy Court has not denied by a Final Order, all to the extent that any such fees and expenses have not been previously paid.

1.13    ***Administrative Claim*** means any Claim for payment of costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), and 1114(e)(2) of the Bankruptcy Code, including: (i) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor; (ii) compensation for Accrued Professional Compensation; (iii) all fees and charges assessed against the Estate pursuant to Chapter 123 of Title 28 of the United States Code; and (iv) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Case pursuant to sections 503(b)(3), (4) and (5) of the Bankruptcy Code.

1.14    ***Administrative Services Agreement*** means the Administrative Services Agreement, dated March 31, 2004, by and between the Debtor and Amsterdam Consulting (as assumed by Amsterdam Consulting pursuant to the Assignment and Assumption Agreement, dated July 14, 2008, by and among the Debtor, Amsterdam Consulting, and Amsterdam Services Corp.).

1.15    ***Advisory Agreement*** means the Advisory Agreement, dated March 31, 2004, by and between the Debtor and GMSC.

1.16    ***Allowed*** means with respect to Claims: (a) any Claim, proof of which is timely filed by the applicable bar date; (b) any Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; or (c) any Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; ***provided***, ***that*** with respect to any Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time, as may be extended by the Bankruptcy Court from time to time, fixed by the Plan, the Bankruptcy Code,

the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. An Allowed Claim (i) includes a Disputed Claim to the extent such Disputed Claim becomes Allowed after the Effective Date and (ii) shall be net of any valid setoff exercised with respect to such Claim pursuant to the provisions of the Bankruptcy Code and applicable law; ***provided, however,*** such setoff shall not otherwise be applicable to the amounts owed with respect to the 2007 Bonds. Unless otherwise specified in this Plan, in section 506(b) of the Bankruptcy Code, or by Final Order of the Bankruptcy Court, "Allowed" Claims shall not, for purposes of distributions under this Plan, include interest on such Claim accruing from and after the Petition Date. For the avoidance of doubt, the 2007 Bond Trustee shall hold an Allowed Claim in the amount of $222,266,997 as of the Petition Date, plus unliquidated, accrued, and unpaid fees and expenses of the 2007 Bond Trustee and its professionals incurred through the Petition Date.

1.17    ***Amended and Assumed Administrative Services Agreement*** means the Administrative Services Agreement as assumed, in amended form, by the Reorganized Debtor in accordance with Section 4.5 of this Plan.

1.18    ***Amended Subvention Certificate*** means the Amended Subvention Certificate to be entered into between the Debtor and ACCHS in accordance with this Plan.

1.19    ***Amsterdam Consulting*** means Amsterdam Consulting, LLC.

1.20    ***Assets*** means all assets of the Debtor of any nature whatsoever, including, without limitation, all property of the Estate pursuant to Bankruptcy Code section 541, Cash, Avoidance and Other Actions, equipment, inventory, tax refunds, claims of right, interests and property, real and personal, tangible and intangible, and proceeds of any of the foregoing.

1.21    ***Avoidance and Other Actions*** means all actions, causes of action, suits, choses in action, and claims of the Debtor and/or the Estate against any entity or Person, whether direct, indirect, derivative, or otherwise arising under section 510 of the Bankruptcy Code or seeking to avoid a transfer of property or recover property pursuant to sections 542 through 550 of the Bankruptcy Code or applicable non-bankruptcy law.

1.22    ***Bankruptcy Code*** means title 11 of the United States Code, as now in effect or hereafter applicable to this Chapter 11 Case.

1.23    ***Bankruptcy Court*** means the United States Bankruptcy Court for the Eastern District of New York, having jurisdiction over the Chapter 11 Case.

1.24    ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure, as amended, and the Local Rules of the Bankruptcy Court, as applicable to this Chapter 11 Case.

1.25    **Bar Date Order** means, collectively, any order or orders entered by the Bankruptcy Court establishing a bar date by which a Proof of Claim must be filed in the Chapter 11 Case.

1.26    **Board of Directors** means the board of directors of the Debtor as of the Petition Date.

1.27    **Business Day** means any day of the calendar week, except Saturday, Sunday, a "legal holiday," as defined in Federal Bankruptcy Rule 9006(a), or any day on which commercial banks are authorized or required by law to close in Central Islip, New York.

1.28    **Cash** means cash and cash equivalents of the Debtor, including, without limitation, deposits in transit whether in the form of check or electronic transfer.

1.29    **Cash Collateral Order** means any order, whether interim or final, allowing the use by the Debtor during the Chapter 11 Case of the cash collateral of the 2007 Bond Trustee.

1.30    **Causes of Action** means any claim, cause of action, controversy, demand, agreement, right (including to legal or equitable remedies), action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.  Cause of Action includes, without limitation: (a) any right of setoff, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or Chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any state law fraudulent transfer claim; and (f) any claim listed in the Plan Supplement.

1.31    **Chapter 11** means chapter 11 of the Bankruptcy Code.

1.32    **Chapter 11 Case** means the above-captioned case.

1.33    **Claim** means a claim, as defined by section 101(5) of the Bankruptcy Code, against the Debtor or its Assets, whether or not asserted.

1.34    **Class** means a class or category of Claims as classified and described in Section 3 of this Plan.

1.35    **Committee** or **Committees** means any official committee (and any and all subcommittees thereof), if any, appointed in the Chapter 11 Case pursuant to section 1102 of the Bankruptcy Code.

1.36    **Confirmation Date** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the Bankruptcy Court's docket.

1.37 **Confirmation Hearing** means the hearing on confirmation of this Plan pursuant to section 1129 of the Bankruptcy Code.

1.38 **Confirmation Order** means the order entered by the Bankruptcy Court confirming this Plan in accordance with Chapter 11 of the Bankruptcy Code.

1.39 **Consenting Holders** means parties holding all rights with respect to or otherwise having authority to vote the Series 2007A Bonds and the Series 2007C Bonds that are party to the Plan Support Agreement.

1.40 **Corporate Governance Documents** means the certificates of incorporation, certificates of formation, resolutions, by-laws, and related documents of the Debtor and the Reorganized Debtor.

1.41 **Creditor** means a holder of a Claim.

1.42 **Cure** means the payment of Cash by the Reorganized Debtor, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to (i) cure a monetary default by the Debtor in accordance with the terms of an executory contract or unexpired lease of the Debtor and (ii) permit the Reorganized Debtor to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

1.43 **Days Cash on Hand** shall have the meaning provided in the 2014 Bond Indenture.

1.44 **Debt Service Reserve Fund** shall have the meaning provided in the 2014 Bond Indenture.

1.45 **Debt Service Reserve Fund Requirement** shall have the meaning provided in the 2014 Bond Indenture.

1.46 **Debtor** means Amsterdam House Continuing Care Retirement Community, Inc., as debtor and debtor in possession, and includes the Estate, where appropriate.

1.47 **Disbursing Agent** means the Debtor or the Reorganized Debtor, or the entity or entities chosen by the Debtor or the Reorganized Debtor to make or facilitate distributions pursuant to this Plan.

1.48 **Disclosure Statement** means the disclosure statement in respect of the Plan, as the same may be altered, modified, or amended.

1.49 **Disputed** means, with respect to any Claim, any Claim that is not yet Allowed and is subject to a claims objection filed before any deadline set by the Bankruptcy Court.

1.50 **Distribution Date** means the date, occurring on or as soon as reasonably practicable after the Effective Date but no later than five (5) days after the Effective Date, on

5

which the Disbursing Agent first makes the required Cash distributions to holders of Allowed Claims as provided in this Plan.

1.51    **Distribution Record Date** means, other than with respect to public securities cancelled by this Plan, the Effective Date or such other date as may be designated in the Confirmation Order.

1.52    **Distribution Waterfall** means the priority of distributions from the Revenue Fund following the Effective Date, as more fully set forth in the 2014 Bond Indenture.

1.53    **DTC** means The Depository Trust Company.

1.54    **Effective Date** means a Business Day selected by the Debtor with the consent of the 2007 Bond Trustee and the Issuer, which is, unless the Confirmation Order directs otherwise, no earlier than the date on which each of the conditions to this Plan's Effective Date set forth herein has either been satisfied or waived in accordance with this Plan and no later than November 28, 2014.

1.55    **Entrance Fee Fund** means the existing Entrance Fee Fund held by the 2007 Bond Trustee pursuant the 2007 Indenture.

1.56    **Entrance Fees** means all Initial Entrance Fees and Turnover Entrance Fees.

1.57    **Escrow Agreement** means that certain Escrow Agreement dated as of July 21, 2014, by and among the Debtor, the 2007 Bond Trustee, and Amalgamated Bank as escrow agent.

1.58    **Estate** means the estate of the Debtor created by the Debtor's Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

1.59    **Excess Cash** shall have the meaning provided in the 2014 Bond Indenture.

1.60    **Exculpated Party** means each of: (i) the Debtor and its member or members, (ii) the Reorganized Debtor and its member or members, (iii) each Consenting Holder in any capacity, (iv) the Issuer, (v) the 2007 Bond Trustee in any capacity, and (vi) the current and former officers, directors, members, managers, employees, attorneys, and advisors, each in their respective capacities as such, of each of the foregoing.

1.61    **Executory Contract** means a contract to which the Debtor is a party that is capable of assumption or rejection under section 365 of the Bankruptcy Code.

1.62    **Facility** means the continuing care retirement community known as "The Amsterdam at Harborside" and owned by the Debtor, located in Port Washington, New York.

1.63    **Federal Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure, as amended.

6

1.64    ***Final Order*** means an order or judgment of the Bankruptcy Court entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Case that has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, to petition for certiorari, or to move for a new trial, reargument, or rehearing shall have expired; ***provided***, ***however***, that the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure, or Federal Bankruptcy Rules 9023 or 9024, may be filed relating to such order shall not cause such order to not be a Final Order.

1.65    ***General Unsecured Claim*** means any unsecured Claim against the Debtor, including, without limitation, any Resident Claim, that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, Other Secured Claim, Series 2007A/B Bond Claim, or Series 2007C Bond Claim.

1.66    ***GDC*** means Greystone Development Company II, LP.

1.67    ***GMSC*** means Greystone Management Services Company, LLC.

1.68    ***Initial Entrance Fee*** means the initial entrance fee that the first resident to occupy each independent living unit at the Facility pays pursuant to a Residency Agreement.

1.69    ***Insurance Policies*** means, collectively, all of the Debtor's insurance policies.

1.70    ***Interest*** means any membership interest in the Debtor, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest.

1.71    ***Issuer*** means the Nassau County Industrial Development Agency.

1.72    ***Lien*** has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.73    ***Marketing and Development Advisory Services Agreement*** means the Marketing and Development Advisory Services Agreement, dated March 31, 2004, by and between the Debtor and GDC, as amended on or before the Effective Date.

1.74    ***New Financial Services Advisory Agreement*** means that certain Financial Services Advisory Agreement, in the form to be agreed upon between the 2014 Bond Trustee and the Debtor prior to the Effective Date (as such agreement may be further amended, supplemented, or modified from time to time), to be entered into by and between GMSC and the Reorganized Debtor in accordance with Section 4.5 herein.

      1.75    ***New Marketing Services Advisory Agreement*** means that certain Marketing Services Advisory Agreement to be entered into by and between GDC and the Reorganized Debtor in accordance with Section 4.5 herein.

      1.76    ***Office of the U.S. Trustee*** means the Office of The United States Trustee, Alfonse D'Amato Federal Courthouse, 560 Federal Plaza, Central Islip, NY 11722.

      1.77    ***Operating Account*** shall have the meaning set forth in the 2014 Bond Indenture.

      1.78    ***Operating Reserve Fund*** shall have the meaning set forth in the 2014 Bond Indenture.

      1.79    ***Other Priority Claim*** means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

      1.80    ***Other Secured Claim*** means the PILOT Claim and any Secured Claim other than a Series 2007A/B Bond Claim or Series 2007C Bond Claim.

      1.81    ***Person*** means an individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, trust, estate, unincorporated organization, governmental unit, government (or agency or political subdivision thereof), or other entity, including, without limitation, the Debtor.

      1.82    ***Petition Date*** means the date on which the Debtor filed a petition commencing the Chapter 11 Case.

      1.83    ***PILOT Agreement*** means the Payment in Lieu of Taxes Agreement dated as of December 1, 2007, as amended by the First Amendment to Payment in Lieu of Taxes Agreement dated as of June 1, 2014, between the Debtor and the Issuer regarding payments in lieu of taxes to be made by the Debtor to the Treasurer of the County of Nassau with respect to the applicable real property taxes and assessments levied or assessed against the Facility, as amended from time to time.

      1.84    ***PILOT Claim*** means any claim arising under the PILOT Agreement or PILOT Mortgage.

      1.85    ***PILOT Mortgage*** means the Mortgage and Assignment of Rents dated as of December 1, 2007, from the Issuer and the Debtor in favor of the County of Nassau, on behalf of itself and such other instrumentalities to which amounts shall be due and owing pursuant to the PILOT Agreement, and its successors or assigns under the PILOT Mortgage.

      1.86    ***Plan*** means this Amended Plan, as altered, modified, or amended in accordance with the Bankruptcy Code and the Bankruptcy Rules.

      1.87    ***Plan Supplement*** means the compilation of documents and forms of documents, schedules, and exhibits to this Plan, to be filed prior to the Confirmation Hearing, as

amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, and the Bankruptcy Rules.

1.88   ***Plan Support Agreement*** means that certain Plan Support Agreement, dated as of July 21, 2014 (including, without limitation, the exhibits, attachments, and appendices thereto), entered into by and among the Debtor and each of the Consenting Holders on the date thereof, as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof.

1.89   ***Primary Market Area*** shall have the meaning set forth in the feasibility study prepared by Dixon Hughes PLLC in connection with the issuance of the Series 2007 Bonds.

1.90   ***Priority Tax Claim*** means any Claim of a governmental unit of a kind entitled to priority under section 507(a)(8) of the Bankruptcy Code.

1.91   ***Professionals*** means all professionals employed in this Chapter 11 Case pursuant to sections 327, 328, and 1103 of the Bankruptcy Code.

1.92   ***Proof of Claim*** means a proof of Claim filed against the Debtor in the Chapter 11 Case.

1.93   ***Refunds*** means any resident refund obligations under the terms of the Residency Agreements.

1.94   ***Released Parties*** means (i) the Debtor and its member or members, (ii) the Reorganized Debtor and its member or members, (iii) each Consenting Holder in any capacity, (iv) the Issuer, (v) the 2007 Bond Trustee in any capacity, and (vi) the current and former officers, directors, members, managers, employees, attorneys, and advisors, each in their respective capacities as such, of each of the foregoing.

1.95   ***Releasing Party*** means each holder of a Claim who has voted to accept the Plan and who has not chosen, by marking the appropriate box on the ballot, to opt out of the "Release by Holders of Claims" provided for in Section 8.3 of this Plan.

1.96   ***Reorganized Debtor*** means the reorganized Amsterdam House Continuing Care Retirement Community, Inc., or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date, after giving effect to the restructuring transactions occurring on the Effective Date in accordance with this Plan.

1.97   ***Residency Agreements*** means those certain residency agreements entered into by and between the residents of the Facility and the Debtor and any additional documents related thereto, including any amendments, supplements, or addendums.

1.98   ***Resident Claim*** means any Claim that a resident may hold or assert against the Debtor, its Estate, or its Assets, including, without limitation, any Claim arising under, related to, or in connection with a Residency Agreement.

1.99    **Schedules** means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs, if any, filed by the Debtor pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

1.100    **Secondary Market Area** means the area within the following zip codes: 11001, 11003, 11004, 11005, 11010, 11042, 11354, 11355, 11356, 11357, 11358, 11359, 11360, 11361, 11362, 11363, 11364, 11365, 11366, 11367, 11375, 11423, 11426, 11427, 11428, 11429, 11439, 11549, 11550, 11552, 11553, 11554, 11797, 11801 and 11803.

1.101    **Secured Claim** means any Claim of a Creditor that is (i) secured by property of the Estate, to the extent of the value of the Creditor's interest in the Estate's interest in such property, as provided in section 506(a) of the Bankruptcy Code or (ii) subject to setoff under section 553 of the Bankruptcy Code, to the extent of the amount subject to setoff, as provided in section 506(a) of the Bankruptcy Code.

1.102    **Series 2007A Bonds** means the Nassau County Industrial Development Agency Continuing Care Retirement Community Fixed Rate Revenue Bonds (Amsterdam at Harborside Project) Series 2007A, in the original aggregate principal amount of $167,895,000 issued pursuant to the 2007 Indenture.

1.103    **Series 2007A/B Bond Claims** means any and all Claims in respect of the Series 2007A Bonds or the Series 2007B Bonds.

1.104    **Series 2007B Bonds** means the Nassau County Industrial Development Agency Continuing Care Retirement Community Adjustable Rate Revenue Bonds (Amsterdam at Harborside Project) Series 2007B, in the original aggregate principal amount of $8,500,000 issued pursuant to the 2007 Indenture.

1.105    **Series 2007C Bonds** means the Nassau County Industrial Development Agency Continuing Care Retirement Community Variable Rate Demand Revenue Bonds (Amsterdam at Harborside Project) Series 2007C, in the original aggregate principal amount of $95,100,000 issued pursuant to the 2007 Indenture.

1.106    **Series 2007C Bond Claims** means any and all Claims in respect of the Series 2007C Bonds.

1.107    **Series 2014A Bonds** means the Nassau County Industrial Development Agency Continuing Care Retirement Community Fixed Rate Revenue Bonds (Amsterdam at Harborside Project) Series 2014A to be issued by the Issuer pursuant to this Plan under the 2014 Bond Indenture and as more fully described in Section 4.3.1 herein.

1.108    **Series 2014B Bonds** means the Nassau County Industrial Development Agency Continuing Care Retirement Community Fixed Rate Revenue Bonds (Amsterdam at Harborside Project) Series 2014B to be issued by the Issuer pursuant to this Plan under the 2014 Bond Indenture and as more fully described in Section 4.3.2 herein.

1.109  **Series 2014C Bonds** means the Nassau County Industrial Development Agency Continuing Care Retirement Community Excess Cash Flow Bonds (Amsterdam at Harborside Project) Series 2014C to be issued by the Issuer pursuant to this Plan under the 2014 Bond Indenture and as more fully described in Section 4.3.3 herein.

1.110  **Subordination Agreement** means the subordination agreement between ACCHS, the Debtor, and the 2014 Bond Trustee included in the Plan Supplement, as such subordination agreement may be amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof.

1.111  **Subvention Certificate** means that certain Subvention Certificate of Amsterdam House Continuing Care Retirement Community, Inc., dated as of March 31, 2004, between the Debtor and ACCHS issued in consideration of the subvention in the amount of $3,000,000 made by ACCHS to the Debtor.

1.112  **Subvention Claim** means the Claim held against the Debtor by ACCHS under the Subvention Certificate.

1.113  **Turnover Entrance Fee** means any entrance fee, other than an Initial Entrance Fee, that a resident occupying a unit at the Facility pays pursuant to a Residency Agreement.

1.114  **Unexpired Lease** means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.115  **Unrestricted Reserve Amount** shall have the meaning set forth in the 2014 Bond Indenture.

1.116  **Unrestricted Reserve Cap** shall have the meaning set forth in the 2014 Bond Indenture.

1.117  **U.S. Trustee Fees** means all fees and charges assessed against the Estate of the Debtor under 28 U.S.C. § 1930 of the United States Code.

1.118  **Voting Deadline** means the deadline to vote to accept or reject this Plan set forth in the Disclosure Statement or an order of the Bankruptcy Court, as such deadline may be extended or modified from time to time.

###### B.    Interpretation:  Application of Definitions and Rules of Construction.

Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in, or exhibit to, this Plan, as the same may be amended, waived, or modified from time to time.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein.  A term used herein that is not defined herein shall have the meaning assigned to that term in the Bankruptcy Code.  The rules of construction contained in section 102 of the Bankruptcy Code shall apply to this Plan.  The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  Unless otherwise

provided, any reference in this Plan to an existing document, exhibit, or schedule means such document, exhibit, or schedule as it may have been amended, restated, revised, supplemented, or otherwise modified.  If a time or date is specified for any payments or other distribution under this Plan, it shall mean on or as soon as reasonably practicable thereafter.  Further, where appropriate from a contextual reading of a term, each term includes the singular and plural form of the term regardless of how the term is stated and each stated pronoun is gender neutral.

## SECTION 2.    TREATMENT OF ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, AND U.S. TRUSTEE FEES

2.1    *Administrative Claims*.    In accordance with Bankruptcy Code section 1123(a)(1), Administrative Claims have not been classified and are treated as described herein.  Except as otherwise provided in this Plan, by written agreement of the holder of an Allowed Administrative Claim to accept different treatment than provided under this Plan, or by order of the Bankruptcy Court, a Person holding an Allowed Administrative Claim will receive Cash equal to the unpaid portion of such Allowed Administrative Claim that has come due for payment under any applicable order or law, as soon as practicable after the later of: (i) the third Business Day after the Effective Date or as soon as reasonably practicable thereafter as determined by the Disbursing Agent; (ii) the date on which such Person becomes the holder of such an Allowed Administrative Claim; or (iii) the date or dates when that Allowed Administrative Claim is payable by its terms, consistent with past practice and in accordance with past terms.

2.2    *Professional Compensation*.  Professionals or other Persons asserting a Claim for Accrued Professional Compensation for services rendered before the Effective Date must file and serve on the Debtor, the Reorganized Debtor, the 2007 Bond Trustee, and such other Persons who are designated by the Bankruptcy Rules, the Confirmation Order, or other order of the Bankruptcy Court, an application for final allowance of such Claim for Accrued Professional Compensation no later than 30 days after the Effective Date.  Objections to any Claim for Accrued Professional Compensation must be filed and served on the Reorganized Debtor, the Office of the U.S. Trustee, the 2007 Bond Trustee, and the requesting party no later than 25 days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application for final allowance of such Claim for Accrued Professional Compensation was served.

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and section 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor may employ and pay any professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to any party or action, order, or approval of the Bankruptcy Court.

2.3    *Priority Tax Claims*.    In accordance with section 1123(a)(1) of the Bankruptcy Code, Priority Tax Claims have not been classified and are treated as described in this Section 2 of this Plan.  Unless otherwise agreed by the holder of an Allowed Priority Tax Claim, any Person holding an Allowed Priority Tax Claim will receive, as determined by the Reorganized Debtor in its sole discretion and in full satisfaction of such Claim, payment in Cash

in full on the later of (i) the Effective Date, or as soon as reasonably practicable thereafter as determined by the Disbursing Agent, or (ii) the date such Claim becomes an Allowed Claim.

> 2.4 ***U.S. Trustee Fees***.  U.S. Trustee Fees include all fees and charges assessed against the Debtor's Estate under section 1930 of Title 28 of the United States Code. All U.S. Trustee Fees will be paid in full by the Reorganized Debtor as they become due and owing.

## SECTION 3.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

> 3.1 ***Classification and Specification of Treatment of Claims***.  All Claims, except those described in Section 2 herein, are placed in the following impaired or unimpaired Classes of Claims pursuant to sections 1123(a)(1), 1123(a)(2), and 1123(a)(3) of the Bankruptcy Code, which sections require this Plan to designate such Classes and to specify their impaired or unimpaired status.  A Claim is classified in a particular Class only to the extent that the Claim qualifies within the description of the Class and is classified in a different Class to the extent that the Claim qualifies within the description of that different Class.  A Claim is in a particular Class only to the extent that the Claim is an Allowed Claim in that Class and has not been paid, released, withdrawn, waived, or otherwise satisfied under this Plan.  Unless this Plan expressly provides otherwise, when a Class includes a subclass, each subclass is a separate Class for all purposes under the Bankruptcy Code, including, without limitation, voting and distribution.

> Subject to all other applicable provisions of this Plan (including its distribution provisions), classified Claims shall receive the treatment set forth below.  This Plan will not provide any distributions on account of a Claim to the extent that such Claim has been disallowed, released, withdrawn, waived, or otherwise satisfied or paid as of the Effective Date, including, without limitation, through payment by a third party.  Except as specifically provided in this Plan, this Plan will not provide any distributions on account of a Claim for which the obligation to pay has been assumed by a third party.

> 3.2 ***Classes of Claims and Interests***.

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Series 2007A/B Bond Claims | Impaired | Entitled to Vote |
| 3 | Series 2007C Bond Claims | Impaired | Entitled to Vote |
| 4 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 5 | General Unsecured Claims | Unimpaired | Deemed to Accept |
| 6 | Subvention Claim | Impaired | Entitled to Vote |
| 7 | Interests in Debtor | Unimpaired | Deemed to Accept |

> 3.2.1 <u>Class 1 — Other Priority Claims</u>.  This Class consists of all Allowed Other Priority Claims, if any such Claims still exist as of the Effective Date.  Each

Allowed Other Priority Claim shall be in a separate subclass.  Except to the extent that the holder of an Allowed Other Priority Claim agrees to less favorable treatment, each holder of an Allowed Other Priority Claim will receive, in full and final satisfaction and discharge of and in exchange for each Allowed Other Priority Claim: (i) deferred Cash payments of a value, as of the Effective Date, equal to the holder's Allowed Other Priority Claim, or (ii) payment in Cash in full on the later of: (a) the third (3rd) Business Day after the Effective Date or as soon as reasonably practicable thereafter as determined by the Disbursing Agent; and (b) the third (3rd) Business Day after the date on which such Other Priority Claim becomes an Allowed Claim.

   3.2.2 Class 2 — Series 2007A/B Bond Claims.  This Class consists of all Series 2007A/B Bond Claims and includes all Claims of the holders of (i) the Series 2007A Bonds, which Claims shall be deemed Allowed pursuant to this Plan in the aggregate principal amount of $164,385,000, plus accrued and unpaid interest as of the Petition Date in the amount of $635,171.84, plus accrued and unpaid interest from the Petition Date to the Effective Date in the approximate amount of $3,811,031; and (ii) the Series 2007B Bonds, which Claims shall be deemed Allowed pursuant to this Plan in the aggregate principal amount of $8,500,000, plus accrued and unpaid interest as of the Petition Date in the amount of $49,335.42, plus accrued and unpaid interest from the Petition Date to the Effective Date in the amount of $193,375.  Upon the terms and subject to the conditions set forth in this Plan, on the Effective Date, in full and final satisfaction and discharge of and in exchange for each Allowed Series 2007A/B Bond Claim:

- Each holder of an outstanding Series 2007A Bond or outstanding Series 2007B Bond shall exchange the then outstanding Series 2007A Bond or Series 2007B Bond for (i) its *pro rata* share of the principal amount of the Series 2014A Bonds in the aggregate principal amount of $129,663,750 allocated to that respective maturity as further set out in Schedule A attached hereto; and (ii) its *pro rata* share of the principal amount of the Series 2014C Bonds in the aggregate principal amount of $47,225,656 (inclusive of interest from the Petition Date through the Effective Date as set forth in Section 4.3.3 hereof).

- Each holder of an outstanding Series 2007A Bond or outstanding Series 2007B Bond shall also receive payment in full in Cash on account of its allocable share of accrued and unpaid interest on the Series 2007A Bonds or Series 2007B Bonds, as applicable, through the date immediately preceding the Petition Date, which payment shall be made as of the Distribution Date.

   3.2.3 Class 3 — Series 2007C Bond Claims.  This Class consists of all Series 2007C Bond Claims and includes all Claims of the holders of the Series 2007C Bonds, which shall be deemed Allowed pursuant to this Plan in the aggregate principal amount of $47,685,000, plus accrued and unpaid interest as of the Petition Date in the amount of $1,012,489.73, plus accrued and unpaid interest from the Petition Date to the Effective Date in the amount of $984,695.  Upon the terms and subject to the conditions set forth in this Plan, on the Effective Date, in full and final satisfaction and discharge of and in exchange for each Allowed Series 2007C Bond Claim:

- Each holder of an outstanding Series 2007C Bond shall exchange the then outstanding Series 2007C Bond for a *pro rata* share of:

- Series 2014A Bonds in the aggregate principal amount of $11,921,250;

- Series 2014B Bonds in the aggregate principal amount of $23,842,500; and

- Series 2014C Bonds in the aggregate principal amount of $12,905,945 (which amount shall include interest from the Petition Date through the Effective Date, as set forth in Section 4.3.3 hereof).

- Each holder of an outstanding Series 2007C Bond shall also receive payment in full in Cash on account of its allocable share of accrued and unpaid interest (based upon the contractual rate of interest of 10% per annum) on the Series 2007C Bonds through the date immediately preceding the Petition Date, which payment shall be made as of the Distribution Date.

3.2.4   <u>Class 4 — Other Secured Claims</u>.   This Class consists of all Other Secured Claims.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction and discharge of and in exchange for each Allowed Other Secured Claim, on the later of the Effective Date and the date such Other Secured Claim becomes Allowed, or as soon as practicable thereafter, each holder of an Allowed Other Secured Claim shall have its Other Secured Claim reinstated and the legal, equitable, and contractual rights to which the holder of such Claim is entitled shall otherwise be unaltered in accordance with section 1124 of the Bankruptcy Code.  For the avoidance of doubt, this Class 4 includes the PILOT Claim.

3.2.5   <u>Class 5 —General Unsecured Claims</u>.   This Class consists of all General Unsecured Claims.  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction and discharge of and in exchange for each General Unsecured Claim, each holder of an Allowed General Unsecured Claim will receive payment in full in Cash of the unpaid portion of such Allowed General Unsecured Claim on the latest of (i) the third (3rd) Business Day after the Effective Date or as soon as practicable thereafter as determined by the Disbursing Agent, (ii) the third (3rd) Business Day after the date on which such General Unsecured Claim becomes an Allowed Claim, (iii) the date such Allowed General Unsecured Claim becomes due and payable in the ordinary course of business, or (iv) as otherwise agreed to by the Debtor and the holder of such General Unsecured Claim, and this Plan shall otherwise leave unaltered the legal, equitable, and contractual rights to which the holder of such General Unsecured Claim is entitled; ***provided***, ***however***, that the Debtor may seek authority from the Bankruptcy Court to pay certain General Unsecured Claims in advance of the Effective Date in the ordinary course of business.  The Debtor reserves its right, however, to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date.

3.2.6   <u>Class 6 — Subvention Claim</u>.   This Class consists of the Subvention Claim.  On or after the Effective Date, holders of Claims in this Class shall: (i) receive no distribution on account of the Subvention Claim, (ii) enter into the Subordination Agreement, and (iii) retain the Subvention Claim as a claim against the Reorganized Debtor on the terms set forth in the Subvention Certificate.

3.2.7   <u>Class 7 — Interests in Debtor</u>.  This Class consists of all Interests in the Debtor.  On the Effective Date, ACCHS will retain all membership interests in the Reorganized Debtor and will enter into a reasonable agreement with the 2014 Bond Trustee and the Reorganized Debtor providing that neither ACCHS nor the Reorganized Debtor shall engage in any conduct within the Primary Market Area or Secondary Market Area of Harborside that competes with the sales efforts of Harborside.

3.3   ***Acceptance or Rejection of this Plan***.

3.3.1   <u>Acceptance by an Impaired Class</u>.  In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an impaired Class of Claims shall have accepted this Plan if this Plan is accepted by the holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject this Plan.

3.3.2   <u>Presumed Acceptance of this Plan</u>.  Classes 1, 4, 5, and 7 are not impaired under this Plan and are, therefore, conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.

3.3.3   <u>Voting Class</u>.  Classes 2, 3, and 6 are impaired under this Plan and are entitled to vote to accept or reject this Plan.

## SECTION 4.   MEANS FOR IMPLEMENTATION OF THIS PLAN

4.1   ***Sources of Consideration***.  Cash consideration necessary for the Reorganized Debtor to make payments or distributions pursuant hereto shall be obtained from the Entrance Fee Fund and the Operating Reserve Fund, all other unrestricted Cash available to the Reorganized Debtor as of the Effective Date, and Cash derived from the Reorganized Debtor's business operations.

4.2   ***Cancellation of 2007 Bonds***.  Except as otherwise provided in this Plan or the Confirmation Order, on the Effective Date, the 2007 Bonds shall be cancelled, and the 2007 Bonds and related 2007 Bond Documents shall continue in effect solely to the extent they relate to and are necessary to (i) allow for the applicable distributions pursuant to the Plan, (ii) permit the 2007 Bond Trustee and the Issuer to be compensated for fees and reimbursed for expenses including expenses of its professionals, assert its charging lien, enforce its indemnity and other rights and protections with respect to and pursuant to the 2007 Bond Documents, (iii) permit the 2007 Bond Trustee to set one or more record dates and distributions dates with respect to the distribution of funds to beneficial holders of the 2007 Bonds, as applicable, (iv) permit the Bond Trustee to appear in the Chapter 11 Case, and (v) permit the 2007 Bond Trustee and the Issuer to perform any functions that are necessary in connection with the foregoing clauses (i) through (iv).

4.3   ***Issuance of 2014 Bonds***.  On the Effective Date, the Issuer will issue the 2014 Bonds in accordance with the terms of this Plan and pursuant to the 2014 Bond Indenture.

               4.3.1    <u>Series 2014A Bonds</u>.  The Series 2014A Bonds shall be issued as current paying bonds with an aggregate principal amount of $141,585,000.  The Series 2014A Bonds shall bear interest at and have maturities in the years and in principal amounts as set forth on Schedule A attached hereto, with a maturity date of 35 years.  The Series 2014A Bonds shall further be subject to optional and mandatory redemption as set forth in the 2014 Bond Indenture. Interest on the Series 2014A Bonds shall be payable semiannually following the Effective Date and principal shall be paid as set forth in the 2014 Bond Indenture.

               4.3.2    <u>Series 2014B Bonds</u>.  The Series 2014B Bonds shall be issued as current paying bonds with an aggregate principal amount of $23,842,500.  The Series 2014B Bonds shall bear interest at 5.5%, payable semiannually, and shall mature on July 1, 2020.  The Series 2014B Bonds shall be subject to optional and mandatory redemption as set forth in the 2014 Bond Indenture.

               4.3.3    <u>Series 2014C Bonds</u>.  The Series 2014C Bonds shall be issued in the aggregate principal amount of $55,142,500, plus interest accrued on the 2007 Bonds from the Petition Date through the Effective Date at the rate equal to (i) in connection with the Series 2007A Bonds and Series 2007B Bonds at the proposed corresponding rate of interest accruing under the Series 2014A Bonds; and (ii) in connection with the Series 2007C Bonds at the rate of 5.9% per annum, all as further set out in Schedule A, attached hereto.  The Series 2014C Bonds shall bear interest at 2%, payable semiannually, but only to the extent of Excess Cash, in accordance with the Distribution Waterfall under the 2014 Bond Indenture, applied first to accrued interest, then to principal.  The Series 2014C Bonds shall mature on January 1, 2049.

               4.3.4    <u>Priority of 2014 Bonds</u>.  The Series 2014A Bonds and the Series 2014B Bonds will be *pari passu*, secured by a Lien on all assets of Amsterdam except that the 2014B Bonds will have a first Lien against the Entrance Fees and the Series 2014A Bonds will have a second Lien against Entrance Fees.  Each of the Series 2014A Bonds and Series 2014B Bonds will be senior to the Series 2014C Bonds in repayment and security, ***provided***, ***however***, that the Lien securing the Series 2014A Bonds and the Series 2014B Bonds will be junior only to the Lien of the PILOT Mortgage, which will remain in effect after the Effective Date.  The Series 2014C Bonds shall be secured by a Lien on all assets of Amsterdam, junior to the Lien of the PILOT Mortgage and the Liens securing the Series 2014A Bonds and the Series 2014B Bonds.

               4.3.5    <u>2014 Bond Documents</u>.  In connection with the foregoing matters described in this Section 4.3.5, on the Effective Date, the Issuer, the Debtor, and the 2014 Bond Trustee, as applicable, will enter into the 2014 Bond Documents, including the 2014 Bond Indenture, the 2014 Installment Sale Agreement, and the 2014 Mortgage.  The 2007 Bond Trustee shall transfer substantially all funds and accounts created or maintained under or pursuant to the 2007 Indenture in accordance with the 2014 Bond Documents and this Plan.

               4.3.6    <u>Effective Date Transactions</u>.  Upon the Effective Date, the deposits in the Entrance Fee Fund, together with (x) the balances as of the Effective Date of the Debtor's operating accounts and of the Operating Reserve Fund and (y) revenues and other income of the Debtor available on the Effective Date, shall be applied in the following order of priority to the extent of available funds: (i) to pay any Refunds due and owing; (ii) to pay all

professional fees and expenses, and all other reasonable fees and expenses, incurred in connection with the "Restructuring Transaction" as defined in the Restructuring Term Sheet attached as Exhibit A to this Plan (including, without limitation, any costs associated with obtaining opinions from bond counsel) subject to an agreed upon budget; (iii) to pay interest on the Series 2007 Bonds accrued and unpaid through the date immediately preceding the Petition Date; (iv) to fund the Operating Reserve Fund in an amount equal to approximately 130 Days Cash on Hand; (v) to fund the Unrestricted Reserve Amount in an amount equal to approximately 45 Days Cash on Hand; and (vi) to fund the Debt Service Reserve Fund up to the initial Debt Service Reserve Fund Requirement.

        4.3.7  <u>Additional Terms of 2014 Bonds</u>.  Additional terms and conditions with respect to the 2014 Bonds are set forth in the Restructuring Term Sheet attached as Exhibit A to this Plan and in the 2014 Bond Documents.  To the extent of any inconsistencies between the Restructuring Term Sheet and the 2014 Bond Documents, the 2014 Bond Documents shall govern the respective rights and obligations of the parties.

        **4.4**  ***Section 1145 Exemption.***  Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the 2014 Bonds shall be exempt from, among other things, the registration and prospectus delivery requirements of Section 5 of the Securities Act of 1933 (as now in effect or hereafter amended) and any other applicable state or federal law requiring registration and/or delivery of a prospectus prior to the offering, issuance, distribution, or sale of securities.  Any person who solicits or participates in the offer, issuance, sale, or purchase of the 2014 Bonds issued under, or in accordance with, this Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, is not liable, on account of such solicitation or participation, for violation of an applicable law, rule, or regulation governing solicitation of acceptance or rejection of this Plan or the offer, issuance, sale, or purchase of securities pursuant thereto.

        **4.5**  ***Advisory Services Agreements.***  On or before the Effective Date, the Reorganized Debtor will (i) assume the Administrative Services Agreement and simultaneously enter into the amendments thereto, resulting in the Amended and Assumed Administrative Services Agreement, (ii) assume the Marketing and Development Advisory Services Agreement and enter into the amendments thereto, (iii) enter into the New Financial Services Advisory Agreement, and (iv) enter into the New Marketing Services Advisory Agreement.

        **4.6**  ***Assumption of Residency Agreements***.  On the Effective Date, the Reorganized Debtor shall assume all of the Residency Agreements in their entirety.

        **4.7**  ***Reorganized Debtor's Board of Directors***.  The existing members of the Board of Directors of the Debtor shall continue to be members of the Board of Directors of the Reorganized Debtor.  The Board of Directors of the Debtor consists of Lawrence B. Thompson, Esq.; James J. Campbell; Isabel M. Carden; Joseph C. Hoopes, Jr.; Jay H. McDowell, Esq.; Frances R. Olivieri; The Reverend Deacon Frank L. Peterson, Jr.; The Reverend James G. Callaway, Jr.; George L. Van Amson; Dr. Karen M. Hopkins, M.D.; and R. Scott Edmonds.

        **4.8**  ***Officers of the Reorganized Debtor***.  The existing officers of the Debtor shall continue to be officers of the Reorganized Debtor.  Such officers shall serve in accordance

with applicable non-bankruptcy law. The existing officers of the Debtor include James Davis (President & CEO); Joseph C. Hoopes, Jr. (Treasurer); and Jay H. McDowell (Secretary).

4.9 ***Employee Benefits***. Except as otherwise provided herein, on and after the Effective Date, the Reorganized Debtor may: (i) honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans for, among other things, compensation, health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of the Debtor who served in such capacity at any time, and (ii) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising before the Petition Date; ***provided***, ***however***, that the Debtor's or the Reorganized Debtor's performance under any employment agreement will not entitle any person to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or restore, reinstate or revive any such benefit or alleged entitlement under any such policy, program or plan. Nothing herein shall limit, diminish or otherwise alter the Reorganized Debtor's or the Debtor's defenses, claims, Causes of Action or other rights with respect to any such contracts, agreements, policies, programs, and plans.

4.10 ***Vesting of Assets in the Reorganized Debtor***. Except as otherwise provided in this Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, or as soon as practicable thereafter, all property of the Debtor's Estate and all Causes of Action of the Debtor (except those released pursuant to the Releases by the Debtor) shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens securing the 2014 Bonds or the PILOT Agreement). On and after the Effective Date, except as otherwise provided in this Plan, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

4.11 ***Restructuring Transactions***. On the Effective Date or as soon as reasonably practicable thereafter, the Debtor and the Reorganized Debtor may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan, including: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of this Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Persons may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan and having other terms to which the applicable Persons agree; (iii) the filing of appropriate certificates or articles of incorporation or amendments thereof, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; and (iv) all other actions that the applicable Persons determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

4.12    ***Corporate Action***.  Upon the Effective Date, all actions contemplated by this Plan (whether to occur before, on, or after the Effective Date) shall be deemed authorized and approved in all respects, and all matters provided for in this Plan involving the corporate structure of the Debtor or the Reorganized Debtor and any corporate action required by the Debtor or the Reorganized Debtor in connection with this Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the directors or officers of the Debtor or the Reorganized Debtor.

On or (as applicable) before the Effective Date, the appropriate officers of the Debtor or the Reorganized Debtor, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, certificates of incorporation, operating agreements, and instruments contemplated by this Plan (or necessary or desirable to effect the transactions contemplated by this Plan) in the name of and on behalf of the Debtor or the Reorganized Debtor, as the case may be, and any and all other agreements, documents, securities, and instruments relating to the foregoing.

4.13    ***Section 1146 Exemption from Certain Taxes and Fees***.  Pursuant to section 1146(a) of the Bankruptcy Code, any transfer of property and any issuance, transfer, or exchange of a security in connection with or pursuant to this Plan shall not be subject to any stamp, mortgage recording, or other similar tax, charge, or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax, charge, or governmental assessment and, as applicable, to accept for filing and recordation instruments or other documents pursuant to such transfer of property or to permit the issuance, transfer, or exchange of a security without the payment of any such tax, charge, or governmental assessment.  Such exemption specifically applies, without limitation, to (i) the creation and recordation of any mortgage, deed of trust, lien, or other security interest; (ii) the making or assignment of any lease or sublease; (iii) any restructuring transaction authorized by this Plan, including, without limitation, the issuance by the Issuer of the 2014 Bonds; or (iv) the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation, or dissolution; (c) deeds; or (d) assignments executed in connection with any transaction occurring under this Plan.

4.14    ***Preservation of Causes of Action of the Debtor***.  In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, the Exculpated Claims against the Exculpated Parties and the Debtor Released Claims against the Released Parties), the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and the Reorganized Debtor's right to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtor may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtor.  No Person may rely on the absence of a specific reference in this Plan or the Disclosure Statement to any Cause of Action against such Person as any indication that the Debtor or the Reorganized Debtor, as applicable, will not pursue any and all available Causes of Action against such Person.  Except with respect to Causes of Action as to which the Debtor or

the Reorganized Debtor has released any Person on or before the Effective Date (including pursuant to the Releases by the Debtor or otherwise), the Debtor or the Reorganized Debtor, as applicable, expressly reserves all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in this Plan.  Unless any Causes of Action against a Person are expressly waived, relinquished, exculpated, released, compromised, or settled in this Plan or by an order of the Bankruptcy Court, the Reorganized Debtor expressly reserves all Causes of Action for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the confirmation or consummation of this Plan.  For the avoidance of doubt, nothing in this Section 4.14 shall affect the "Release by the Debtor" provided in Section 8.2 of this Plan.

**SECTION 5.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

      5.1    ***Assumption and Rejection of Executory Contracts and Unexpired Leases***.  Except as otherwise provided in the Plan or in an order of the Bankruptcy Court, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, each of the Executory Contracts and Unexpired Leases of the Debtor will be deemed assumed as of the Effective Date, unless such Executory Contract or Unexpired Lease: (i) was assumed or rejected previously by the Debtor; (ii) expired or terminated pursuant to its own terms before the Effective Date; (iii) is the subject of a motion to reject filed on or before the Effective Date; or (iv) is identified as an Executory Contract or Unexpired Lease to be rejected in the Plan Supplement filed on or before the Effective Date.

      **Notwithstanding anything contained in this Plan to the contrary, each Residency Agreement, and all obligations arising thereunder, including the repayment of Initial Entrance Fees, Turnover Entrance Fees, and all other entrance deposits and fees, will be assumed by the Reorganized Debtor, as of the Effective Date, pursuant to this Plan.**

      Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or rejections of such Executory Contracts or Unexpired Leases as set forth in this Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise indicated, all assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to this Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to this Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as such terms may have been modified by such order.  Notwithstanding anything to the contrary in this Plan, the Debtor or the Reorganized Debtor, as applicable, reserves the right to alter, amend, modify, or supplement the list of Executory Contracts and Unexpired Leases identified in the Plan Supplement at any time before the Effective Date.  After the Effective Date, the Reorganized Debtor shall have the right to terminate, amend, or modify any contracts, leases, or other agreements without approval of the Bankruptcy Court, subject to the terms thereof.

5.2    ***Claims Based on Rejection of Executory Contracts or Unexpired Leases***.  All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; ***provided, that*** any such Claims arising from the rejection of an Unexpired Lease shall be subject to the cap on rejection damages imposed by section 502(b)(6) of the Bankruptcy Code.  Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed and forever barred from assertion and shall not be enforceable against the Debtor, the Reorganized Debtor, the Estate, or its property, without the need for any objection by the Debtor or the Reorganized Debtor or further notice to, action by, or order or approval of the Bankruptcy Court.  All Allowed Claims arising from the rejection of the Debtor's Executory Contracts or Unexpired Leases shall be classified as Class 5 General Unsecured Claims and shall be treated in accordance with this Plan.

5.3    ***Cure of Defaults for Assumed Executory Contracts and Unexpired Leases***.  Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed under this Plan is in default shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by Cure.  If there is a dispute regarding (i) the nature or amount of any Cure; (ii) the ability of the Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed; or (iii) any other matter pertaining to assumption, Cure shall occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption.

Assumption of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall result in the full waiver, release, and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting change in control or ownership interest composition and other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of the assumption.

5.4    ***Insurance Policies***.  Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtor shall assume (and assign to the Reorganized Debtor if necessary to continue the Insurance Policies in full force) all of the Insurance Policies pursuant to section 365(a) of the Bankruptcy Code.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtor's foregoing assumption and assignment of each of the Insurance Policies.

5.5    ***Modifications, Amendments, Supplements, Restatements, or Other Agreements***.  Unless otherwise provided, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated, or is rejected or repudiated under this Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith, unless such Executory Contract or Unexpired Lease has been previously assumed by the Debtor.

5.6 **Reservation of Rights**.  Nothing contained in this Plan or the Plan Supplement shall constitute an admission by the Debtor that any contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtor or the Reorganized Debtor, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

5.7 **Contracts and Leases Entered Into After the Petition Date**.  Notwithstanding any other provision in this Plan, contracts and leases entered into after the Petition Date by the Debtor, including any Executory Contracts and Unexpired Leases assumed by the Debtor, will be performed by the Debtor or the Reorganized Debtor in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

**SECTION 6.    PROVISIONS GOVERNING DISTRIBUTIONS**

6.1 **Timing and Calculation of Amounts to Be Distributed**.  Except as otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each holder of an Allowed Claim against the Debtor shall receive the full amount of the distributions that this Plan provides for Allowed Claims in the applicable Class and in the manner provided herein.  In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in this Plan.  Except as otherwise provided for in this Plan, holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

6.2 **Disbursing Agent**.  Except as otherwise provided in this Plan, all distributions under this Plan shall be made by the Reorganized Debtor as Disbursing Agent or such other Person designated by the Reorganized Debtor as a Disbursing Agent.  With respect to the issuance of the 2014 Bonds, such bonds shall be deemed issued and exchanged as of the Effective Date without presentment by the beneficial owners.  The Distribution Record Date in connection with the holders of the 2014 Bonds shall be as early as practicable so as to enable the Debtor, the Issuer, and their respective agents to comply with the customary practices and

procedures of the Depository Trust Company.  All Cash distributions to be made to beneficial holders of the 2007 Bonds shall be made to the 2007 Bond Trustee, which shall make such distributions to the beneficial holders of the 2007 Bonds in accordance with the terms of the 2007 Indenture.

6.3     ***Rights and Powers of Disbursing Agent***.  The Disbursing Agent shall be empowered to:  (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan;  (ii) make all distributions contemplated hereby; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of this Plan.

6.4     ***Payments and Distributions on Disputed Claims***.  Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but that later become Allowed Claims shall be deemed to have been made on the Effective Date.

6.5     ***Special Rules for Distributions to Holders of Disputed Claims***. Notwithstanding any other provision of this Plan and except as may be agreed to by the Debtor or the Reorganized Debtor, on the one hand, and the holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

6.6     ***Delivery of Distributions in General***.  Except as otherwise provided in this Plan, distributions to holders of Allowed Claims shall be made to holders of record as of the Distribution Record Date by the Disbursing Agent.  Distributions to holders of Allowed Claims will be made at the address of each such holder as set forth in the Debtor's books and records, except that, in the case of holders of the 2007 Bonds, distributions will be made by means of book-entry exchange through the facilities of the DTC in accordance with the customary practices of the DTC, as and to the extent practicable.  Distributions under this Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in this Plan.  None of the Debtor, the Reorganized Debtor, or the applicable Disbursing Agent shall incur any liability whatsoever on account of any distributions under this Plan except for gross negligence, willful misconduct, or fraud.

6.7     ***Undeliverable Distributions and Unclaimed Property***.  In the event that any distribution to any holder is returned as undeliverable, the Disbursing Agent shall use reasonable efforts to determine the current address of such holder.  No distribution to such holder shall be made unless and until the Disbursing Agent has determined such holder's then current address, at which time such distribution shall be made as soon as practicable; ***provided***, ***however***, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the Distribution Date.  After such date, all "unclaimed property" or interests in property shall revert to the Reorganized Debtor (notwithstanding any applicable federal or state escheat or abandoned or unclaimed

property laws to the contrary), and the Claim of any holder to such property shall be discharged and forever barred.

6.8     ***Withholding and Reporting Requirements***.  In connection with this Plan and all instruments issued in connection therewith, the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions under this Plan shall be subject to any such withholding or reporting requirements.

6.9     ***Setoffs***.  Except as otherwise provided herein and subject to applicable law, the Debtor may, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the holder of a Claim, setoff against any Allowed Claim (which setoff shall be made against the Allowed Claim, not against any distributions to be made under the Plan with respect to such Allowed Claim), any claims, rights, and Causes of Action of any nature that the Debtor may hold against the holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such holder have not been otherwise released, waived, relinquished, exculpated, compromised, or settled on or prior to the Effective Date (whether pursuant to this Plan or otherwise), and any distribution to which a holder is entitled under this Plan shall be made on account of the Claim, as reduced after application of the setoff described above.  In no event shall any holder of a Claim be entitled to setoff any Claim against any claim, right, or Cause of Action of the Debtor unless such holder obtains entry of a Final Order entered by the Bankruptcy Court authorizing such setoff or unless such setoff is otherwise agreed to in writing by the Debtor and a holder of a Claim; ***provided, that***, where there is no written agreement between the Debtor and a holder of a Claim authorizing such setoff, nothing herein shall prejudice or be deemed to have prejudiced the Debtor's right to assert that any holder's setoff rights were required to have been asserted by motion to the Bankruptcy Court prior to the Effective Date.  This Section 6.9 shall not be applicable to the distributions to be made to or for the benefit of the beneficial holders of the 2007 Bonds.

6.10     ***Insurance Claims***.  No distributions under this Plan shall be made on account of an Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to the Debtor's Insurance Policies.  To the extent that one or more of the Debtor's insurers agrees to satisfy in full a Claim, then immediately upon such agreement, such Claim may be expunged without an objection to such Claim having to be filed and without any further notice to, action by, or order or approval of the Bankruptcy Court.

6.11     ***Applicability of Insurance Policies***.  Except as otherwise provided in this Plan, distributions to holders of Allowed Claims shall be made in accordance with the provisions of any applicable Insurance Policy.  Except as expressly provided in this Plan, nothing contained in this Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtor or any Person may hold against any other Person, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

6.12     ***Allocation of Distributions Between Principal and Unpaid Interest***. With the exception of distributions on account of the 2007 Bonds, which shall be treated as

provided in Classes 2 and 3 herein, to the extent that any Claim entitled to a distribution under this Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for U.S. federal income tax purposes, be allocated on the Debtor's books and records to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the accrued but unpaid interest.

6.13     *Interest on Claims*.  Unless otherwise specifically provided for in this Plan (including interest payable under the 2007 Bonds), postpetition interest will not accrue or be paid on Claims, and no Claim holder will be entitled to interest accruing on or after the Petition Date on any Claim.    Similarly, unless otherwise specifically provided for in this Plan, postpetition interest will not accrue or be paid on any Disputed Claim in respect of the period from the Petition Date to the date a final distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

## SECTION 7.    PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

7.1     *Prosecution of Objections to Claims*.  The Debtor or the Reorganized Debtor, as applicable, shall have the exclusive authority to file, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Plan.  From and after the Effective Date, the Reorganized Debtor may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.  The Reorganized Debtor reserves all rights to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

7.2     *Allowance of Claims*.  Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case before the Effective Date (including the Confirmation Order), the Reorganized Debtor after the Effective Date will have and retain any and all rights and defenses held by the Debtor with respect to any Claim as of the Petition Date.  All Claims of any Person against the Debtor shall be disallowed unless and until such Person pays, in full, the amount it owes the Debtor.  This section shall not be applicable to the 2007 Bond Trustee or the beneficial holders of the 2007 Bonds.

7.3     *Distributions After Allowance*.  As soon as practicable following the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under this Plan, without any interest to be paid on account of such Claim.

7.4     *Estimation of Claims*.  The Debtor (before the Effective Date) or the Reorganized Debtor (on or after the Effective Date) may, at any time, and from time to time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed amount of such Claim

or a maximum limitation on such Claim against any party or Person, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtor or the Reorganized Debtor, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. All of the objection, estimation, settlement, and resolution procedures set forth in this Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, objected to, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

## SECTION 8.    SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

8.1    ***Compromise and Settlement of Claims, Interests and Controversies***. Pursuant to section 1123 of the Bankruptcy Code and Federal Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to this Plan, the provisions of this Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its Estate, and holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of this Plan, pursuant to section 363 of the Bankruptcy Code and Federal Bankruptcy Rule 9019(a), without any further notice to, action by, or order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtor may compromise and settle Claims against it and Causes of Action against other Persons.

8.2    ***Releases by the Debtor***. Pursuant to section 1123(b) of the Bankruptcy Code, as of the Effective Date, and except as otherwise specifically provided in this Plan, the Plan Supplement, or the Confirmation Order, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtor and the implementation of the restructuring contemplated by this Plan, the Released Parties are deemed released and discharged by the Debtor, the Reorganized Debtor, and the Estate from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, setoffs, recoupments, remedies, and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, that the Debtor, the Reorganized Debtor, the Estate, or the Released Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest, or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's restructuring, the Chapter 11 Case, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between the Debtor and any Released Party, the

restructuring of Claims and Interests before or during the Chapter 11 Case, the negotiation, formulation, or preparation of this Plan and the Disclosure Statement, the Plan Supplement or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence relating to the Debtor taking place on or before the Effective Date (collectively, the "***Debtor Released Claims***"), other than claims or liabilities arising out of or relating to any act or omission of a Released Party or a former officer or director of the Debtor that constitutes willful misconduct (including fraud) or gross negligence. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under this Plan or any document, instrument, or agreement (including the Plan Supplement, inclusive of the 2014 Bond Documents) executed to implement this Plan.

    8.3  ***Releases by Holders of Claims***.  As of the Effective Date and except as otherwise specifically provided in this Plan, the Plan Supplement, or the Confirmation Order, for good and valuable consideration, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Debtor, the Reorganized Debtor, the Estate, and the Released Parties from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, setoffs, recoupments, remedies, and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, that such Person would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's restructuring, the Chapter 11 Case, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Case, the negotiation, formulation, or preparation of this Plan, the Disclosure Statement, the Plan Supplement or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event or other occurrence relating to the Debtor taking place on or before the Effective Date (collectively, "***Released Claims***"), other than claims or liabilities arising out of or relating to any act or omission of a Released Party or a former officer or director of the Debtor that constitutes willful misconduct (including fraud) or gross negligence; ***provided***, ***however***, that this Plan shall not release the Debtor, the Reorganized Debtor, and the Released Parties from any Cause of Action held by a governmental entity existing as of the Effective Date based on (i) the Internal Revenue Code or other domestic state, city, or municipal tax code, (ii) the environmental laws of the United States or any domestic state, city, or municipality, (iii) any criminal laws of the United States or any domestic state, city, or municipality, (iv) the Securities and Exchange Act of 1934 (as now in effect or hereafter amended), the Securities Act of 1933 (as now in effect or hereafter amended), or other securities laws of the United States or any domestic state, city, or municipality, (v) the Employee Retirement Income Security Act of 1974, as amended, or (vi) the laws and regulations of the Bureau of Customs and Border Protection of the United States Department of Homeland Security.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under this Plan or any document, instrument, or agreement (including the Plan Supplement, inclusive of the 2014 Bond Documents) executed to implement this Plan.

8.4 **_Exculpation_**.  Upon and effective as of the Effective Date, the Debtor and its officers, employees, attorneys, investment bankers, financial advisors, and other professional advisors and agents will be deemed to have solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(e) of the Bankruptcy Code.

Except with respect to any acts or omissions expressly set forth in and preserved by this Plan, the Plan Supplement, or any related documents, the Exculpated Parties shall neither have, nor incur any liability to any entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming, or effecting this Plan or any contract, instrument, release, or other agreement or document created or entered into in connection with this Plan, the filing of the Chapter 11 Case, the pursuit of confirmation of this Plan, the administration and implementation of this Plan, the distribution of property under this Plan, or any other related agreement or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtor; **_provided, that_** the foregoing "exculpation" shall have no effect on the liability of any entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct (including fraud); **_provided further, that_** each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her, or its duties pursuant to, or in connection with, this Plan or any other related document, instrument, or agreement.

8.5 **_Discharge of Claims_**.  Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Bar Date Order, in this Plan, or in any contract, instrument, or other agreement or document created pursuant to this Plan (including, but not limited to, the 2014 Bond Documents), the distributions, rights, and treatment that are provided in this Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Claims and Causes of Action of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, and rights against the Debtor or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (i) a Proof of Claim based upon such Claim, debt, or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim based upon such Claim, debt, or right is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the holder of such a Claim has accepted this Plan.  Except as otherwise provided herein, any default by the Debtor with respect to any Claim that existed before or on account of the filing of the Chapter 11 Case shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims subject to the Effective Date occurring, except as otherwise expressly provided in this Plan.

8.6 **_Injunction_**.  FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY SUIT, ACTION, OR OTHER PROCEEDING, ON ACCOUNT OF

OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST, OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THIS PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN THIS PLAN, ALL RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION, OR OTHER PROCEEDING ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST, OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THIS PLAN.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THIS PLAN (INCLUDING, BUT NOT LIMITED TO, THE OBLIGATIONS RELATING TO THE 2014 BONDS), ALL PERSONS WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED, DISCHARGED, OR ARE SUBJECT TO EXCULPATION, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH PERSONS ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH PERSONS OR THE PROPERTY OR ESTATE OF SUCH PERSONS ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (IV) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, SETTLED, OR DISCHARGED PURSUANT TO THIS PLAN.

THE RIGHTS AFFORDED IN THIS PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTOR OR ANY OF ITS ASSETS, PROPERTY, OR ESTATE.  ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTOR SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED (EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS PLAN).

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THIS PLAN OR IN OBLIGATIONS ISSUED PURSUANT TO THIS PLAN (INCLUDING, BUT NOT

LIMITED TO, THE OBLIGATIONS RELATING TO THE 2014 BONDS) FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTOR SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL INTERESTS SHALL BE CANCELLED, AND THE DEBTOR'S LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(g) OF THE BANKRUPTCY CODE.

ALL PERSONS SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTOR, THE DEBTOR'S ESTATE, THE REORGANIZED DEBTOR, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS, OR ANY ACT OR OMISSION, TRANSACTION, OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

8.7    ***Term of Injunctions or Stays***.  Unless otherwise provided in this Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  Upon the Effective Date, all injunctions or stays contained in this Plan or the Confirmation Order shall be in full force and effect in accordance with their terms.

8.8    ***Protection Against Discriminatory Treatment***.  Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Persons, including governmental units, shall not discriminate against the Reorganized Debtor or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, the Reorganized Debtor or another Person with whom the Reorganized Debtor has been associated, solely because the Debtor has been a debtor under Chapter 11, has been insolvent before the commencement of the Chapter 11 Case (or during the Chapter 11 Case but before the Debtor is granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Case.

8.9    ***Release of Liens***.  Except as otherwise provided in this Plan, the 2014 Bond Documents, or any contract, instrument, release, or other agreement or document created pursuant to this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to this Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.  For the avoidance of doubt, except as otherwise provided in this Plan (including the Plan Supplement, inclusive of the 2014 Bond Documents), all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be fully released and discharged on the Effective Date without any further action of any party,

including, but not limited to, further order of the Bankruptcy Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code.

## SECTION 9.    CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

9.1    ***Conditions Precedent to the Effective Date***.    It shall be a condition precedent to the Effective Date that each of the following provisions, terms, and conditions shall have been satisfied or waived pursuant to the provisions of this Plan.

(a)    The Bankruptcy Court shall have entered the Confirmation Order containing findings of fact and conclusions of law satisfactory to the Debtor and the 2007 Bond Trustee, which Confirmation Order shall not be subject to any stay and shall be a Final Order, and which Confirmation Order shall include or provide, among other things:

(i)    a finding by the Bankruptcy Court that the Series 2014 Bonds to be issued on the Effective Date will be authorized and exempt from registration under the applicable securities law, pursuant to section 1145 of the Bankruptcy Code;

(ii)    all provisions, terms and conditions of the Plan and related documents are approved; and

(iii)    all Executory Contracts or Unexpired Leases assumed by the Debtor during the Chapter 11 Case including under the Plan shall remain in full force and effect for the benefit of the Reorganized Debtor or its assignee notwithstanding any provision in such contract or lease (including those described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits such assignment or transfer or that enables, permits, or requires termination of such contract or lease;

(b)    The Bankruptcy Court shall have entered a Final Order approving the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code;

(c)    The 2014 Bonds shall be issued;

(d)    In connection with issuance of the 2014 Bonds, the 2014 Bond Trustee shall have received a satisfactory opinion of bond counsel that the interest on the 2014 Bonds will be excluded from gross income for federal tax purposes;

(e)    A Trigger Date (as defined in the Escrow Agreement) shall have occurred, and the Escrowed Funds (as defined in the Escrow Agreement) shall have been released into the Entrance Fee Fund pursuant to the terms of the Escrow Agreement;

(f)     The Plan and all Plan Supplement documents, including any amendments, modifications, or supplements thereto, shall be in form and substance acceptable to the 2007 Bond Trustee;

(g)     All payments and transfers to be made on the Effective Date shall be made or duly provided for, and the Debtor shall have sufficient Cash on such date to make such payments;

(h)     All authorizations, consents, and regulatory approvals required, if any, in connection with the consummation of the Plan shall have been obtained;

(i)     All other actions, documents and agreements necessary to implement the Plan shall be in form and substance acceptable to the 2007 Bond Trustee and shall have been effected or executed; and

(j)     The Effective Date shall be on or before November 28, 2014.

    9.2     ***Waiver of Conditions***.   The conditions to the Effective Date set forth herein may be waived at any time by the Debtor (except for (i) the Confirmation Order being satisfactory to the 2007 Bond Trustee, (ii) the issuance of the 2014 Bonds, (iii) the bond counsel opinion referred to in Section 9.1(d) above, (iv) the condition that the aforementioned documents and orders be reasonably acceptable to the 2007 Bond Trustee, and (v) the Effective Date shall be on or before November 28, 2014; ***provided***, ***however***, that the Debtor may not waive entry of an order or orders approving the Disclosure Statement and confirming this Plan.

    9.3     ***Effect of Failure of Conditions***.   If the Effective Date does not occur, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall: (i) constitute a waiver or release of any claims by or Claims against the Debtor; (ii) prejudice in any manner the rights of the Debtor, any holders of Claims, or any other Person; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtor, any holders, or any other Person in any respect.

## SECTION 10.  MODIFICATION, REVOCATION OR WITHDRAWAL OF THIS PLAN

    10.1     ***Modification and Amendments***.    Except as otherwise specifically provided herein, the Debtor reserves the right to modify this Plan as to material terms and seek confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Federal Bankruptcy Rule 3019 and those restrictions on modifications set forth in this Plan, the Debtor expressly reserves its right to alter, amend, or modify materially this Plan one or more times, after confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify this Plan or remedy any defect or omission, or reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of this Plan, ***provided***, ***however***, that, except with the prior written consent of each of the 2007 Bond Trustee and the Consenting Holders, the Debtor may not alter, amend, or modify this Plan in any manner that (i) alters or affects the rights or interests of the 2007 Bond Trustee or the

holders of the 2007 Bonds, (ii) alters or affects the treatment of the Series 2007A/B Bond Claims or the Series 2007C Bond Claims under this Plan, (iii) alters or affects the terms or characteristics of the 2014 Bonds as set forth in this Plan prior to such alteration, amendment, or modification, or (iv) is inconsistent with the terms of the Plan Support Agreement. Any such modification or supplement shall be considered a modification of this Plan and shall be made in accordance with this Plan. For the avoidance of doubt, nothing in this Section 10.1 shall be deemed to supplant or supersede the requirements of Federal Bankruptcy Rule 3019.

10.2 **_Effect of Confirmation on Modifications_**. Entry of the Confirmation Order shall mean that all modifications or amendments to this Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Federal Bankruptcy Rule 3019.

10.3 **_Revocation or Withdrawal of this Plan_**. The Debtor reserves the right to, consistent with its fiduciary duties, revoke or withdraw this Plan before the Effective Date. If the Debtor revokes or withdraws this Plan, or if confirmation does not occur, then: (i) this Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of any Executory Contract or Unexpired Lease effected by this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void, and (iii) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtor or any other Person; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Person.

# SECTION 11.  RETENTION OF JURISDICTION

11.1 Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Case and all matters arising out of or related to the Chapter 11 Case and this Plan, including jurisdiction to:

(a) allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims;

(b) decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or this Plan;

(c)     resolve any matters related to:    (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate any Claims arising therefrom, including rejection Claims, cure Claims pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease, (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed, (iii) the Reorganized Debtor amending, modifying, or supplementing, after the Effective Date, any Executory Contracts or Unexpired Leases on the list of Executory Contracts and Unexpired Leases to be assumed or rejected, and (iv) any dispute regarding whether a contract or lease is or was executory or unexpired;

(d)     ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

(e)     adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

(f)     adjudicate, decide, or resolve any and all matters related to any Cause of Action;

(g)     adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(h)     enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

(i)     resolve any avoidance or recovery actions under sections 105, 502(d), 542 through 551, and 553 of the Bankruptcy Code;

(j)     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the consummation of this Plan or any Person's obligations incurred in connection with this Plan (exclusive of the obligations arising under the 2014 Bonds);

(k)     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or

appropriate to restrain interference by any Person with consummation or enforcement of this Plan;

(l)     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the discharge, releases, injunctions, exculpations, indemnifications, and other provisions contained in this Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

(m)    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(n)     adjudicate any and all disputes arising from or relating to distributions under this Plan;

(o)     consider any modifications of this Plan, cure any defect or omission, or reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

(p)     determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

(q)     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan (exclusive of those documents relating to the 2014 Bonds);

(r)     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(s)     hear and determine all disputes involving the existence, nature, or scope of the Debtor's discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

(t)     enforce all orders previously entered by the Bankruptcy Court;

(u)    hear any other matter not inconsistent with the Bankruptcy Code; and

(v)    enter an order concluding or closing the Chapter 11 Case.

## SECTION 12.  MISCELLANEOUS PROVISIONS

12.1    ***Immediate Binding Effect***.  Notwithstanding Federal Bankruptcy Rules 3020(e), 6004(h), or 7062 or any other Bankruptcy Rule, upon the occurrence of the Effective Date, the terms of this Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtor, the Reorganized Debtor, and any and all holders of Claims or Interests (irrespective of whether such holders of Claims or Interests are deemed to have accepted this Plan), all Persons that are parties to or are subject to the settlements, compromises, releases, exculpation, discharges, and injunctions described in this Plan, each Person acquiring property under this Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtor.

12.2    ***Additional Documents***.  On or before the Effective Date, the Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan, subject to the consent of the 2007 Bond Trustee.  The Debtor or the Reorganized Debtor, as applicable, and all holders of Claims receiving distributions pursuant to this Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

12.3    ***Dissolution of Any Committees***.  On the Effective Date, Committees, if any, shall dissolve, and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Case.

12.4    ***Reservation of Rights***.  Except as expressly set forth in this Plan, this Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of this Plan, any statement or provision contained in this Plan, or any action taken or not taken by the Debtor or other Person with respect to this Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtor or other Person with respect to the holders of Claims or Interests before the Effective Date.

12.5    ***Successors and Assigns***.  The rights, benefits, and obligations of any Person named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiary, or guardian, if any, of such Person.

12.6    ***Votes Solicited in Good Faith***.  Upon entry of the Confirmation Order, the Debtor will be deemed to have solicited votes on this Plan in good faith and in compliance with the Bankruptcy Code and any applicable non-bankruptcy law, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtor and its respective affiliates, agents,

representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under this Plan, and, therefore, will have no liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on this Plan or the offer, issuance, sale, or purchase of the 2014 Bonds offered under this Plan.

12.7    ***Closing of Chapter 11 Case***.    The Debtor or the Reorganized Debtor shall, promptly after the full administration of the Chapter 11 Case, file with the Bankruptcy Court all documents required by Federal Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

12.8    ***Notices***.    All notices or requests in connection with this Plan shall be in writing and given by mail addressed to:

CADWALADER, WICKERSHAM & TAFT LLP
Attn:  Ingrid Bagby, Esq. and Christopher Updike, Esq.
One World Financial Center
New York, New York  10281
Telephone:     (212) 504-6000
Facsimile:     (212) 504-6666


Amsterdam House Continuing Care Retirement Community, Inc.
Attn:  James Davis
300 East Overlook
Port Washington, NY 11050
Telephone:     (212) 316-7711
Facsimile:     (212) 662-1793
Email:          jdavis@amsterdamnh.org


All notices and requests to Persons holding any Claim in any Class shall be sent to them at their last known address or to the last known address of their attorney of record in this Chapter 11 Case.  Any such holder of a Claim may designate in writing any other address for purposes of this Section 12.8, which designation will be effective upon receipt by the Debtor.

12.9    ***Headings***.    The headings used in this Plan are inserted for convenience only and neither constitute a portion of this Plan nor in any manner affect the construction of the provisions of this Plan.

12.10    ***Severability***.    If, prior to confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan

will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.

       12.11 ***Validity and Enforceability***.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.  Should any provision in this Plan be determined by the Bankruptcy Court or any appellate court to be unenforceable following the Effective Date, such determination shall in no way limit the enforceability and operative effect of any and all other provisions of this Plan.

       12.12 ***Plan Supplement***.  Any exhibits or schedules not filed with this Plan may be contained in the Plan Supplement, if any, and the Debtor hereby reserves the right to file such a Plan Supplement.

       12.13 ***Governing Law***.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflicts of laws, shall govern the rights, obligations, construction, and implementation of this Plan and the restructuring transactions consummated or to be consummated in connection therewith.

       12.14 ***Request for Confirmation Pursuant to Sections 1129(a) and 1129(b) of the Bankruptcy Code***.  The Debtor requests entry of a Confirmation Order under Bankruptcy Code section 1129(a) and, to the extent necessary, Bankruptcy Code section 1129(b).

Dated:  September 2, 2014                    Respectfully submitted,

                                            **Amsterdam House Continuing Care**
                                            **Retirement Community, Inc.**


                                            By: _/s/ James Davis_____
                                                Name:  James Davis
                                                Title:  President and Chief Executive Officer

**<u>Schedule A</u>**

**The Series 2007A Bonds will be exchanged as follows:**

| Series 2007A Bonds | | | Series 2014A Bonds | | | Series 2014C Bonds[2] | Cash Distribution[3] |
|---|---|---|---|---|---|---|---|
| Outstanding Principal Amount | Original Maturity (January 1) | Original Interest Rate | Principal Amount | Maturity (January 1) | Interest Rate | | |
| $8,340,000 | 2018 | 5.875% | $6,255,000 | 2023 | 5.875% | $2,256,491 | $28,581.88 |
| $28,165,000 | 2027 | 6.500% | $21,123,750 | 2032 | 6.500% | 7,682,004 | 106,792.29 |
| $127,880,000 | 2043 | 6.700% | $95,910,000 | 2049 | 6.700% | 34,968,786 | 499,797.67 |

**The Series 2007B Bonds will be exchanged as follows:**

| Series 2007B Bonds | | | Series 2014A Bonds | | | Series 2014C Bonds[1] | Cash Distribution[2] |
|---|---|---|---|---|---|---|---|
| Outstanding Principal Amount | Original Maturity (January 1) | Original Interest Rate | Principal Amount | Maturity (January 1) | Interest Rate | | |
| $8,500,000 | 2028 | Adjustable | $6,375,000 | 2034 | 6.500% | $2,318,375 | $49,335.42 |

**The Series 2007C Bonds will be exchanged as follows:**

| Series 2007C Bonds | | | Series 2014A Bonds | | | Series 2014B Bonds[4] | Series 2014C Bonds[1] | Cash Distribution[2] |
|---|---|---|---|---|---|---|---|---|
| Outstanding Principal Amount | Original Maturity (January 1) | Original Interest Rate | Principal Amount | Maturity (January 1) | Interest Rate | | | |
| $47,685,000 | 2028 | Variable | $11,921,250 | 2034 | 6.500% | $23,842,500 | $12,905,945 | $1,012,489.73 |

---

[2] Equals 25% of the outstanding principal amount of the Series 2007 Bonds, plus interest accrued from the Petition Date through the Effective Date, at the post-petition rate of interest for the Series 2007A Bonds and Series 2007B Bonds and 5.9% per annum for the Series 2007C Bonds. Assumes a Petition Date of July 22, 2014 and an Effective Date of November 28, 2014.  The Series 2014C Bonds bear interest at 2.0% per annum and mature on January 1, 2049.

[3] Equal interest accrued to, but not including the Petition Date of July 22, 2014.

[4] The Series 2014B Bonds mature on July 1, 2020 and bear interest at 5.50% per annum.

**Exhibit A**

FOR SETTLEMENT DISCUSSIONS ONLY
SUBJECT TO FEDERAL RULE OF EVIDENCE 408
TO BE FILED

## RESTRUCTURING TERM SHEET

This Restructuring Term Sheet (this "***Term Sheet***"), dated as of July 21, 2014 (the "***Execution Date***"), sets forth certain of the principal terms and conditions of a financial restructuring (the "***Restructuring Transaction***") of the outstanding indebtedness of Amsterdam House Continuing Care Retirement Community, Inc. ("***Amsterdam***" or the "***Debtor***"), including, without limitation, (i) $167,895,000 Nassau County Industrial Development Agency Continuing Care Retirement Community Fixed Rate Revenue Bonds (Amsterdam at Harborside Project) Series 2007A (the "***Series 2007A Bonds***"), (ii) $8,500,000 Nassau County Industrial Development Agency Continuing Care Retirement Community Adjustable Rate Revenue Bonds (Amsterdam at Harborside Project) Series 2007B (the "***Series 2007B Bonds***"), and (iii) $95,100,000 Nassau County Industrial Development Agency Continuing Care Retirement Community Variable Rate Demand Revenue Bonds (Amsterdam at Harborside Project) Series 2007C (the "***Series 2007C Bonds***" and together with the Series 2007A Bonds and the Series 2007B Bonds, the "***Series 2007 Bonds***") pursuant to that certain Indenture of Trust (the "***2007 Indenture***"), dated as of December 1, 2007, between the Nassau County Industrial Development Agency (the "***Issuer***") and UMB Bank, n.a., as trustee (the "***Trustee***").

The Restructuring Transaction contemplates, among other things, an exchange of the outstanding Series 2007 Bonds in the aggregate principal amount of approximately $222,375,000, plus accrued and unpaid interest thereon, as provided for herein, for new Series 2014A Bonds, Series 2014B Bonds and Series 2014C Bonds (as such terms are hereinafter defined). This Term Sheet contemplates the consummation of the Restructuring Transaction through a plan of reorganization (the "***Plan***") in a chapter 11 proceeding of Amsterdam (the "***Anticipated Bankruptcy Proceeding***") pending before a court of competent jurisdiction (the "***Bankruptcy Court***") as more fully described below.

This Term Sheet and the undertakings contemplated herein are subject in all respects to the negotiation, execution and delivery of mutually acceptable definitive documentation between Amsterdam, the Issuer, the Trustee, and the members of an informal steering committee comprised of bondholders currently holding 75% of the outstanding aggregate principal amount of Series 2007 Bonds (the "***Steering Committee***"). This Term Sheet is not and shall not be deemed to be a solicitation of votes for the acceptance of the Plan or any plan of reorganization.

**THE TERM SHEET IS BEING PROVIDED AS PART OF A COMPREHENSIVE COMPROMISE AND SETTLEMENT, EACH ELEMENT OF WHICH IS CONSIDERATION FOR THE OTHER ELEMENTS AND AN INTEGRAL ASPECT OF THE PROPOSED RESTRUCTURING OF THE SERIES 2007 BONDS. THE TERM SHEET IS SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND COMPARABLE STATE STATUTES. NOTHING IN THE TERM SHEET SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION OR A WAIVER, AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE, SOLELY FOR SETTLEMENT PURPOSES, WITH A FULL RESERVATION AS TO ALL RIGHTS, REMEDIES AND DEFENSES OF**

**AMSTERDAM, THE TRUSTEE, THE STEERING COMMITTEE, AND ALL OTHER PARTIES.**

Capitalized terms not otherwise defined herein shall have the meanings given to them in the 2007 Indenture.

## A.    <u>Implementation of Restructuring Transaction</u>

| Plan Process | The Restructuring Transaction will be implemented through the Plan.  The Series 2014A Bonds, Series 2014B Bonds and Series 2014C Bonds (each as defined below and collectively, the "***Series 2014 Bonds***") will be issued on the effective date of the Plan (the "***Effective Date***") pursuant to an Indenture of Trust ("***2014 Indenture***" and together with all related documents necessary for the issuance of the Series 2014 Bonds, the "***2014 Bond Documents***") between the Issuer and the Trustee. |
|---|---|
| | The Plan contemplates acceptances from the holders of at least two-thirds in dollar amount and a majority in number of the holders of the Series 2007 Bonds that vote to accept or reject the Plan. |
| | Amsterdam will file in the Anticipated Bankruptcy Proceeding a Plan and disclosure statement to the Plan (the "***Disclosure Statement***"), that is acceptable to the Trustee, which contains the terms and conditions outlined in the Term Sheet, on the timeline set forth below.  Prior to the filing of the Anticipated Bankruptcy Proceeding, Amsterdam shall provide the Plan, Disclosure Statement, Cash Collateral Agreement (defined herein) and all other principal documents associated with the Anticipated Bankruptcy Proceeding (collectively, the "***Bankruptcy Documents***") to the Trustee for its review and consent.  Any substantive amendments, modifications or supplements to the Bankruptcy Documents shall be reviewed by, and acceptable to, the Trustee; provided, however, that no amendment, modification, or supplement shall be materially different from the Term Sheet. |
| Plan Support | Prior to the commencement of the Anticipated Bankruptcy Proceeding, and subject to the timeline set forth herein, the Steering Committee agrees to take all necessary steps to enter into a binding plan support agreement (the "***Plan Support Agreement***") concerning the Steering Committee's commitment to and support of the Plan. |
| | The Steering Committee agrees to take all steps necessary to support confirmation of the Plan, pursuant to the terms of the Plan Support Agreement, and the Steering Committee agrees to not take any actions inconsistent with this Term Sheet, and to direct the Trustee not to take any actions inconsistent with this Term Sheet.  The Steering Committee agrees to vote or cause to be voted all such claims that the Steering Committee's members control, or have the ability to control, to accept the Plan by delivering a duly executed and completed ballot or ballots, as applicable, accepting the Plan on a timely basis pursuant to the ongoing solicitation of votes for the Plan and shall not change such vote.  The Steering Committee agrees not to vote or cause to be voted (to the extent applicable) any of the claims that the Steering Committee's members hold, control, or have the ability to control to reject the Plan, and agree not to otherwise commence any proceeding to oppose the Plan or object to confirmation thereof.  All such actions by the Steering Committee are subject to the terms of the Plan Support Agreement. |
| Forbearance Period Extension | The Trustee and Amsterdam agree to take all necessary steps to enter into a further amendment (the "***Amendment***") to the Amended and Restated Forbearance Agreement, dated March 21, 2014 ("***Amended and Restated Forbearance Agreement***"), extending the Forbearance Period (as defined in the Amended and Restated Forbearance Agreement) through the earlier of the date of commencement of the Anticipated Bankruptcy Proceeding (the "***Petition Date***") or July 25, 2014. |

| Steering Committee Retention of Bonds and Claims | The Steering Committee agrees that it shall not sell, transfer, assign, or otherwise dispose of, directly or indirectly, any of the Series 2007 Bonds, or any right, claim, or interest (voting or otherwise) related to or arising from the Series 2007 Bonds, held by its respective members, subject to the terms and conditions of the Plan Support Agreement. |
|---|---|
| Escrow of Entrance Fees Received Post-Petition | All Entrance Fees received after the commencement of the Anticipated Bankruptcy Proceeding but before the Effective Date (*"Escrowed Entrance Fees"*) shall be held in escrow solely for the benefit of the corresponding resident, and shall not constitute property of the Debtor's bankruptcy estate.  Amsterdam will file a first-day motion in the Anticipated Bankruptcy Proceeding requesting authority to effectuate such escrow, pursuant to an Initial Entrance Fee escrow agreement acceptable to the Trustee. |
| Assumption of Residence Agreements and Related Obligations | The Plan shall provide that Amsterdam will assume all existing Residence Agreements, including but not limited to those agreements with residents of Amsterdam's Assisted Living Units and Nursing Center and their related obligations, including the obligation of Amsterdam to pay any resident refunds required to be satisfied under the terms of the Residence Agreements (*"Refunds"*). |
| Trade Creditor and Vendor Claims Paid in Full | The Plan shall provide that the claims of all trade creditors and vendors shall be paid in full. |

## B.    Terms of Restructuring

| Exchange | On the Effective Date, the holders of the Series 2007A Bonds and Series 2007B Bonds shall exchange the then outstanding Series 2007A Bonds and Series 2007B Bonds for a pro rata share of (i) certain Series 2014A Bonds issued in the aggregate principal amount equal to 75% of the then outstanding Series 2007A Bonds and Series 2007B Bonds and (ii) certain Series 2014C Bonds issued in the aggregate principal amount equal to (A) 25% of the then outstanding Series 2007A Bonds and Series 2007B Bonds, plus (B) interest accrued on such Series 2007 Bonds from the Petition Date through the Effective Date at the post-effective restructuring rate of interest. |
|---|---|
| | On the Effective Date, the holders of the Series 2007C Bonds shall exchange their Series 2007C Bonds for a pro rata share of (i) certain Series 2014A Bonds issued in the aggregate principal amount equal to $11,921,250, (ii) certain Series 2014B Bonds issued in the aggregate principal amount equal to $23,842,500, and (iii) certain Series 2014C Bonds issued in the aggregate principal amount equal to (A) 25% of the then outstanding Series 2007C Bonds, plus (B) interest accrued on such Series 2007 Bonds from the Petition Date through the Effective Date at 5.9% per annum. |
| Series 2014A Bonds | The Series 2014A Bonds shall be issued as current paying bonds with an aggregate principal amount equal to (i) approximately 75% of the then outstanding principal amount of the Series 2007A Bonds and Series 2007B Bonds, plus (ii) $11,921,250 with respect to the Series 2007C Bonds.  The Series 2014A Bonds shall bear interest at and have maturities in the years and in principal amounts as set forth on Schedule 1 hereto.  The Series 2014A Bonds shall further be subject to mandatory redemption/amortization as set forth in Schedule 2 hereto. Interest on the Series 2014A Bonds shall be payable semiannually following the Effective Date and principal shall be paid annually as set forth in Schedule 2. |
| | The Series 2014A Bonds will be secured by a first priority lien on all assets of Amsterdam (except for Entrance Fees) *pari passu* with the Series 2014B Bonds and a second priority lien on Entrance Fees. The Series 2014A Bond shall mature in 35 years. |
| | The Series 2014A Bonds will be subject to optional redemption prior to maturity commencing on the 10th year after the Effective Date at a price equal to: in year 10, at a price of 101% and thereafter at par. |

| Series 2014B Bonds | The Series 2014B Bonds shall be issued as current paying bonds with an aggregate principal amount equal to $23,842,500 at the Effective Date. The Series 2014B Bonds shall bear interest at 5.5%, payable semiannually, maturing in 5.5 years. The Series 2014B Bonds shall be subject to mandatory redemption from Entrance Fees, as set forth below. |
|---|---|
| | The Series 2014B Bonds will be secured by a first priority lien on Entrance Fees and shall be secured *pari passu* with the Series 2014A Bonds on the other assets of Amsterdam. |
| Series 2014C Bonds | The Series 2014C Bonds (the "***Series 2014C Bonds***") shall be issued in an aggregate principal amount equal to (A) approximately 25% of the then outstanding principal amount of the Bonds as of the Effective Date, plus (B) interest accrued on the Series 2007 Bonds from the Petition Date through the Effective Date at the post-effective restructuring rate of interest; provided that for the Series 2007C Bonds, at 5.9% per annum. |
| | The Series 2014C Bonds shall bear interest at 2%, payable semiannually, but only to the extent of Excess Cash (defined below), in accordance with the Distribution Waterfall (defined below), applied first to accrued interest, then to principal. The Series 2014C Bonds shall mature in 35 years. |
| | Any balance outstanding on the Series 2014C Bonds at final maturity shall be due and payable in full. |
| | The Series 2014C Bonds will be secured by a lien on all assets of Amsterdam subordinate to the lien securing the Series 2014A Bonds and Series 2014B Bonds. |
| Priority/Security | The Series 2014A Bonds and the Series 2014B Bonds will be *pari passu*, secured by a first priority lien on all assets of Amsterdam (except Entrance Fees) and will be senior to the Series 2014C Bonds in repayment and security. The Series 2014B Bonds will have a first priority lien on all Entrance Fees and the Series 2014A Bonds will have a second priority lien on all Entrance Fees. The Series 2014C Bonds will be secured by a lien on all assets of Amsterdam subordinate to the lien securing the Series 2014A Bonds and Series 2014B Bonds. |
| Subordinate Obligations | The $3,000,000 Subvention Certificate to Amsterdam from Amsterdam Continuing Care Health System, Inc., dated March 31, 2004 (the "***Subvention***"), shall be assumed by Amsterdam as part of the Restructuring Transaction and the Plan, and shall continue to be enforceable according to its terms, provided that the Subvention is amended to reflect that no amounts thereon shall be paid until the Series 2014 Bonds are paid in full and it is confirmed that the Subvention has no negative impact on the actuarial analysis relating to the restructuring. |
| Advisory Agreements | The third party services advisors for Amsterdam (which as of the date hereof includes Amsterdam Consulting, LLC, Greystone Development Company II, LP and Greystone Management Services Company, LLC) and the terms and conditions of their respective agreements as of the Effective Date shall be as agreed to by Amsterdam with the reasonable approval of the Trustee. |
| Mount Sinai CCRC Property and Contribution by Sponsor | Amsterdam Continuing Care Health System, Inc. (the "***Sponsor***") understands that subject to the approval of the NYS Department of Health ("***DOH***"), the owner of the property in Mount Sinai, NY intended for development as a CCRC is in negotiations to sell the property to a third party who will assume the obligations under the HEAL Grant issued previously. If DOH agrees to the assignment of the HEAL Grant, upon completion of the sale, neither the Sponsor nor any other Amsterdam affiliate shall have any obligations under the HEAL Grant. |
| | Moreover, neither Amsterdam nor its Sponsor shall engage in any conduct within the within the primary market area or secondary market area of the Amsterdam at Harborside facility that competes with the sales efforts of the Amsterdam at Harborside facility. For the purposes of foregoing, "primary market area" is as defined in the feasibility study prepared |

|  | by Dixon Hughes PLLC in connection with the issuance of the Series 2007 Bonds and "secondary market area" means the area within the following zip codes: 11001, 11003, 11004, 11005, 11010, 11042, 11354, 11355, 11356, 11357, 11358, 11359, 11360, 11361, 11362, 11363, 11364, 11365, 11366, 11367, 11375, 11423, 11426, 11427, 11428, 11429, 11439, 11549, 11550, 11552, 11553, 11554, 11797, 11801 and 11803. |
|---|---|
| **Indenture Held/Amsterdam Held Funds** | |
| **Operating Account** | Upon the Effective Date, Amsterdam shall hold and maintain an operating account (the "***Operating Account***"), which shall be subject to the lien of the Trustee under the 2014 Indenture pursuant to a deposit account control agreement with a depository bank that is reasonably acceptable to the Trustee. The Operating Account shall contain no more than 45 Days Cash on Hand as an unrestricted reserve amount funded as of the Effective Date (the "***Unrestricted Reserve Amount***"). The Unrestricted Reserve Amount may be increased by Amsterdam's share of the Excess Cash received pursuant to the Distribution Waterfall below until the Unrestricted Reserve Amount equals 120 Days Cash on Hand (the "***Unrestricted Reserve Cap***"). |
| **Entrance Fee Fund** | Upon the Effective Date, Amsterdam shall maintain the existing Entrance Fee Fund under the 2014 Indenture. After the Effective Date, pursuant to the 2014 Indenture, all Entrance Fees of Amsterdam shall be required to be deposited in the Entrance Fee Fund until the Series 2014B Bonds are paid in full. <br><br> Entrance Fees will only be transferred from the Entrance Fee Fund after any applicable rescission rights under the Residence Agreements have expired. <br><br> Entrance Fees on deposit in the Entrance Fee Fund shall be applied on a monthly basis as follows: <br><br> 1. To pay any Refunds; <br><br> 2. To replenish the balance of the Operating Reserve Fund and the Operating Account to a combined total of 175 Days Cash on Hand; <br><br> 3. To redeem Series 2014B Bonds in authorized denominations; and <br><br> 4. After payment in full of the Series 2014B Bonds, any remaining Entrance Fee amounts will be transferred to the Revenue Fund (as defined herein) and shall be available to flow through the Distribution Waterfall (as defined herein). |
| **Revenue Fund** | The 2014 Indenture shall establish a Revenue Fund with the Trustee, subject to the lien of the 2014 Indenture, pursuant to which all revenues and other income of Amsterdam (the "***Revenues***"), shall, upon the Effective Date, be deposited into a revenue fund (the "***Revenue Fund***"). Funds from the Revenue Fund shall be withdrawn pursuant to the Distribution Waterfall below. |
| **Operating Reserve Fund** | Upon the Effective Date, Amsterdam shall maintain the existing Operating Reserve Fund with the Trustee, subject to the lien of the 2014 Indenture, and fund such Operating Reserve Fund with an amount such that Amsterdam shall have 130 Days Cash on Hand[5] as of the |

---

[5] The term "***Days Cash on Hand***" means the sum of the amount in the Operating Reserve Fund and the Operating Account (collectively, "***Total Available Cash***") divided by average daily cash expenditures. Average daily cash expenditures is defined as reported expenses per Amsterdam' income statement (including any interest expenses) less depreciation and amortization (the "***Cash Operating Expenses***") for the three (3) months preceding the measurement date multiplied by a multiple of four (4) and divided by 365 days. The Days Cash on Hand will be calculated and reported on a quarterly basis; however, Amsterdam shall produce monthly reports thirty (30) days following each month with respect to the Operating Reserve Fund until the later of Stabilized Occupancy (as defined in the 2014 Indenture) or the payment in full of the Series 2014B Bonds.

| | Effective Date.  The amounts in the Operating Reserve Fund shall be available to Amsterdam for Operating Expenses (as defined herein) including those set forth in the First, Second, and Third of the Distribution Waterfall. |
|---|---|
| **Bond Fund** | Upon the Effective Date, Amsterdam shall establish a Bond Fund (the "***Bond Fund***") under the 2014 Indenture, subject to the lien of the 2014 Indenture, with subaccounts for each series of Series 2014 Bonds.  In accordance with the Distribution Waterfall below, the Bond Fund will receive (i) the monthly payments of principal and interest due and payable under the Series 2014A Bonds and Series 2014B Bonds, and (ii) Excess Cash (as defined below and to the extent provided for in the Distribution Waterfall) with such amounts then being distributed to the holders of the Series 2014C Bonds. |
| **Debt Service Reserve Fund** | Upon the Effective Date, Amsterdam shall establish a Debt Service Reserve Fund (the "***Debt Service Reserve Fund***") under the 2014 Indenture, subject to the lien of the 2014 Indenture to secure payment of the Series 2014A Bonds and Series 2014B Bonds.  All amounts held by the Trustee in the Debt Service Reserve Fund with respect to the Series 2007 Bonds shall be transferred to the new Debt Service Reserve Fund.  The Debt Service Reserve Fund shall not become an asset of Amsterdam, but shall remain funds held by the Trustee for the benefit of the holders of the Series 2014A Bonds and Series 2014B Bonds. The Debt Service Reserve Fund Requirement shall equal (i) until the Series 2014B Bonds are paid in full, Annual Debt Service, which shall be satisfied prior to the commencement of the redemption of the Series 2014B Bonds and (ii) thereafter, Maximum Annual Debt Service. After payment in full of the Series 2014A Bonds and Series 2014B Bonds, the Debt Service Reserve Fund shall secure payment of the Series 2014C Bonds. |
| **Distribution Waterfall** | Upon the Effective Date, all Entrance Fees, including Escrowed Entrance Fees, shall be deposited with the Trustee in the Entrance Fee Fund.  Such amounts, together with the balances of the Operating Account and the Operating Reserve Fund, as of such date, and any Revenues available to Amsterdam at such time, shall be applied in the following order of priority: |

> 1. to pay any Refunds;
>
> 2. to pay all professional fees and expenses incurred in connection with the Restructuring Transaction (including, without limitation, any costs associated with obtaining opinions from bond counsel) subject to an agreed upon budget;
>
> 3. to pay interest on the Series 2007 Bonds accrued and unpaid through the date before the Petition Date (approximately $1,696,996.98 assuming a July 22, 2014 Petition Date);
>
> 4. to fund the Operating Reserve Fund in an amount equal to approximately 130 Days Cash on Hand (approximately $11.1 million);
>
> 5. to fund the Unrestricted Reserve Amount in an amount equal to approximately 45 Days Cash on Hand (approximately $3.9 million); and
>
> 6. to fund the Debt Service Reserve Fund up to the initial Debt Service Reserve Fund Requirement.

Thereafter, all post-Effective Date Entrance Fees and other Revenues of Amsterdam shall be deposited in the Entrance Fee Fund or the Revenue Fund, as applicable; provided, however, that Revenues with respect to any government payor shall be deposited into an account in the name of Amsterdam, and such Revenues shall be swept into the Revenue Fund on a weekly basis.

Subject to the next sentence, amounts on deposit in the Revenue Fund shall be made available to Amsterdam on a monthly basis to satisfy ongoing operations and management costs and expenses of Amsterdam, including, without limitation, any management fees,

budgeted capital expenditures relating to Amsterdam, Refunds and replenishment of any Unrestricted Reserve Amount (collectively, the "***Operating Expenses***").   If an Event of Default (as defined in the 2014 Indenture) shall occur, then the monthly amounts on deposit in the Revenue Fund available for withdrawal to satisfy Operating Expenses shall be made available to Amsterdam in an amount not to exceed the amounts set forth in an operating budget established pursuant to the terms of the 2014 Indenture.

On the first day of each calendar month, monies in the Revenue Fund shall be distributed in the following order of priority (the "***Distribution Waterfall***"):

- First, to transfer to Amsterdam's Operating Account the amount certified by Amsterdam (in a certificate setting forth in reasonable detail the projected application of the amount so certified) as necessary to pay anticipated Operating Expenses for the upcoming month (taking into account any unapplied amount withdrawn for such purpose in a prior month);

- Second, to the Series 2014A Bonds subaccount and the Series 2014B Bonds subaccount of the Bond Fund, in an amount equal to $1/6^{th}$ of the interest due on the next interest payment date;

- Third, to the Series 2014A Bonds subaccount and the Series 2014B Bonds subaccount of the Bond Fund, in an amount equal to $1/12^{th}$ of the principal due on the next principal payment date;

- Fourth, to replenish the balance of the Operating Reserve Fund and the Operating Account to a combined total of 175 Days Cash on Hand;

- Fifth, to replenish any deficiency as of the Effective Date in the Debt Service Reserve Fund necessary to make the amount therein equal the Debt Service Reserve Fund Requirement;

- Sixth, any remaining amounts after application of paragraphs first to fifth above (such remaining amounts referred to as "***Excess Cash***") shall be transferred as follows until the amount in the Operating Account is funded up to the Unrestricted Reserve Cap: 50% to the Operating Account and 50% to the Series 2014C Bonds subaccount of the Bond Fund to redeem Series 2014C Bonds; and thereafter, 100% of the Excess Cash shall be deposited in the Series 2014C Bonds subaccount of the Bond Fund to redeem Series 2014C Bonds;

The foregoing requirement to remit all Revenues into the Revenue Fund shall terminate to the extent (i) Amsterdam's Debt Service Coverage Ratio is greater than 1.30x, (ii) Amsterdam has 250 Days Cash on Hand, (iii) Stabilized Occupancy (as defined in the 2014 Indenture) has been maintained for six consecutive months, and (iv) there is not otherwise a default or Event of Default under the 2014 Bond Documents.  Under such circumstances, all Revenues will instead be transferred to Amsterdam's Operating Account, and Amsterdam shall thereafter be required to make monthly payments of principal and interest, plus replenish any deficiencies in the Debt Service Reserve Fund, as further set forth under the 2014 Indenture.

| **Operating/Financial Covenants** |
| --- |

| **Days Cash on Hand** | Days Cash on Hand requirement of not less than (i) 150 Days Cash on Hand as of each testing date, commencing June 30, 2015, (ii) 175 Days Cash on Hand as of each testing date, commencing on the second testing date following the date the Series 2014B Bonds are paid in full, and (iii) 200 Days Cash on Hand as of each testing date thereafter, commencing on the third testing date following the date the Series 2014B Bonds are paid in full (each such requirement, the "***DCOH Target***").  Amsterdam shall provide reporting of Days Cash on Hand quarterly, the Days Cash on Hand covenant will be tested semi-annually on each June 30 and December 31 (each, a "***Testing Date***"). |
| --- | --- |

| | |
|---|---|
| **Additional Permitted Indebtedness** | Amsterdam shall not be permitted to issue any additional indebtedness except for (i) Capitalized Leases not to exceed $1,000,000 in the aggregate, (ii) refunding indebtedness pursuant to terms and conditions acceptable to a majority of Series 2014 Bondholders, (iii) indebtedness relating to the financing of construction of additional independent living units not to exceed 71 units ("Phase II"), provided that prior to the incurrence of such indebtedness, (A) at least ninety-two percent (92%) of the independent living units in the existing Project are occupied or reserved with ten percent (10%) deposits, (B) at least seventy percent (70%) of the independent living units to be constructed as Phase II have been reserved with executed Residence Agreements and deposits at least equal to ten percent (10%) of the Entrance Fee shall have been received for such units; (C) there is a guaranteed maximum price or stipulated construction contract for Phase II; (D) the Cumulative Cash Loss or Debt Service Coverage Ratio (as applicable) and the Liquidity Covenant were met on the most recent evaluation date, (E) all required deposits have been made into the Operating Reserve Fund, (F) a Consultant's forecast shows that the Debt Service Coverage Ratio for the two (2) Fiscal Years following the completion of Phase II will be at least 1.25 and the Days' Cash on Hand at the end of the first Fiscal Year in which the average occupancy of such Independent Living Units is forecasted to reach eighty-five (85%) will be at least 200 and (G) concurrently with the issuance of such indebtedness, Amsterdam shall redeem at least twenty (20) percent of the original principal amount of the Series 2014C Bonds. |
| **Cumulative Cash Loss Covenant** | Amsterdam shall have a Cumulative Cash Loss no greater than the amount set forth in a Schedule to be agreed upon by the Steering Committee and Amsterdam for the prior fiscal quarter. |
| **Debt Service Coverage Ratio** | Commencing with the earlier of (i) the first fiscal year following achievement of Stabilized Occupancy (as to be defined in the 2014 Indenture) and (ii) the fiscal quarter ending December 31, 2016 (the "***Initial Testing Date***"), Amsterdam shall achieve a debt service coverage ratio of not less than (a) 1.10x from the Initial Testing Date until December 31, 2017 and (b) 1.20x thereafter, which ratio shall be measured (i) on a rolling four quarter basis, commencing on the Initial Testing Date and each fiscal quarter thereafter through the fiscal quarter ending December 31, 2017, and (ii) on an annual basis, at the end of each fiscal year, thereafter.  This ratio will include net Entrance Fees (i.e., Entrance Fees, but not Initial Entrance Fees, received during such period minus Entrance Fees refunded during such period) in the numerator and the denominator will be Maximum Annual Debt Service on the Series 2014A Bonds and the Series 2014B Bonds. |
| **IL Occupancy Covenants** | Commencing with the first fiscal quarter following the Effective Date, Amsterdam will have occupied independent living ("IL") units equal to or above the levels set forth for the prior fiscal quarter in the projections to be agreed upon by the Steering Committee and Amsterdam (the "***IL Occupancy Covenant***").  Amsterdam shall achieve 92% occupancy of IL units no later than 18 months after the Effective Date (the "***IL Target Covenant***"). |
| **Assisted Living and Nursing Center Occupancy Covenants** | Commencing with the first fiscal quarter following the Effective Date, Amsterdam shall achieve and maintain (i) a 90% occupancy level for Assisted Living ("***AL***") units and (ii) an 85% occupancy level for Nursing Center ("***NC***") units, which shall be measured as the average occupancy of the AL and NC units, as applicable, during such fiscal quarter (the "***AL/NC Occupancy Covenant***"). |
| **Failure to meet covenants** | (i)  If Amsterdam fails to meet the Cumulative Cash Loss Covenant, the Days Cash on Hand, the AL/NC Occupancy Covenant or the Debt Service Coverage Ratio as of any testing date, then upon the first occurrence of such non-compliance, Amsterdam shall be required to retain a management consultant acceptable (which approval shall not be unreasonably withheld) to the holders of not less than a majority of the outstanding aggregate principal amount of the Series 2014A Bonds and the Series 2014B Bonds (each treated as separate class), to provide a report and improvement plan to the Trustee. |

| | |
|---|---|
| | (ii)  If Amsterdam fails to meet the Cumulative Cash Loss Covenant, the Days Cash on Hand or the Debt Service Coverage Ratio by the end of the second quarter after the report and improvement plan are provided, Amsterdam shall, at the direction of the holders of not less than a majority of the outstanding aggregate principal amount of the Series 2014A Bonds and the Series 2014B Bonds (each treated as separate class), replace the management services advisor with an advisor acceptable to such holders. |
| | (iii)  If Amsterdam fails to meet the Cumulative Cash Loss Covenant, the Days Cash on Hand, the AL/NC Occupancy Covenant or the Debt Service Coverage Ratio for two consecutive testing dates, then such non-compliance will constitute an Event of Default under the 2014 Indenture.  If on any testing date after the Initial Testing Date, the Debt Service Coverage Ratio is 1.0x or below or the Days Cash on Hand is equal to or less than 130, it shall constitute an Event of Default under the 2014 Indenture. |
| | (iv)  Same remedies in (i) or (ii) above will apply for failure to meet the IL Occupancy Covenant or the IL Target Covenant, provided that Amsterdam shall be required to hire a marketing consultant in lieu of a management consultant and shall, at the direction of the holders of not less than a majority of the outstanding aggregate principal amount of the Series 2014A Bonds and the Series 2014B Bonds (each treated as separate class), replace the marketing agent in lieu of the management services advisor. Furthermore, if there is no acting marketing agent, Amsterdam shall be required to hire a marketing agent acceptable to the Trustee. |
| **Reporting Requirements** | |
| **Reporting** | Amsterdam shall deliver monthly financial statements (including a balance sheet, an income statement, an escrow statement and a cash flow statement) and a monthly report on marketing, occupancy and sales within 45 days following the prior month end comparing actual results to budget and shall include an explanation of variances of more than 10% from budgeted amounts.  Such financial statements shall also include an Entrance Fee analysis.<br><br>Amsterdam shall enter into a new Continuing Disclosure Agreement providing for the same reporting as required by the existing Continuing Disclosure Agreement (in addition to the information required above), except for any amendments thereto required to reflect changes to Rules 15c2-12. |
| **Update Calls** | Until the later of Stabilized Occupancy (as defined in the 2014 Indenture) or the first year from the Effective Date, Amsterdam shall hold monthly calls for holders of the Series 2014 Bonds.  After such time, Amsterdam shall hold quarterly calls. |
| **General Provisions** | |
| **Marketing and Development Fees** | Subsequent to the Effective Date of the restructuring, any fees that become due under the marketing and development advisory services agreement will be paid as they become due as follows:<br><br>•  Pro rata at each 5% occupancy increment to 90% – $33,579 per increment, 85% and 90% remaining; and<br><br>•  Milestone payment for achievement of 90% occupancy – $302,214.50 to be paid upon achievement of 90% occupancy and $302,214.50 to be deferred and paid upon the earlier of (i) termination of Greystone and (ii) achievement of 92% occupancy.<br><br>Of the amount earned and deferred as of the date hereof (totaling approximately $772,324) the following payment terms would apply: |

| | |
|---|---|
| | • $522,324 to be paid on Effective Date; <br><br> • $250,000 to be deferred and paid upon the earlier of (i) termination of Greystone and (ii) payment in full of the Series 2014B Bonds; and <br><br> • Of the $250,000 deferred, the amount owed will be reduced by approximately 1/6 for each month that achievement of 90% occupancy falls behind the date in the projections for the restructuring.  [i.e. if the projections show achievement of 90% in February 2015 and we achieve it in April 2015, the $250,000 would be reduced for 2 months delayed achievement (or 1/3)] |
| **PILOTs** | The Payment in Lieu of Taxes Agreement, as amended by the First Amendment to the Payment in Lieu of Taxes Agreement dated as of June 1, 2014 (providing for the extension of the current taxation rate) shall be assumed by Amsterdam as part of the Plan. |
| **New 2014 Bond Documents** | The 2014 Bond Documents shall be prepared or, as applicable, amended and modified in a manner necessary to effectuate the Restructuring Transaction.  The 2014 Bond Documents and other agreements governing the Restructuring Transaction shall provide, inter alia, that (i) Amsterdam shall incur no new indebtedness without the consent of the holders of at least 66% in the principal amount of Series 2014A Bonds and Series 2014B Bonds (each treated as a separate class), except for new indebtedness set forth in (ii) hereof, (ii) Amsterdam shall be permitted to incur additional indebtedness, subject to certain additional bonds tests to be determined, (a) for the purpose of constructing additional units at The Amsterdam at Harborside facility and (b) of up to $1 million total for capital leases; (iii) except as provide herein, shall contain all of the existing covenants, defaults and provisions and (iv) such additional provisions as acceptable to the Steering Committee and consistent with the Term Sheet. |
| **Release/Exculpation** | The Restructuring Transaction contemplated by the Term Sheet shall contain customary release, injunction and exculpation provisions for all Parties to the Restructuring Transaction to the extent available under applicable law. The Parties hereby agree that they will use respective best efforts to obtain approval of such release, injunction and exculpatory provisions, which by way of example only shall include opposing any effort by any person or entity that is not a Party to this Term Sheet to eliminate or reduce the scope of such release, injunction and exculpation provisions. |
| **Binding Effect** | The obligation of each of the undersigned parties to pursue the Restructuring Transaction in accordance with the terms hereof is subject to (i) the negotiation, execution and delivery of mutually acceptable final documentation, (ii) receipt of all necessary consents, including any consent of any party's credit or other committee or board of directors and any regulatory approvals, (iii) receipt of a satisfactory tax opinion confirming that the interest on the 2014 Bonds will be excluded from gross income for federal income tax purposes under the Internal Revenue Code, and (iv) confirmation of the Plan pursuant to an order of confirmation acceptable to Amsterdam and the Trustee. |
| **Cash Collateral Order** | The Trustee shall enter into a cash collateral agreement ("***Cash Collateral Agreement***") with Amsterdam upon the commencement of Anticipated Bankruptcy Proceeding that shall (i) permit Amsterdam to use cash collateral, subject to agreed upon budgets, (ii) provide that Amsterdam may requisition funds from the Entrance Fee Fund in an aggregate amount not to exceed $2,220,000 during the Anticipated Bankruptcy Proceeding to pay Refunds then due and owing, provided that Amsterdam shall only be permitted to requisition such funds after it has expended $2,350,000 on Refunds during the Anticipated Bankruptcy Proceeding from Amsterdam's current operating accounts; and (iii) provide that all Entrance Fees received during the Anticipated Bankruptcy Proceeding be held in escrow and subordinating any rights or liens of the bondholders of the Bonds to the rights of any resident/payor of such escrowed Entrance Fees, subject to the occurrence of the Effective Date; provided that the Trustee shall retain its first priority lien against the Debtor's interest in such funds. As further adequate protection, |

| | |
|---|---|
| | Amsterdam shall acknowledge that the Debt Service Reserve Fund and the Entrance Fee Fund are not property of Amsterdam's bankruptcy estate and the Trustee shall be entitled to utilize such funds in accordance with the terms of the 2007 Indenture and other applicable documents related to the Series 2007 Bonds without further order of the Court. Any Refunds that become due and payable during the Anticipated Bankruptcy Proceeding in excess of the amounts in (ii) above may be paid from amounts in the Entrance Fee Fund at the sole discretion of the Steering Committee. |
| **Miscellaneous** | This Term Sheet shall be governed by the laws of the State of New York.<br><br>This Term Sheet may be executed in one or more counterparts, and when all counterparts have been executed, each executed counterpart will have the force and effect of the original. |
| **Timeline** | The Restructuring Transaction contemplated by the Term Sheet shall proceed as soon as practicable following approval of this Term Sheet and any supporting documentation by Amsterdam and the Trustee (the "***Parties***").  The Parties agree that after such date, they shall use their best efforts to adhere to the following timeline:<br><br>1.  June 16 – Exchange of drafts of the principal Bankruptcy Documents and 2014 Bond Documents;<br><br>2.  July 17 – Finalize terms of the agreed Bankruptcy Documents and 2014 Bond Documents, and execution of Plan Support Agreement<br><br>3.  July 21 – Petition Date (filing of Plan, Disclosure Statement, cash collateral motion, and first days)<br><br>4.  August 22 – Entry of interim cash collateral order;<br><br>5.  September 8 – Entry of final cash collateral order, and approval of Disclosure Statement;<br><br>6.  September 9 – October 23 – Solicitation of Plan (mailing date through voting deadline);<br><br>7.  October 24 – Confirmation of Plan; and<br><br>8.  November 28 – Effective Date. |

**Schedule 1**
**Series 2014A Bonds**

| Principal Amount | Maturity (January 1) | Interest Rate |
|---|---|---|
| $6,255,000 | 2023 | 5.875% |
| $21,123,750 | 2032 | 6.500% |
| $6,375,000 | 2034 | 6.500% |
| $95,910,000 | 2049 | 6.700% |
| $11,921,250 | 2049 | 6.700% |

**Schedule 2**
**Series 2014A Bonds**

The Series 2014A Bonds shall be subject to mandatory sinking fund redemption by the Agency prior to maturity, as selected by the Trustee, on January 1 of each of the years and in the principal amounts set forth below, at a Redemption Price equal to 100% of the principal amount thereof, together with interest accrued to the date of redemption:

| Mandatory Sinking Fund Redemption (January 1) | $6,255,000 Series 2014A Bonds maturing January 1, 2023 | $21,123,750 Series 2014A Bonds maturing January 1, 2032 | $6,375,000 Series 2014A Bonds maturing January 1, 2034 | $95,910,000 Series 2014A Bonds maturing January 1, 2049 | $11,921,250 Series 2014A Bonds maturing January 1, 2049 |
|---|---|---|---|---|---|
| 2019 | $1,418,934 | | | | $123,524 |
| 2020 | 1,502,297 | | | | 131,800 |
| 2021 | 1,590,556 | | | | 140,631 |
| 2022 | 1,684,002 | | | | 150,053 |
| 2023 | 59,211 | $1,723,726 | | | 160,106 |
| 2024 | | 1,887,685 | | | 170,833 |
| 2025 | | 2,010,384 | | | 182,279 |
| 2026 | | 2,141,059 | | | 194,492 |
| 2027 | | 2,280,228 | | | 207,523 |
| 2028 | | 2,428,443 | | | 221,427 |
| 2029 | | 2,586,291 | | | 236,263 |
| 2030 | | 2,754,400 | | | 252,092 |
| 2031 | | 2,933,437 | | | 268,982 |
| 2032 | | 378,097 | $2,746,013 | | 287,004 |
| 2033 | | | 3,327,177 | | 306,233 |
| 2034 | | | 301,810 | $3,241,633 | 326,751 |
| 2035 | | | | 3,773,767 | 348,643 |
| 2036 | | | | 4,026,610 | 372,002 |
| 2037 | | | | 4,296,393 | 396,926 |
| 2038 | | | | 4,584,250 | 423,521 |
| 2039 | | | | 4,891,396 | 451,896 |
| 2040 | | | | 5,219,120 | 482,173 |
| 2041 | | | | 5,568,800 | 514,479 |
| 2042 | | | | 5,941,910 | 548,949 |
| 2043 | | | | 6,340,017 | 585,729 |
| 2044 | | | | 6,764,798 | 624,973 |
| 2045 | | | | 7,218,040 | 666,846 |
| 2046 | | | | 7,701,649 | 711,524 |
| 2047 | | | | 8,217,660 | 759,196 |
| 2048 | | | | 8,768,242 | 810,063 |
| 2049 | | | | 9,355,715 | 864,337 |